## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Civil Case Number:_____

Michael Christopher Adderley

(Write the full name of the plaintiff)

vs.

Gloria Ego, Michael Ahearn, Ivelisse Negron
Edmund Haskins, Rachel Kuhl, Destiny
Murray, John Jorden, Claudette Vanni
Mark Speiser, Deborah Anthony

(Write the full name of the defendant/s in this case)

## COMPLAINT UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983

**I. Party Information**

**A.** Plaintiff: Michael Christopher Adderley

Address: 464 NW 2 Terrace

Inmate/Prison No.:_____

*Year* of Birth:_____(Do <u>not</u> include day or month, pursuant to Fed. R. Civ. P 5.2)

(Write your name, address and prison/inmate number, if applicable)

vs.

**B.** Defendant: _____   Defendant:_____

Official Position:_____   Official Position:_____

Place of Employment:_____   Place of Employment:_____

(Write the full name of each defendant, official position and place of employment. Attach a separate page if you need additional space for additional defendants. )

Page 1

Defendants 

# **ATTORNEYS**

**Michael G Ahearn**
Bar Number:120855
Mail Address:

Michael G. Ahearn
2850 N Andrews Ave
Wilton Manors, FL 33311-2514

Office: **954-563-1716**
Cell: **954-563-1716**

**Claudette Renee Vanni**

Bar Number:188451
Mail Address:

Broward County Courthouse
201 SE 6th St Ste 933
Fort Lauderdale, FL 33301-3344

Office: **954-831-7572**

**Edmund MacBryde Haskins**
Bar Number:69034
Mail Address:

Office of General Counsel - DCF
201 W Broward Blvd Ste 502
Fort Lauderdale, FL 33301-1839

Office: **954-467-4551**

**Rachel Beth Kuhl**
Bar Number:50951
Mail Address:

The Law Offices of Rachel B. Kuhl, P.A.
1830 N University Dr # 113
Fort Lauderdale, FL 33322-4114

Office: **954-908-5142**

Page 2

Cell: **954-559-1203**

**John G Jordan**
Bar Number:162847
Mail Address:

John G. Jordan P. A.
2787 E Oakland Park Blvd Ste 416
Fort Lauderdale, FL 33306-1652

Office: **954-772-8222**

# <u>Individuals</u>

Ivelisse Negron
Family Support Specialist
325 Superior Ave., Rm. 38
Cleveland, OH 44114

Destiny Murray
1400 W Commercial Blvd 2nd Floor,
Fort Lauderdale, FL 33309

Gloria Ego
7378 W Atlantic Blvd Margate, FL 33063

Deborah Anthony
P O BOX 668304
Pompano Beach, FL 33066
&
Glachman & Brill P.A.
6421 Congress Ave. Suite 120
Boca Raton, FL 33487

## II. Statement of Claim

Briefly describe the facts of your case.  Describe how each defendant is involved, names of other persons involved, and dates and pl aces.  Each claim  should be stat ed in a separately num bered paragraph.  Please use short and plain statements, with separately numbered paragraphs indicating why the relief requested should be granted.  Do not include legal arguments or cite cases or statutes. Attach additional pages, if necessary.

_See Attachment_

## III. Relief Requested

Briefly state what you are requesting from the Court (what do you want the Court to do).  Do not include legal arguments or cite cases or statutes. Attach additional pages, if necessary.

_See Attachment_

_____

_____

## IV. Jury Demand

Are you demanding a jury trial?          ✓ Yes          _____ No

Signed this _____ 18 _____ day of _____ Sept _____ , 20 20

_____
Signature of Plaintiff

I declare under penalty of perjury that the foregoing is truce and correct.

Executed on: 9 / 18 / 2020 _____

_____
Signature of Plaintiff

# <u>Table of Content</u>

| <u>Items</u> | <u>Pages</u> |
|---|---|
| Claim  - | 1-5 |
| Exhibit A - | 6-13 |
| Exhibit B - | 14-27 |
| Exhibit C - | 28-38 |
| Exhibit D - | 39-42 |
| Exhibit E-1 - | 43-46 |
| Exhibit E-3 - | 47-134 |
| Exhibit E-4 - | 135-166 |

5 pages

## CLAIM/ RELIEF

Background of my injuries

In 1991, I was in a severe car accident in where my right knees, back and neck was injured.  I was shot twice in 1997 in Jersey City, NJ; where one bullet entered my upper back on my right side and existed from the lower right side and the second shot went through my left forearm. I was in a multiple car accident with my grandmother, Dorothy Jones, in 2014 on the 95 freeway and was notified then that I had spine (Thoracic spine and two Bulged Disc) and neck injuries (C4 and C6); along with signs of arthritis. From 2013- 2015, I worked at FEDEX as a grounds worker in a hot environment; grabbing heavy material on a continuous basis during that time. Many times I had to leave working in 2015 due to heavy loss of salt and my muscles would lock up and I started to become physically ineffective to preform work duties; my body started rejecting my abilities to lift heavy objects. I was awarded my disable by the Social Security Administration on August 11, 2020, in which, I filed in 2017 and 2018.

# CLAIM

Around September 06, 2017 I purchase some materials from Home Depot for hurricane protection purposes. I had two plywood boards installed on the front of the property only to protect myself and the house from Hurricane Irma which I am allowed to do so, as the rest of the window had storm shutters. The events dated below contributed to me becoming physically disabled; as I have limited function abilities from previous injuries and based on perjury; but also placing me in harms way intently for financial gain with cruel and unusually punishment and the judge allowed it. **See Exhibit A under email exchange 1**

On this day 09/20/2017

The court appointed guardian **Gloria Ego** and her attorney **Michael Ahearn** violated my civil right by depriving me of my of civil rights by presenting false allegation of assault to the judge to have me remove from my home at 2114 NW 5 Street Pompano Beach, FL. 33069 without a police report or a hospital report. The judge considered their claim and court ordered me to be remove from my home at 2114 NW 5 Street Pompano Beach, FL. 33069 and interfered with my daughter's child custody case which took place before my grandmother's mental health case.

On this day 09/20/2017

The attorney of the court appointed guardian **Michael Ahearn** violated my civil right by depriving me of my of civil rights by presenting false allegation of assault to the judge to have me remove from my home at 2114 NW 5 Street Pompano Beach, FL. 33069 without a police

M7

# Social Security Administration
## Retirement, Survivors, and Disability Insurance
Notice of Award

Office of Central
Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date: August 23, 2020
BNC#: 20M1949F41958-A



0001568 00015506     3 MB  0.439 0818M0CTR7PI T64 P11
MICHAEL C ADDERLEY
464 NW 2ND TERRACE
DEERFIELD BEACH, FL   33441-1936

You are entitled to monthly disability benefits beginning
May 2019.

**The Date You Became Disabled**

We found that you became disabled under our rules on
November 9, 2018.

The date we found you disabled is different from the date you
gave us on the application.

To qualify for disability benefits, you must be disabled for
five full calendar months in a row.  The first month you are
entitled to benefits is May 2019.

**What We Will Pay And When**

We pay Social Security benefits for a given month in the next
month.  For example, we pay Social Security benefits for March
in April.

- You will receive ████████ around August 23, 2020.

- This is the money you are due for May 2019 through
  July 2020.

Your next payment of ████████ which is for August 2020, will be
received on or about the fourth Wednesday of September 2020.

- After that you will receive ███████ on or about the fourth
  Wednesday of each month.

- Later in this letter, we will show you how we figured these
  amounts.

- The day of the month you receive your payments depends on
  your date of birth.

SEE NEXT PAGE

2

report or a hospital report. The judge favored their claim and court ordered me to be remove from my home at 2114 NW 5 Street Pompano Beach, FL. 33069 and interfered with my daughter's child custody case which took place before my grandmother's mental health case.

"Link to case number CV60440."

The civil rights complaints is linked to how my grandmother, Dorothy Jones, was taking from her home illegally with a false report by Department of Children and Family – Adult Protective Service who provide the court with a false report of Mrs. Jones metal evaluation by, Jason Osborne, someone who is not certified with the State of Florida to practice **see Exhibit B**; perjury by Department of Children and Family – Adult Protective Service Investigators (Ivelisse Negron and Destiny Murray) and attorney Edmund Haskins, who never gave me a referral while my grandmother was in the hospital; along with the Magistrate, Claudette Vanni and misrepresentation by Rachel Kuhl court pointed attorney and did not present nothing upon Dorothy Jones behave towards her daughter Deborah Anthony and how Mrs. Jones was being taking advantage of financially by her daughter, **see Exhibit C**. Deborah Anthony is the individual who made false claim of negligence against me and the General Inspector in Tallahassee, Florida clear me of any claims of abuse, negligence, and exploitation with various reports, but refuse to investigate the claims of negligence reported by Deborah Anthony. **see Exhibit D** The outcome of the hearings also contributed to my injuries, because Dorothy Jones would have been home as the court started out to do so, then changed based on perjury. **see Exhibit E** case number PRC 16-4508.

The outcome of the hearings also contributed to my injuries, because Dorothy Jones would have been home as the court started out to do so, then changed based on perjury under Exhibit B, and I would not have been force out illegally nor lifting heavy furniture and heavy items that I am not supposed to be touching. I had to ask for additional time, as I was hurting and was forced to ice my back and neck up for months due to severe pain and inflammation against my nerves and bone.

Family members are not being allowed to visit or call my grandmother, Dorothy Jones, who raised me and my brother Nick Adderley and her family who misses and loves her. This is the same way Deborah Anthony had the visitation and phone call arrangements at St. John Rehab Facility while stealing thousands of Mrs. Jones money on towards Mrs. Anthony personal business and not for the well-being of my grandmother. I have a restraining order against my mother, Deborah Anthony, who keeps calling false reports against me and threaten me with a gun.

# <u>RELIEF</u>

1. Release of Dorothy Jones immediately.
2. Restoration of Dorothy Jones.
3. Return of all Dorothy Jones properties and funds (Assets); (Reimbursements).
4. Restoration of Michael Adderley at 2114 NW 5 Street.

3

5.  Rehab for Dorothy Jones (Oral and Physical).
6.  Termination of **Judge Speiser** (The employee of the Broward County Courthouse (Family Court) for violation of civil right against Dorothy Jones and Michael Adderley; and for showing favoritism towards Deborah Anthony, the person whom Mrs. Jones did not wanting to make decision for her and for purposely ignoring evidence).
7.  Termination of **Magistrate Vanni** (The employee of the Broward County Courthouse (Family Court) for violation of civil right against Dorothy Jones and Michael Adderley; and for showing favoritism towards Deborah Anthony, the person whom Mrs. Jones did not wanting to make decision for her and for purposely ignoring evidence).
8.  Termination of **Ivelisse Negron** (The employee of Department of Children and Family (Adult Protective Service)).
9.  Termination of Practice **Edmund Haskins** (The employee of Department of Children and Family (Counselor))
10. Termination of **Rachel Kuhl** (The employee of the Broward County Courthouse (Court Pointed Attorney))
11. Termination of **Destiny Murray** (The employee of Department of Children and Family)
12. Termination of Practice **Gloria Ego** (The court appointed guardian)
13. Termination of **Michael Ahearn** (The attorney of the court appointed guardian)
14. Termination of **John Jordan (**The employee of the Broward County Courthouse (Court Pointed Attorney)
15. Termination of **Charmaine Hamilton**
16. Arrest of highlighted names under resignation for the assisting in the kidnapping of Dorothy Jones and Aiyanna Adderley and names assigned to the case that have real estate or financial certification link to their attorney profession. (Dorothy Jones needed an attorney pertaining to her health and not her assets.)
17. $6,000,000.00 Lawsuit for lost, damages, and punitive damages against the Department of Children and Family for violation of Depriving of Civil Rights **42 U.S.C. § 1983.** (Notified DCF Inspector several times and they did nothing; and notified DCF for exploitation and elderly abuse against the court appointed guardian, Gloria Ego, and DCF for violation of civil right against Dorothy Jones, John Butts, and Michael Adderley; and for showing favoritism to Deborah Anthony, the person whom Mrs. Jones did not wanting to make decision for her and for purposely ignoring evidence).
18. $2,000,000.00 Lawsuit for lost damages, and punitive damages against **Northwest Medical Center Hospital by administration** for violation of Depriving of Civil Rights **42 U.S.C. § 1983,** and would not acknowledge Dorothy Jones who signed a right to refusal twice to leave to the hospital for rehab. Facility, as Mrs. Jones wanted to have her rehab at the hospital and return home as the magistrate order on 8/10/16, and she never received a walker to help her with her stability to stay stable while walking.
19. $3,000,000 Lawsuit against the Broward County Courthouse for not providing resource for this case.
20. $3,000,000 Lawsuit against the guardian, Gloria Ego for lost, damages, and punitive damages.

4

21. $3,000,000 Lawsuit against guardian's attorney, Michael Ahearn, for lost, damages, and punitive damages.
22. $3,000,000 Lawsuit against Magistrate Vanni for lost, damages, and punitive damages.
23. $3,000,000 Lawsuit against Judge Speiser for lost, damages, and punitive damages.
24. $2,000,000 Lawsuit against Glachman & Brill, P.A. for lost, damages, and punitive damages.
25. Paying for Michael Adderley's attorney fees (Summer Horton), which is severely overdue because of the negligence by Gloria Ego and Deborah Anthony.
26. Paying for Michael Adderley's car payment, which is severely overdue because of the negligence by Gloria Ego and Deborah Anthony.
27. Paying for Michael Adderley's storage fee (Lost everything in both storage units – Value Store It, which is severely overdue because of the negligence by Gloria Ego and Deborah Anthony.
28. Paying for my Hospital bill (2016 Hospitalize at Northwest Medical Center), which is severely overdue because of the negligence by Gloria Ego and Deborah Anthony.
29. Damaged my back during the week of my removal at 2114 NW 5 Street Pompano Beach FL., 33069 (Sept. 20, 2017), which is severely overdue because of the negligence by Gloria Ego and Deborah Anthony.
30. Inventory List of what was spent and purpose which the judge and magistrate was allow to order.
31. Giving Deborah Anthony Mental and Emotional Assistance due to her action against her family. (Family doesn't want to press any charges on Deborah Anthony, nor Brandi Roland.)
32. Civil Action Lawsuit against Northwest Medical Center (Margate, Florida)
33. Medicare investigation (Fraud)
34. SSI investigation (Fraud)
35. VA investigation (Fraud)
36. Close down Lamercie Home Facility
37. Arrest of Lamercie Home Facility members involved with the assist of violations (no court order no permitting visitation and calls to Dorothy Jones).
38. The family request that a full federal investigation be conducted against all parties highlighted names under resignation for previous cases, as there may be other family victims.

9/18/2020

_____

Michael Adderley

5

## 8 pages

# EXHIBIT A

## Emails

# Hurricane Irma Protection

Michael Adderley – 2114 NW 5 Street, Pompano Beach, FL. 33069





yahoo!mail gloria ego Michael Adderley Account Info Go Sign Out Home

Inbox Contacts Notepad Calendar Switch to the newest Yahoo Mail

Compose

Back to Search Delete Spam Actions Apply

Inbox 999+
Drafts 109
Sent
Archive
Spam
Trash

Folders Edit Hide
+ New folder

spokeo.com Search Anyone, Anywhere - We Found

**Gloria Ego** Sep 7, 2017 at 12:36 PM
To: adderley_ccpbcdc@yahoo.com
Michael Ahearn, Esquire

Mr. Adderley:

I have been trying to contact you via multiple texts and voice mail, all of which remain unanswered.

Please note that I am sending someone to the house as I write this email, for the purpose assessing the home for storm preparation.

Regards,
Gloria A. Ego
Guardian for Dorothy Jones

--
*Gloria A. Ego, PG, CSA*
*Your Senior Matters, Inc.*
*7378 W. Atlantic Blvd., PMB 222*
*Margate, FL 33063-4214*
*Telephone: 954-675-9201*
*Facsimile: 954-933-1620*

This Email and Attachments, if any, contains information which is confidential and/or legally privileged. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents herein is strictly prohibited. If you have wrongfully received this message and the following attachments, if any, it is respectfully requested that they be destroyed and erased as soon as possible.

Apple Mac mini 2.3GHz Core i5 (Mid...

$259
Processor 2.3GHz dual-core Intel Core i 5 processor
Memory 4.0GB (2x 2.0GB).

Compose Delete Spam Actions Apply

7

spokeo.com          Search Anyone, Anywhere - We Found

**Gloria Ego**                                        Sep 7, 2017 at 3:35 PM
adderley_ccpbcdc@yahoo.com
Michael Ahearn, Esquire

Mr. Adderley

I just received a telephone call from the one and only contractor I could find this late date, who could secure your grandmother's home in preparation for the storm.

He stated that you practically assaulted him while telling him to leave the property, in addition to throwing some of the materials over the fence.

I am including Attorney Ahearn in this email

On Thu, Sep 7, 2017 at 12:36 PM, Gloria Ego < yourseniormatters@gmail.com > wrote:

Mr. Adderley:

I have been trying to contact you via multiple texts and voice mail, all of which remain unanswered.

Please note that I am sending someone to the house as I write this email, for the purpose assessing the home for storm preparation.

Regards,
Gloria A. Ego
Guardian for Dorothy Jones

Gloria A. Ego, PG, CSA
Your Senior Matters, Inc.
7378 W. Atlantic Blvd., PMB 222
Margate, FL 33063-4214
Telephone: 954-675-9201
Facsimile: 954-933-1620

This Email and Attachments, if any, contains information which is confidential and/or legally privileged. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents herein is strictly prohibited. If you have wrongfully received this message and the following attachments, if any, it is respectfully requested that they be destroyed and erased as soon as possible.

--
Gloria A. Ego, PG, CSA
Your Senior Matters, Inc.
7378 W. Atlantic Blvd., PMB 222
Margate, FL 33063-4214
Telephone: 954-675-9201
Facsimile: 954-933-1620

This Email and Attachments, if any, contains information which is confidential and/or legally privileged. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents herein is strictly prohibited. If you have wrongfully received this message and the following attachments, if any, it is respectfully requested that they be destroyed and erased as soon as possible.

**Apple Mac mini 2.3GHz Core i5 (Mid...**

$259

Processor 2.3GHz dual-core Intel Core i 5 processor Memory 4.0GB (2x 2.0GB)..

**Shop now**

Mac of All Trades



yahoo/mail

michael ahearn

Michael Adderley | Account info | Go | Sign Out | Home

Inbox | Contacts | Notepad | Calendar | Switch to the newest Yahoo Mail

Compose

Inbox 999+
Drafts 109
Sent
Archive
Spam
Trash

Folders | Edit | Hide
+ New folder

Compose

← Back to Search | ↩ ↩ → | Delete | Spam | Actions ▾ | Apply | ✕

beenverified.com    See Records On Your Name - We Found

**Michael Adderley**
EsqMichael Ahearn

Sep 18, 2017 at 8:26 PM

I don't know what he told you, but there were witnesses here that saw everything...I don't get it...
-------------------------------------
On Mon, 9/18/17, Michael Ahearn, Esq <mgaesq@yahoo.com> wrote:

Subject: Re: Dorothy Jones Health Services
To: "Michael Adderley" <adderley_ccpbcdc@yahoo.com>
Cc: "Gloria Ego" <yourseniormatters@gmail.com>
Date: Monday, September 18, 2017, 8:06 PM

We shall see what the Judge says.
You don't get it. That house is not yours. it belongs to
the guardianship and you have no right to live there and
there is no good reason to not sell it since Ms. Jones is
never going back there. If you want to make everything a
fight, feel free, all you are going to do is cause me to
run up attorneys fees and cost your grandmother her
remaining assets.

Sincerely

Michael G. Ahearn, Esq

Sent from my iPad

>
On Sep 18, 2017, at 7:58 PM, Michael Adderley <adderley_ccpbcdc@yahoo.com>
wrote:
>
> If there
is no police report then it's not true....slandering my
name is not right and illegal as you know...
>
-------------------------------------
> On Mon, 9/18/17, Michael Ahearn <mgaesq@yahoo.com>
wrote:
>
> Subject:
RE: Dorothy Jones Health Services
> To:
adderley_ccpbcdc@yahoo.com
> Cc: "Gloria Ego"
<yourseniormatters@gmail.com>
> Date: Monday, September 18, 2017, 3:59
PM
>
> Mr. Adderley
As you are aware there is a
> hearing
before Judge Speiser regarding Ms. Jones on
> September 20  per the attached Notice of
Hearing.  Please be advised that I due
>
to your harassment and threats of violence towards the
> worker my client hired to secure the
residence before the
> storm, I am going
to Petition the Court to ban you from the
> property. The Petition to ban you from the
property will be
> filed tonight or
tomorrow and once filed I will email you a
> copy. Furthermore in the next week or so,

Apple Mac
mini 2.3GHz
Core i5 (Mid...

$259

Processor 2.3GHz dual-
core Intel Core i 5
processor Memory
4.0GB (2x 2.0GB).

**Shop now**

Mac of
All
Trades

Case 0:20-cv-61935-RS   Document 1   Entered on FLSD Docket 09/23/2020   Page 18 of 181



my client will
> Petition the Court to
list the property for sale.   Sincerely
> Michael G. Ahearn, Esq

.

*10*

Hurricane Tools



Board front window





12





Board front two windows

Pages 14

EXHIBIT B



**CONFIDENTIAL**
**INVESTIGATIVE SUMMARY (IS)**
Adult In-Home Investigation
(without Reporter Information)

| Case Name<br>Jones, Dorothy | Intake Number<br>2016-140676-01 | Investigative Sub-Type<br>In-Home | County<br>Broward |
|---|---|---|---|
| Date/Time Intake Received<br>05/19/2016 1:01 PM | | Protective Investigator<br>Infante, Deyron | |
| Date/Time Investigation Closed<br>06/10/2016 3:15 PM | | Protective Investigator Supervisor<br>NOBLES, RONALD L | |

## i.    Allegation Narrative(s)

| Sequence Type<br>Additional | Date/Time Received<br>05/27/2016 6:31 AM | Response Priority<br>24 Hours |
|---|---|---|

**Narrative**
Ms. Jones is a vulnerable adult because of ███████, ███████████, ██████████ and possible ██████████

Ms. Jones was taken to in a hospital after she fell and suffered an injury. Ms. Jones is currently residing in a rehab hospital. Ms. Jones was unable to feed herself nor could she stand up without assistance. Ms. Jones had to eat pureed food. Ms. Jones was confused.

The grandson was living off Ms. Jones SSA check. The grandson was paying his car note and car insurance with the money. The grandson was using the money to pay for his lifestyle, eating out and other things. The grandson had possession of Ms. Jones debit card which has Ms. Jones SSA funds on it. There were bank statements to show this. Ms. Jones asked for food to eat because she was hungry. There was no food in the home. Ms. Jones had a 2013 car that she drove. Ms. Jones was unable to go get food to eat. The grandson moved into Ms. Jones home. He had a key to the home. The grandson was trying to establish the fact Ms. Jones did not live alone. The grandson wanted Ms. Jones to leave the rehab and come home. Ms. Jones needs to be at a skilled nursing facility. Ms. Jones needed more care than the grandson was able to provide. The grandson was trying to get an attorney to get Ms. Jones out of the rehab facility.

The grandson had an open DCF case for abusing his child.

| Sequence Type<br>Initial | Date/Time Received<br>05/19/2016 1:01 PM | Response Priority<br>24 Hours |
|---|---|---|

**Narrative**
Mrs. Jones is a vulnerable adult due to physical ██████████ and physical limitations. Mrs. Jones recently had a █████ and ambulates with a cane. Mrs. Jones is not mentally incompetent and can complete some of her ADLs, such a feeding herself.

There are concerns that the daughter is taking advantage of Mrs. Jones. It is believed the daughter is attempting to gain access to Mrs. Jones' financial accounts. The daughter wants Mrs. Jones' money for her own selfish reasons. The daughter has been trying to reinforce her massage parlor business that has been going nowhere. The daughter is trying to force Mrs. Jones to stay in one spot and make it seem like she is incompetent in order to try to take over her business and gain access to her accounts. Mrs. Jones has stated that she does not want the daughter's name on anything. Mrs. Jones had a ████ on 05/12/16 and has been hospitalized since. Mrs. Jones has no problems with her heart, bones, and is able to feed herself, swallow on her own, and speak clearly. However, since the daughter became involved, she has been feeding Mrs. Jones as if she cannot feed herself. Mrs. Jones no longer wants to be in the hospital. Mrs. Jones does not want to eat the hospital food and does not want to take any more medications. Mrs. Jones is set to be discharged home and would not need to go to a facility for rehabilitation. However, it is believed that the daughter is trying to "handicap" Mrs. Jones. The daughter pulls Mrs. Jones' doctors away from her so she cannot hear anything and is keeping secrets from her regarding her own health. There are concerns the daughter will have Mrs. Jones medicated and force her to eat food, which will stress her out and affect her blood pressure. The daughter has allowed Mrs. Jones' cell phone battery to die and every time someone attempts to contact Mrs. Jones by hospital phone, it is "not around" Mrs. Jones has an ██████████ that is being delayed as a result of still being in the hospital.

The grandson has lived with Mrs. Jones for over five years and takes care of her and her finances. The grandson and his cousin tag-team to help Mrs. Jones and clean her home, cook her food, and provide other assistance. When the grandson goes to his part-time job

A person who knowingly or willfully makes public or discloses to any unauthorized person any confidential information contained in the Florida Safe Families Network is subject to the penalty provisions of s. 415.111

14



# CONFIDENTIAL
## INVESTIGATIVE SUMMARY (IS)
### Adult In-Home Investigation
### (without Reporter Information)

myFLFAMILIES.COM

from 9:30pm-3:30am, the cousin steps in to help out Mrs. Jones. The grandson attained a Power of Attorney that the hospital is stating is invalid due to Mrs. Jones not having been "in her right state of mind" when it was granted, despite the grandson being the only contact listed on Mrs. Jones' medical records. The hospital is instead utilizing the daughter's Power of Attorney for unknown reasons, superseding the grandson's. The daughter has also made it so that the grandson cannot visit Mrs. Jones despite her wanting him to visit. The daughter has provided little to no assistance for Mrs. Jones over the course of the past five years. Where the grandson buys Mrs. Jones fresh fruits and vegetables, the daughter has provided fast food on occasion. Previously, Mrs. Jones had to terminate the daughter from her place of business and kick her out of her home. Mrs. Jones had to take the daughter to court because her life was threatened, as the daughter slashed her tires and law enforcement was involved. During the process, Mrs. Jones' accounts were affected and frozen. Mrs. Jones lost a tilapia fish farm due to the entire situation.

Field Narrative

| II. | Victim(s) | | | | | |
|---|---|---|---|---|---|---|
| Name<br>Jones, Dorothy | DOB<br>06/02/1934 | Age<br>85 | Gender<br>Female | Race<br>Black/African American | | Disabilities<br>Physical Limitations - Other Infirmities/Aging |
| Maltreatment<br>Exploitation | Findings<br>No Indicator | Incident Date | Caregiver Responsible | | | Fatality<br>No |
| Lacks Capacity to Consent<br>NO | Intervention Services are Needed<br>No | | Placement Outside the Home is Required<br>No | | | Judicial Action Required<br>No |

| III. | Other Participant(s) | | | | | |
|---|---|---|---|---|---|---|
| Name | DOB | Age | Gender | Race | | Role |
| Anthony, Deborah | 11/26/1955 | 63 | Female | Black/African American | | Significant Other |
| ADDERLEY, MICHAEL CHRISTOPHER | 09/23/1975 | 44 | Male | Black/African American | | Significant Other |

| IV. | Implications for Victim Safety |
|---|---|
| A. | Victim Safety Factors Implications<br>Victim is 81 yr old female who suffers from infirmities of aging and physical limitations with CTC. Victim needs a cane to ambulate. as per victim. Victim was dressed in a hospital gown, Victim was clean with no scars, bruises or marks. Victim had no foul odor. No safety implications<br><br>Victim is currently in St. John's Nursing and Rehab. No safety implications. |
| B. | Service Needs Implications<br>Victim in hospital. No services needed<br><br>Victim is currently if St. John Nursing and Rehab. All needs are being met. |
| C. | PRP Factors Implications<br>implications known.<br><br>No safety implications from the AP's |
| D. | Criminal History Summary and Implications for Victim Safety<br>checked criminal; no implications. |
| E. | Prior Reports and Service Records Implications for Victim Safety<br>no priors; no implications. |

A person who knowingly or willfully makes public or discloses to any unauthorized person any confidential information contained in the Florida Safe Families Network is subject to the penalty provisions of s. 415.111

15



**CONFIDENTIAL**
**INVESTIGATIVE SUMMARY (IS)**
Adult In-Home Investigation
(without Reporter Information)

MYFLFAMILIES.COM

| V. | **Overall Safety Assessment** |
|---|---|

initial level of safety risk is low. The victim is currently in North Broward Medical Center where she is receiving necessary and appropriate care. Victim is 81 y/o old female who suffers from infirmities of aging and the effect of a ███ that cause physical limitations. The victim has CTC, Victim uses a cane to ambulate. Victim was dressed in a hospital gown. Victim was clean with no scars, bruises or marks. Victim had no foul odor. The hospital is very clean with all working utilities. PI has not been able to locate AP.

Final level of risk remains low. The victim was release from the hospital to St. John's Nursing and Rehab. Victim has CTC and is aware of her finances.

| VI. | **Summary/Findings Implications** |
|---|---|

This is being closed with no indicators to support the allegation of Exploitation. The has CTC, which was verified by a psychological administered on 5/27/16. The victim denied the allegations that she is being exploited by either of the AP's. Victim did not want the department to look into any of her financial records.
The victim stated that she doesn't believe AP's are taking any kind of advantage of her including financially. Stated that She loves both AP's, and dislike that both have a conflict. Victim stated that she is aware that AP and grandson does not get along however not to this extend. Stated that Both AP and grandson are POA's. stated that she stayed with grandson before the hospital and wants to go home with grandson. Stated that grandson has his name on all of her properties.
AP Debra Anthony stated that she never took anything from Victim and what she has taken is reimbursement money from the business.
Michael Adderley.

AP stated that he never tampered or took any money from victim's social security. stated that he was under several bank account authorize by the Victim. stated that he never used the Social security checks nor the VA checks. stated that he used nephews account to pay for car because his was compromised by a lawyer. AP stated he's doesn't have a car anymore and he uses victim's car to get around in which the victim authorize him to use it. AP stated that he gave his whole income tax check and worked with the Victim since the late 90's. AP stated that he has possession of Victim's debit card, lately he took $100 dollars from victims personal bank account authorize by the Victim. Would use victim's money to buy groceries. AP stated that there is food in the house and always had.
The victim is currently at St. John's Nursing and Rehab where she is receiving necessary and appropriate care.

There are no implications for the victim's safety.

| VII. | **Recommended Disposition Narrative** |
|---|---|

Victim has CTC and denied the allegations. Victim is currently in rehab receiving necessary and appropriate care. No further department intervention needed.

| VIII. | **Signatures** |
|---|---|

| SIGNATURE – Protective Investigator | Date Signed |
|---|---|

| SIGNATURE – Protective Investigator Supervisor | Date Signed |
|---|---|

A person who knowingly or willfully makes public or discloses to any unauthorized person any confidential information contained in the Florida Safe Families Network is subject to the penalty provisions of s. 415.111

16

5/28/16y  3

## PHYSICIAN/PRESCRIBER PLEASE SIGN AND RETURN

☐ Send NO MEDS  ☐ Send ★ MEDS ONLY  ☐ When available/next routine delivery:
☐ Send ALL MEDS  ☐ Doses taken from Emergency/Backup Stock  ☐ Stat

| Facility Name St John | | Address | | | Signature of Nurse Receiving Order  Grace Sessya 5/24/16 | Date/Time |
|---|---|---|---|---|---|---|
| Family Name  Jones | First Name  Dorothy | DOB | Admission Number | Room Number | Attending Physician  Dr Mendy / Deanna Lyon | ☐ READ BACK AND VERIFIED |

| | MEDICATION / Order | Dose & Form | Route | Schedule | INDICATION - DX |
|---|---|---|---|---|---|
| 5/24/16 10:15 Model | ① Re Insert foley cath | Sy Retention | | 16FR/30cc | |
| | ② Urology consult | | ★ | Retention | |
| | ③ Monthly foley cath change | | | | |
| | ④ Foley cath care Q Shift | | | | |

Physician/Prescriber Signature _____  Title _____  Date _____

**NURSE: Please Initial The Documentation Record As Performed**

| Pharmacy ☐ Courier ☐ Faxed (Fax Original) ☐ Phone | On Physician's Order Sheet | Med Sheet | TX Sheet | Nurse's Notes | Patient Care Plan | Signed  Grace Sessya | Date  5/24/16 | Time |
|---|---|---|---|---|---|---|---|---|

---

5/26/16 at 24

## PHYSICIAN/PRESCRIBER PLEASE SIGN AND RETURN

☐ Send NO MEDS  ☐ Send ★ MEDS ONLY  ☐ When available/next routine delivery:
☐ Send ALL MEDS  ☐ Doses taken from Emergency/Backup Stock  ☐ Stat

| Facility Name St. John's | | Address 307B w 35am | | | Signature of Nurse Receiving Order  m  5/27/16 12 noon | Date/Time |
|---|---|---|---|---|---|---|
| Family Name  Jones | First Name  Dorothy | DOB | Admission Number | Room Number  307B | Attending Physician  DR. Mendez | ☐ READ BACK AND VERIFIED |

| Date Ordered | Time Ordered | Date DC'd | MEDICATION / Order | Dose & Form | Route | Schedule | INDICATION - DX |
|---|---|---|---|---|---|---|---|
| 5/27/16 | | | Psych Consult: Competency. | | | | |

Physician/Prescriber Signature _____  Title _____  Date _____

**NURSE: Please Initial The Documentation Record As Performed**

| Pharmacy ☐ Courier ☐ Faxed (Fax Original) ☐ Phone | On Physician's Order Sheet | Med Sheet | TX Sheet | Nurse's Notes | Patient Care Plan | ADL/Flow | Signed  m | Date  5/27/16 | Time  12 noon |
|---|---|---|---|---|---|---|---|---|---|

17



# CONFIDENTIAL
## INVESTIGATIVE SUMMARY (IS)
### Adult In-Home Investigation
### (without Reporter Information)

| Case Name<br>Jones, Dorothy | Intake Number<br>2016-170410-01 | Investigative Sub-Type<br>In-Home | County<br>Broward |
|---|---|---|---|
| Date/Time Intake Received<br>06/18/2016 2:05 PM | | Protective Investigator<br>Negron, Ivelisse | |
| Date/Time Investigation Closed<br>08/18/2016 12:00 AM | | Protective Investigator Supervisor<br>HARDING, BERNADETTE | |

## I.       Allegation Narrative(s)

| Sequence Type<br>Initial | Date/Time Received<br>06/18/2016 2:05 PM | Response Priority<br>24 Hours |
|---|---|---|

Narrative

Ms. Jones is a vulnerable adult due to the residual effects of a ████ (it happened several weeks ago) that have left her nearly bed-ridden. She also may have mild dementia. Ms. Jones was considered vulnerable before her ████ and in need of care. The ████ has made her more fragile and in need of 24 hour supervision.

Ms. Jones' caregiver is her grandson Michael Adderley. Ms. Jones' ████ several weeks ago has left her especially vulnerable. She claims to be able to use a walker to go to the bathroom, but she also must spend most of her time in bed. The grandson goes to work every day and leaves her alone "all the time." There are concerns that Ms. Jones would not be able to protect herself in an emergency and could not get up if she fell.

Field Narrative

Information received during investigation that the victims daughter, Deborah Anthony has taken approx. $10,000 in less then two months while the victim was in the hospital. In additional Deborah has provided in the past non valid POA.

## II.      Victim(s)

| Name<br>Jones, Dorothy | DOB<br>06/02/1934 | Age<br>85 | Gender<br>Female | Race<br>Black/African<br>American | Disabilities<br>Physical Limitations - Other<br>Infirmities/Aging<br>Mental Limitations - Other |
|---|---|---|---|---|---|
| Maltreatment<br>Exploitation | Findings<br>Verified | Incident Date<br>06/24/2016 | Caregiver Responsible<br>Anthony, Deborah | | Fatality<br>No |
| Lacks Capacity to<br>Consent<br>YES | Intervention Services are Needed<br>Yes | | Placement Outside the Home is<br>Required<br>No | | Judicial Action Required<br>Yes |

| Name<br>Jones, Dorothy | DOB<br>06/02/1934 | Age<br>85 | Gender<br>Female | Race<br>Black/African<br>American | Disabilities<br>Physical Limitations - Other<br>Infirmities/Aging<br>Mental Limitations - Other |
|---|---|---|---|---|---|
| Maltreatment<br>Inadequate Supervision | Findings<br>Verified | Incident Date<br>06/18/2016 | Caregiver Responsible<br>ADDERLEY, MICHAEL<br>CHRISTOPHER | | Fatality<br>No |
| Lacks Capacity to<br>Consent<br>YES | Intervention Services are Needed<br>Yes | | Placement Outside the Home is<br>Required<br>No | | Judicial Action Required<br>Yes |

## III.     Other Participant(s)

A person who knowingly or willfully makes public or discloses to any unauthorized person any confidential information contained in the Florida Safe Families Network is subject to the penalty provisions of s. 415.111

Page 1 of 5

18



**CONFIDENTIAL**
## INVESTIGATIVE SUMMARY (IS)
**Adult In-Home Investigation**
**(without Reporter Information)**

| Name | DOB | Age | Gender | Race | Role |
|---|---|---|---|---|---|
| ADDERLEY, MICHAEL CHRISTOPHER | 09/23/1975 | 43 | Male | Black/African American | AP-HM |
| Anthony, Deborah | 11/26/1955 | 63 | Female | Black/African American | AP |

| IV. | Implications for Victim Safety |
|---|---|

A.   Victim Safety Factors Implications
There are some implications for V's safety. V is over 75yrs old, lacks CTC, is frail, ambulates slowly w/ cane/walker/wheelchair, lives w/ AP (V's grandson), doesn't fear AP, V unable or unwilling to provide for necessities of life regardless of income, refuses needed services/placement, residence has clutter throughout home but not too overwhelming, V unable to do heavy chores/light housekeeping/manage finances/manage medical care or meds/meal prep/unable to use ph/unable to drive.

**********************************

UPDATE:

There are implications for V's safety based on above safety factors.
**********************************

UPDATE:

There are implications for V's safety based on above safety factors.

B.   Service Needs Implications
There are some implications for service needed. API discussed various services (homemaking services, companionship, personal care) for which AP stated V is suppose to get services from St. Johns Rehab but no one has been to residence yet.

**********************************

UPDATE:

There are no implications for services needed. V is currently at Northwest Medical Center receiving the necessary care & services. No services from APS.
**********************************

UPDATE:

There are no implications for service needs. Filed 415 Petition hearing held on 08/10/16 -PS granted for safe & appropriate discharge from hospital.

C.   PRP Factors Implications
There are no implications for V's safety based on above PRP factors. AP works/is not financially dependent on V, doesn't restrict V's access to community, resides w/ V, and AP doesn't have physical/mental limitations.

*************************************************

UPDATE:

There are no implications for V's safety based on above PRP factors.
*****************************************

UPDATE:

There are no implications for V's safety based on above PRP factors.

D.   Criminal History Summary and Implications for Victim Safety
Criminal history reviewed on Christopher Adderly , some implications for V's safety.

A person who knowingly or willfully makes public or discloses to any unauthorized person any confidential information contained in the Florida Safe Families Network is subject to the penalty provisions of s. 415.111

19



# CONFIDENTIAL
## INVESTIGATIVE SUMMARY (IS)
### Adult In-Home Investigation
### (without Reporter Information)

---

| | | |
|---|---|---|
| | | Criminal history reviewed on Deborah Anthony, no implications for V's safety. |
| | E. | Prior Reports and Service Records Implications for Victim Safety |
| | | Priors reviewed, no implications for V's safety. |

---

| **V.** | **Overall Safety Assessment** |
|---|---|

Overall level of risk is intermediate. V is over 75yrs old, lacks CTC, is frail, ambulates slowly w/ cane/walker/wheelchair, lives w/ AP (V's grandson), doesn't fear AP, V unable or unwilling to provide for necessities of life regardless of income, refuses needed services/placement, residence has clutter throughout home but not too overwhelming, V unable to do heavy chores/light housekeeping/manage finances/manage medical care or meds/meal prep/unable to use ph/unable to drive. API discussed various services (homemaking services, companionship, personal care) for which AP stated V is suppose to get services from St. Johns Rehab but no one has been to residence yet.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Final level of risk is low. V is currently at Northwest Medical Center receiving the necessary care & services. Filed 415 Petition hearing held on 08/10/16 -PS granted. The following was determined by court: 1-Monitoring a safe and appropriate discharge from Northwest Medical Center to a placement commensurate with her level of care, 2-Financial Management (applying for public assistance benefits), 3-POAs between V and AP Michael Adderley & AP Deborah Anthony are suspended, 4-AP Michael Adderley & Joseph Dudley may have unsupervised visitation with the V at her facility, upon approved background checks by APS. 5-AP Deborah Anthony may have supervised visitation with the V, at the V's facility & to be supervised by the facility. Follow-up to the 415 petition/court date was set for 08/15/15 @04:00pm.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Final level of risk is low. Filed 415 Petition hearing held on 08/10/16 -PS granted for safe & appropriate discharge from hospital.

---

| **VI.** | **Summary/Findings Implications** |
|---|---|

Case is being closed as verified for inadequate supervision. There is a preponderance of evidence to support the allegations of inadequate supervision-caregiver not present. The AP Michael was made aware at the beginning of the investigation that the v lacked capacity and could not be left home alone. He reported that he would have people stay with the victim when he is not at home. API completed a home visit on 08/04/16 to verify adequate supervision was provided for V. V was discovered being home alone. BSO was contacted & AP Michael was contacted multiple times. V appeared disheveled, unkempt, and confused. EMS was contacted & evaluated the V & highly recommended the V to be checked out at the hospital. V became defensive. V was ▮▮▮▮▮ & sent to Northwest Medical Center due to a risk to the V's health. AP made contact w/ API after the V was removed from home. Per AP's statement, he left the V alone as of "6 something" in the morning today (08/04/16).

Per V's statement, she stated her grandson, Michael Christopher Adderley (AP), is her caregiver. She states she walks on her own but uses her cane when she needs it. She stated the walker & wheelchair in the home are her dau's but if she needs them, she will use it. Dau of V was not present in home & per V & AP, dau of V/mtr of AP is not welcomed in home. She stated she doesn't like people to be in her business and doesn't allow too many people inside her home. She stated she mainly stay in her bed due to the meds she is on that make her feel weak & she is tired of driving. She stated AP does go to work. She stated she doesn't want her dau in the home and she had family members who are allowed to visit come by. V stated she has a PCP but doesn't remember at the time.

Per AP Michael Adderley's statement, he verified he lives in the home w/ V & is her caregiver. He stated the V did not have a ▮▮▮▮. He stated the V fell. He stated V ambulates on her own or w/ her cane. He stated V is unable to cook so he cooks for her. He stated he works 4 days/wk and when he leaves for work, he has family members over to watch her. He stated he has been having issues w/ his mtr/V's dau for some time now. AP was informed on 06/19/16 V is unable to be left alone due to her not knowing who to call in case of emergency. He stated while he's at work, he'll make sure either his cousin or V's btr is over to help V.

---

A person who knowingly or willfully makes public or discloses to any unauthorized person any confidential information contained in the Florida Safe Families Network is subject to the penalty provisions of s. 415.111

20



**CONFIDENTIAL**
**INVESTIGATIVE SUMMARY (IS)**
**Adult In-Home Investigation**
**(without Reporter Information)**

Per Capacity Evaluator Jason Osborne's statement, he completed a Capacity to Consent assessment. Assessment showed V scoring a 6 out of 30 on the SLUMS examination. He found the V lacking capacity.

Per PCP's statement taken on 08/04/16, V was recently seen by him on 08/01/2016. He stated AP Michael brought the V in. PCP "absolutely" has concerns for V's safety. PCP stated he asked AP Michael his concerns & AP Michael told him, per PCP's statement, "he (AP Michael) is always w/ the V".

Per AP Deborah Anthony's statement, she stated the V was found in the home alone, no active ph, no communication. She stated she "doesn't want anything to do w/ V and w/ V's care". She stated she was "not going to have name dragged through the mud" and "I'm not going to jail". She stated she is concern for the V. She stated the V had 2 ▮▮▮▮ and 2 ▮▮▮▮ ▮▮▮▮. She stated she is currently working on guardianship but then she stated she wants the state to take charge of V. She stated she is afraid to go around V & AP Michael. She stated "she is in fear" and "doesn't want to go to jail". She stated AP Michael "should of never signed the V out of rehab". She stated it is best the V goes into the custody of the state.

Case is being closed as verified for exploitation for AP Dorothy. Per V's statement, she stated that she just wants her money back. When asked again about it, V stated she just wants her money back. Per AP Michael Adderley's statement, he stated his mtr/the V's dau, Deborah Anthony (AP), took about 10k from the V's bank acct while the V was at the hospital. He stated Deborah submitted to the bank a POA doc which he stated the V was not aware of it due to her being in the hospital. He stated he is only trying to protect the V from getting her money taken away.

Per AP Deborah Anthony's statement, she stated in May 2015, she took $2,500 out of V's CD acct ending in 7507 to pay V's medical bill at St. John's Rehab. She stated the V's insurance covered the cost so she attempted to deposit $2,500 back into the V's acct but the acct ending in 7507 was blocked. She stated the V had a WellsFargo acct where she inputted the money into. She stated it is AP Michael who is using the V's money. AP Deborah provided picture of a cashier's check made out to St John's Rehab in the amt of $2k. AP Deborah also provided picture of a deposit receipt for a WellsFargo bank acct showing a deposit in the amt of $2k being deposit in a WellsFargo acct ending in 2662. When asked about the remaining $500, AP Deborah stated she used it to pay for her attorney's fees. AP Deborah stated the money withdrawn was for the care of the V.

Per email received on 07/01/2016 from WellsFargo, V does not have any accts w/ them. On 08/15/2016, per WellsFargo Elder's Financial Abuse Representative Kelly Ridout, V does have 2 accts (ending in 6137 & 2662) which V is the sole acct holder on both accts. She stated the initial search provided multiple accts under the V's name for which they submitted the previous email. She stated per her search, she was able to locate the V's acct. She stated the V does not have any POA listed/named on the accts. She stated she will place an expedite request for the bank records which was submitted on 08/15/2016 by WellsFargo.

So far, the money that was withdrawn from V's Bank of America CD acct showed it being used towards the V's care. Last request for bank records was placed on 08/15/2016 from WellsFargo. Per the arrival of the WellsFargo's bank records, the records will be reviewed & if it shows exploitation was completed against the V by the AP Deborah Anthony, a case for exploitation will be open.

There are no implications for V's safety, V is currently at Northwest Medical Center receiving the necessary care & services. Filed 415 Petition hearing held on 08/10/16 -PS granted monitoring a safe and appropriate discharge from hospital to a placement commensurate with her level of care, Follow-up to the 415 petition/court date was set for 09/13/15 @04:00pm.

| VII. | **Recommended Disposition Narrative** |
|---|---|

Filed 415 hearing held on 08/10/16 -PS granted. The following was determined by court: 1-Monitoring a safe and appropriate discharge from Northwest Medical Center to a placement commensurate with her level of care, 2-Financial Management (applying for public assistance benefits), 3-POAs between V and AP Michael Adderley & AP Deborah Anthony are suspended, 4-AP Michael Adderley & Joseph Dudley may have unsupervised visitation with the V at her facility, upon approved background checks by APS. 5-AP Deborah Anthony may have supervised visitation with the V, at the V's facility & to be supervised by the facility. Follow-up to the 415 petition/court date was set for 08/15/2016 @04:00pm.

A person who knowingly or willfully makes public or discloses to any unauthorized person any confidential information contained in the Florida Safe Families Network is subject to the penalty provisions of s. 415.111

21

**CONFIDENTIAL**
**INVESTIGATIVE SUMMARY (IS)**
Adult In-Home Investigation
(without Reporter Information)

---

**VIII.    Signatures**

---

**SIGNATURE** – Protective Investigator                    Date Signed

**SIGNATURE** – Protective Investigator Supervisor          Date Signed

---

A person who knowingly or willfully makes public or discloses to any unauthorized person any confidential information contained in the Florida Safe Families Network is subject to the penalty provisions of s. 415.111

22

letter

From:  Hardison, Miles (miles.hardison@flhealth.gov)

To:    adderley_ccpbcdc@yahoo.com

Date:  Friday, January 17, 2020, 05:06 PM EST

Good afternoon,

Please see attached letter.

Thank you,

Miles Hardison, Government Analyst I
Florida Department of Health | Division of Medical Quality Assurance | Bureau of Enforcement | Consumer Services Unit
4052 Bald Cypress Way, Bin C-75
Tallahassee, FL 32399-3275

Phone: (850) 901-6743
Fax: (850) 488-0796

DOH Mission: The mission of the Department of Health is to protect, promote & improve the health of all people in Florida through integrated state, county, & community efforts.

DOH Vision: To be the **Healthiest State** in the nation

DOH Values: (ICARE)
Innovation: We search for creative solutions and manage resources wisely.
Collaboration: We use teamwork to achieve common goals & solve problems.
Accountability: We perform with integrity & respect.
Responsiveness: We achieve our mission by serving our customers & engaging our partners.
Excellence: We promote quality outcomes through learning & continuous performance improvement.

Please note: Florida has a very broad public records law. Most written communications to or from state officials regarding state business are public records available to the public and media upon request. Your email communication may therefore be subject to public disclosure.

 202001020 - 400.pdf
297.9kB

23

Portal

Credential Verification

Not Logged In

New Record

Search Results

## Search Results

Search Criteria:   First Name Starting With: Jason > Last Name Starting With: Osborne

Search Form

Certificants

| Name | Address | Credential | Find Status | View |
|------|---------|------------|-------------|------|
| **Unable to find any matching records** | | | | |

24

# INCIDENT/INVESTIGATION REPORT

| | | |
|---|---|---|
| **Agency Name** *Lauderhill Police Department* | **Case#** *29-1805-002696* | |
| **ORI** *FL0061800* | **Date / Time Reported** *06/19/2018 16:57   Tue* | |
| | **Last Known Secure** *05/15/2018 16:44   Tue* | |

**INCIDENT DATA**

| Location of Incident *4401 Nw 25th Pl, Lauderhill FL 33313-* | Premise Type *Other Residence-other* | Zone/Tract *2943* | At Found *05/15/2018 17:25   Tue* |
|---|---|---|---|

| | Crime Incident(s) | (Com) | Weapon / Tools *NOT APPLICABLE* | | | Activity |
|---|---|---|---|---|---|---|
| #1 | *Information* *INFO* | | Entry | Exit | Security | |
| #2 | Crime Incident | ( ) | Weapon / Tools | | | Activity |
| | | | Entry | Exit | Security | |
| #3 | Crime Incident | ( ) | Weapon - Tools | | | Activity |
| | | | Entry | Exit | Security | |

**MO**

**VICTIM**

| # of Victims *()* | Type: | | Injury: | | | | Domestic: N | | |
|---|---|---|---|---|---|---|---|---|---|
| **V1** | Victim Business Name (Last, First, Middle) | | Victim of Crime # | DOB Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
| Home Address | | | | | | Home Phone | | | |
| Employer Name Address | | | | | Business Phone | | Mobile Phone | | |
| VYR | Make | Model | Style | Color | Lic Lis | | VIN | | |

**OTHERS INVOLVED**

CODES:  V- Victim (Denote V2, V3)   O = Owner (if other than victim)     R = Reporting Person (if other than victim)

| Type: INDIVIDUAL (NOT A LE OFFICER) | | Injury: | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Code *RP* | Name (Last, First, Middle) *ADDERLEY, MICHAEL CHRISTOPHER* | Victim of Crime # | DOB *09/23/1975* Age *42* | Race *B* | Sex *M* | Relationship To Offender | Resident Status *Resident* | Military Branch/Status |
| Home Address *3001 Nw 8th St  Pompano Beach, FL 33069* | | | | | | Home Phone *954-982-5652* | | |
| Employer Name/Address *Collier City Aquaculture Hyrox, 3092 N Powerline Rd, Pompano Beach* | | | | | Business Phone *954-973-6505* | | Mobile Phone | |

| Type: INDIVIDUAL (NOT A LE OFFICER) | | Injury: | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Code *IO* | Name (Last, First, Middle) *JONES, DOROTHY B* | Victim of Crime # | DOB *06/02/1934* Age *83* | Race *B* | Sex *F* | Relationship To Offender | Resident Status *Resident* | Military Branch/Status |
| Home Address *4225 Nw 25th Pl  Lauderhill, FL 33313* | | | | | | Home Phone *954-366-1836* | | |
| Employer Name/Address | | | | | Business Phone | | Mobile Phone | |

**PROPERTY**

L = Lost   S = Stolen   R = Recovered   D = Damaged   Z = Seized   B = Burned   C = Counterfeit / Forged   F = Found
("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| Officer ID# *SKINNER, B.  (LH374)* | | | |
|---|---|---|---|
| Invest ID# *(0)* | | Supervisor *SANTANA, A.  (LH433)* | |

| **Status** | Complainant Signature | Case Status *Inactive* *06.19.2018* | Case Disposition: | Page 1 |
|---|---|---|---|---|

25

# REPORTING OFFICER NARRATIVE

| *Lauderhill Police Department* | | | DCR 29-1805-002696 |
|---|---|---|---|
| Victim | Offense *INFORMATION* | | Date  Time Reported *Tue 06/19/2018 16:57* |

On Tuesday June 19, 2018 at approximately 1630 hours, I was notified by Sgt. Hardy to respond to the front lobby of the Lauderhill Police Department to make contact with Michael Adderly in reference to a to a previous police service call in which an elderly female identified as Dorothy Jones was located at 4401 NW 25th Place which is few homes away from her residence at the Lamercie Assisted Living Facility located at 4225 NW 25th Place.

Adderly stated the Lamercie Home facility is supposed to be a secured facility in which his 84 year old grandmother, Dorothy Jones was able to leave the home without anyone noticing or reporting that she left the property. Adderly stated he is in the process of removing his grandmother from the facility and need a report of the incident.

This report is the following account of the incident which occurred on May 15, 2018.
On May 15, 2018 at approximately 1600 hours, I was dispatched to 4425 NW 22nd St. in Lauderhill in reference to an anonymous report of an elderly black female wearing a blue and white shirt and pants walking in the street and was acting incoherently. The caller stated she asked the elderly female if she is ok and the elderly female stated she needed a ride. The caller left the area was unable to provide any additional information at this time. (Refer to Lauderhill case # 291805002690). I circulated the area and I was unable to locate the elderly female as described above.
On May 15, 2018 at approximately 1644 hours, I was dispatched to 4401 NW 25th Place in Lauderhill in reference to a police service call in reference an elderly female that was found walking in the roadway approximately ¼ from her residence at 4425 NW 25th Place. The caller stated the elderly female stated someone brought her to Ft. Lauderdale and now she is ready to go back home to Deerfield and has no way of getting there. She also stated that her grandson was living in the house and it is unknown if he is still there. And that her daughter is trying to sell her home without her permission.

Shortly after, I responded to 4401 NW 25th Place and met with the reporting person who stated the elderly female is safe inside of her residence. She stated the elderly female approached her and asked her for a ride which concerned her. She stated she brought the elderly female to her residence and notified the Lauderhill Police immediately.

I made contact with the elderly female identified as Dorothy Jones who appeared to be in good health. She stated that she lives in Pompano Beach and she needs a ride to get back to her home and her office. She stated someone dropped her off in Lauderhill and she is trying to get back home. Shortly after, she was able to provide me with a family member telephone number in which the family member was able to confirm that she is a resident of the Lamercie Home located at 4225 NW 25th Place in Lauderhill which is approximately four to five houses away from where Dorothy was found. I made contact with the staff at Lamercie Home who stated they were unaware that Dorothy left the facility and stated they will respond to this location to pick her up.

As I proceeded to assist Dorothy from the couch, she stated she does not want to go back. She stated her daughter put her there and she do not like it there. She stated she wants to go back to her house in Pompano. She stated she will get lost again or she will go to the store to steal something to go to jail so she would not have to return to Lamercie Home.  Shortly after, Dorothy was placed into my marked police unit and

# REPORTING OFFICER NARRATIVE

| Lauderhill Police Department | | OCA 29-1805-002696 |
|---|---|---|
| Victim | Offense INFORMATION | Date Time Reported Tue 06/19/2018 16:57 |

transported back to Lamercie Home. The staff members assisted Dorothy from the vehicle and took her back into the facility.

There was no further action taken by this officer.

<u>11 pages</u>

<u>EXHIBIT C</u>

**INCIDENT/INVESTIGATION REPORT**

| Agency Name | | | Case# 11-1410-005721 |
|---|---|---|---|
| *Broward County Sheriff's Office* | | | Date / Time Reported 10/22/2014 13:07 Wed |
| ORI 0060700 | | | Last Known Secure 10/21/2014 22:00 Tue |
| Location of Incident 2114 Nw 5th St. Pompano Beach FL 33069- | Premise Type *Victim Single Family* | Zone/Tract 1117 | At Found 10/22/2014 13:07 Wed |

**INCIDENT DATA**

| #1 | Crime Incident(s) *Theft - All Other* *THFO* | (Com) | Weapon / Tools *NOT APPLICABLE* | | | Activity |
|---|---|---|---|---|---|---|
| | | | Entry | Exit | Security | |
| #2 | Crime Incident | ( ) | Weapon / Tools | | | Activity |
| | | | Entry | Exit | Security | |
| #3 | Crime Incident | ( ) | Weapon / Tools | | | Activity |
| | | | Entry | Exit | Security | |

MO

**VICTIM**

| # of Victims 1 | Type INDIVIDUAL (NOT A LE OFFICER) | Injury None | | | | | | Domestic: N | |
|---|---|---|---|---|---|---|---|---|---|
| V1 | Victim/Business Name (Last, First, Middle) *JONES, DOROTHY B* | Victim of Crime # 1, | DOB 06/02/1934 Age 80 | Race B | Sex F | Relationship To Offender | Resident Status | Military Branch/Status |

| Home Address *4225 NW 25TH PL., Lauderhill, FL 33313-* | | Home Phone 954-366-1836 |
|---|---|---|
| Employer Name/Address | Business Phone | Mobile Phone |

| VYR | Make | Model | Style | Color | Lic/Lis | VIN |
|---|---|---|---|---|---|---|

CODES   V= Victim (Denote V2, V3)   O = Owner (if other than victim)   R = Reporting Person (if other than victim)

**OTHERS INVOLVED**

| Type INDIVIDUAL (NOT A LE OFFICER) | | Injury: | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Code IO | Name (Last, First, Middle) *ANTHONY, DEBRA ANN* | Victim of Crime # | DOB 11/28/1955 Age 58 | Race B | Sex F | Relationship To Offender | Resident Status Resident | Military Branch/Status |

| Home Address *PO Box 668304 Pompano Beach, FL 33066* | | Home Phone 754-246-8829 |
|---|---|---|
| Employer Name/Address *Utopia Salon & Wellness, 2758 W Atlantic Blvd Pompano Beach Fl 33069* | Business Phone 954-532-0574 | Mobile Phone |

| Type | | Injury: | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Code | Name (Last, First, Middle) | Victim of Crime # | DOB Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |

| Home Address | | Home Phone |
|---|---|---|
| Employer Name/Address | Business Phone | Mobile Phone |

**PROPERTY**

L = Lost   S = Stolen   R = Recovered   D = Damaged   Z = Seized   B = Burned   C = Counterfeit / Forged   F = Found
("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| 1 | 99 | S | $3.00 | | 3 | OTHER MISCELLANEOUS | FLORIDA DL | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| | Outstanding Stolen Val (Total Stolen) $3.00 [$3.00] |
|---|---|
| Officer/ID# MATEO, M  (3455, PATR) (17298) | |
| Invest ID# PEDRE, J.  (2660, PROP) (10590) | Supervisor SMITH, A  (3445, PATR) (13484) |
| Status | Complainant Signature | Case Status *Inactive* 12/03/2014 | Case Disposition | Page 1 |

7

28

CASE SUPPLEMENTAL REPORT

Printed: 09/25/2018  10:02

Broward County Sheriff's Office

OCA: *111410005721*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| Case Status: *INACTIVE* | Case Mng Status: *INACTIVE* | Occured: *10/21/2014* |
| Offense: *THEFT - ALL OTHER* | | |

| | |
|---|---|
| Investigator: *PEDRE, J. (10590)* | Date / Time: *12/03/2014 10:08:48, Wednesday* |
| Supervisor: *COKER, S. J. (11105)* | Supervisor Review Date / Time: *12/05/2014 11:57:19, Friday* |
| Contact: | Reference: *Follow Up* |

B/F senior wanted to report that her FL. driver's license, Social Security card and her Wells Fargo Debit card were missing; she believes her daughter hid them from her.

On 12-1-14, I met with victim Dorothy Jones in reference to her items missing. She says that she located her social security card, but her Florida Drivers License, and debit card are still missing. Victim has obtained a new drivers license and debit card. There was no unauthorized transactions on the debit card. She thinks her daughter Debra Anthony hid them, but she has no proof. Her daughter no longer lives at the residence, and phone number and address are unknown.

There are no leads to pursue in this case. This case is pending inactive.

The victim was informed on the status of this case.

29

INCIDENT/INVESTIGATION REPORT

*Broward County Sheriff's Office*

Case # *11-1410-005721*

| Status Codes | L = Lost | S = Stolen | R = Recovered | D = Damaged | Z = Seized | B = Burned | C = Counterfeit / Forged | F = Found |
|---|---|---|---|---|---|---|---|---|

| | UCR | Status | Quantity | Type Measure | Suspected Type | Up to 3 types of activity |
|---|---|---|---|---|---|---|
| D R U G S | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers

Suspect Hate / Bias Motivated    *None*

NARRATIVE
Zone: 1117

B/F senior wanted to report that her FL. driver's license, Social Security card and her Wells Fargo Debit card were missing; she believes her daughter hid them from her.

30

REPORTING OFFICER NARRATIVE

| Broward County Sheriff's Office | | OCA |
|---|---|---|
| | | 11-1410-005721 |
| Victim | Offense | Date / Time Reported |
| JONES, DOROTHY B | THEFT - ALL OTHER | Wed 10/22/2014 13:07 |

On 10/22/14 at approximately 1459 Hrs., I responded to 2114 NW 5th St. in reference to missing items. I made contact with B/F senior, Dorothy Jones (6/2/34) who wanted to report that her FL. driver's license, Social Security card and Wells Fargo debit card were missing.

Jones advised that the last time she saw these items was on 10/21/14 at approximately 2200 Hrs. She also stated that she saw her daughter, B/F Deborah Anthony (11/28/55) in her room on that night and she believes her daughter took the items. She did not witness this happen and has no evidence that it actually occurred. However, she stated that she and the daughter were the only people at home and she stated that no one else could have taken the items.

I asked if it was possible that she could have misplaced the items, but she was adamant that the daughter hid them from her so she would get in trouble for driving without a license. The daughter was not available for comment. Additionally, Jones also did not have her daughter's phone number.

Jones wanted a police report to show that those items were missing. Note that she also reported an earlier incident concerning damage to a tire on her vehicle (case: 11-1410-005669), where she also accused her daughter of the incident. Since I could not investigate any further, there was no further action at this time.

*10*

*31*

# BRENDA D. FORMAN
## CLERK OF THE COURTS
browardclerk.org ■ BROWARD COUNTY, FLORIDA

Menu ☰

# Case Detail - Public

🖶 Print

---

**Dorothy B Jones Petitioner vs. Deborah Anthony Respondent**

**Broward County Case Number:** DVCE14008054
**State Reporting Number:** 062014DR008054AXDVCE
**Court Type:** Family
**Case Type:** Domestic Violence
**Incident Date:** N/A
**Filing Date:** 11/03/2014
**Court Location:** Central Courthouse
**Case Status:** Disposed
**Magistrate Id / Name:** N/A
**Judge ID / Name:** 59 Kaplan, Michael G.

---

— Party(ies)                                                      Total: 2

|  |  |  |  Attorneys / Address |
|  |  |  | ★ Denotes Lead Attorney |
| Party Type | Party Name | ❓ Address |  |
| Petitioner | **Jones, Dorothy B** |  |  |
| Respondent | **Anthony, Deborah** |  |  |
|  | **DOB:** 11/28/1955 |  |  |

---

— Disposition(s)                                                  Total: 1



| Date | | Statistical Closure(s) |
|------|--|------------------------|
| 11/13/2014 | | Disposed by Judge |

| Date | Disposition(s) | View | Page(s) |
|------|----------------|------|---------|
| 11/13/2014 | **Order of Dismissal/Temporary INJ/DV - Judge**<br> Vol./Book 51253 , Page 948, 1 pages<br> Instrument Number 112650428 | 🔒 | 1 |

## − Event(s) & Document(s)                                   Total: 13

| Date | Description | Additional Text | View | Pages |
|------|-------------|-----------------|------|-------|
| 11/17/2014 | **Proof of Service** | SERVED 11/5/2014<br>Party: *Respondent*<br>Anthony, Deborah | 🔒 | 2 |
| 11/13/2014 | **Clerk's Certificate of Compliance** | | 🔒 | 1 |
| 11/13/2014 | **Proof of Service** | Served On 11/04/14<br>Party: *Respondent*<br>Anthony, Deborah | 🔒 | 1 |
| 11/13/2014 | **Notice of Current Address** | | 🔒 | 1 |
| 11/03/2014 | **File Created for SRS Purposes** | | | |
| 11/03/2014 | **Affidavit of the Clerk** | | 🔒 | 1 |
| 11/03/2014 | **Petition** | | 🔒 | 9 |
| 11/03/2014 | **Civil Cover Sheet** | | 🔒 | 2 |
| 11/03/2014 | **Description Sheet** | | 🔒 | 2 |
| 11/03/2014 | **Petitioner Waiver Domestic Violence** | | 🔒 | 1 |
| 11/03/2014 | **Notice of Related Cases** | | 🔒 | 5 |
| 11/03/2014 | **Temporary Injunction - Domestic Violence - Judge** | Hrg on 11/13/14 @ 9:00am; Rm 870 | 🔒 | 6 |
| 11/03/2014 | **Clerk's Certificate of Compliance** | | 🔒 | 1 |



# BRENDA D. FORMAN
## CLERK OF THE COURTS
browardclerk.org ■ BROWARD COUNTY, FLORIDA

Menu ☰

# Case Detail - Public

🖶 Print

---

**Dorothy Jones Petitioner vs. Deborah Anthony Respondent**

**Broward County Case Number:** DVCE14008371
**State Reporting Number:** 062014DR008371AXDVCE
**Court Type:** Family
**Case Type:** Domestic Violence
**Incident Date:** N/A
**Filing Date:** 11/14/2014
**Court Location:** Central Courthouse
**Case Status:** Disposed
**Magistrate Id / Name:** N/A
**Judge ID / Name:** 59 Kaplan, Michael G.

---

**− Party(ies)**                                                                   Total: 2

| Party Type | Party Name | ❓ Address | ❓ Attorneys / Address<br>★ Denotes Lead Attorney |
|---|---|---|---|
| Petitioner | **Jones, Dorothy** | | ★ Pro Se<br>Retained |
| | | | **Status: Active** |
| Respondent | **Anthony, Deborah** | | |

---

**− Disposition(s)**                                                                 Total: 1

34

| Date | Statistical Closure(s) |
|------|------------------------|
| 11/25/2014 | Disposed by Judge |

| Date | Disposition(s) | View | Page(s) |
|------|----------------|------|---------|
| 11/25/2014 | **Order of Dismissal/Temporary INJ/DV - Judge**<br> Vol./Book 51285 , Page 488, 1 pages<br> Instrument Number 112673449 | 🔒 | 1 |

---

— Event(s) & Document(s)                                            Total: 12

| Date | Description | Additional Text | View | Pages |
|------|-------------|-----------------|------|-------|
| 12/09/2014 | **Proof of Service** | served 11/20/14 | 🔒 | 2 |
| 11/25/2014 | **Notice of Current Address** | | 🔒 | 1 |
| 11/25/2014 | **Clerk's Certificate of Compliance** | | 🔒 | 1 |
| 11/14/2014 | **File Created for SRS Purposes** | | | |
| 11/14/2014 | **Description Sheet** | | 🔒 | 2 |
| 11/14/2014 | **Petitioner Waiver Domestic Violence** | | 🔒 | 1 |
| 11/14/2014 | **Affidavit of the Clerk** | | 🔒 | 1 |
| 11/14/2014 | **Notice of Related Cases** | | 🔒 | 5 |
| 11/14/2014 | **Civil Cover Sheet** | | 🔒 | 2 |
| 11/14/2014 | **Petition** | | 🔒 | 10 |
| 11/14/2014 | **Temporary Injunction - Domestic Violence - Judge** | hrg 11/25/14 @ 9:30 am rm 870 | 🔒 | 6 |
| 11/14/2014 | **Clerk's Certificate of Compliance** | | 🔒 | 1 |

---

— Hearing(s)                                                        Total: 0

35



# CONFIDENTIAL
## INVESTIGATIVE SUMMARY (IS)
### Adult In-Home Investigation
### (without Reporter Information)

MYFLFAMILIES.COM

| Case Name<br>Jones, Dorothy | Intake Number<br>2016-140676-01 | Investigative Sub-Type<br>In-Home | County<br>Broward |
|---|---|---|---|
| Date/Time Intake Received<br>05/19/2016 1:01 PM | | Protective Investigator<br>Infante, Deyron | |
| Date/Time Investigation Closed<br>06/10/2016 3:15 PM | | Protective Investigator Supervisor<br>NOBLES, RONALD L | |

---

## i.    Allegation Narrative(s)

| Sequence Type<br>Additional | Date/Time Received<br>05/27/2016 6:31 AM | Response Priority<br>24 Hours |
|---|---|---|

**Narrative**
Ms. Jones is a vulnerable adult because of ██████ , ██████████ , ███████ and possible in a ██████████

Ms. Jones was taken to in a hospital after she fell and suffered an injury. Ms. Jones is currently residing in a rehab hospital. Ms. Jones was unable to feed herself nor could she stand up without assistance. Ms. Jones had to eat pureed food. Ms. Jones was confused.

The grandson was living off Ms. Jones SSA check. The grandson was paying his car note and car insurance with the money. The grandson was using the money to pay for his lifestyle, eating out and other things. The grandson had possession of Ms. Jones debit card which has Ms. Jones SSA funds on it. There were bank statements to show this. Ms. Jones asked for food to eat because she was hungry. There was no food in the home. Ms. Jones had a 2013 car that she drove. Ms. Jones was unable to go get food to eat. The grandson moved into Ms. Jones home. He had a key to the home. The grandson was trying to establish the fact Ms. Jones did not live alone. The grandson wanted Ms. Jones to leave the rehab and come home. Ms. Jones needs to be at a skilled nursing facility. Ms. Jones needed more care than the grandson was able to provide. The grandson was trying to get an attorney to get Ms. Jones out of the rehab facility.

The grandson had an open DCF case for abusing his child.

| Sequence Type<br>Initial | Date/Time Received<br>05/19/2016 1:01 PM | Response Priority<br>24 Hours |
|---|---|---|

**Narrative**
Mrs. Jones is a vulnerable adult due to physical ██████████ and physical limitations. Mrs. Jones recently had a ████ and ambulates with a cane. Mrs. Jones is not mentally incompetent and can complete some of her ADLs, such a feeding herself.

There are concerns that the daughter is taking advantage of Mrs. Jones. It is believed the daughter is attempting to gain access to Mrs. Jones' financial accounts. The daughter wants Mrs. Jones' money for her own selfish reasons. The daughter has been trying to reinforce her massage parlor business that has been going nowhere. The daughter is trying to force Mrs. Jones to stay in one spot and make it seem like she is incompetent in order to try to take over her business and gain access to her accounts. Mrs. Jones has stated that she does not want the daughter's name on anything. Mrs. Jones had a ████ on 05/12/16 and has been hospitalized since. Mrs. Jones has no problems with her heart, bones, and is able to feed herself, swallow on her own, and speak clearly. However, since the daughter became involved, she has been feeding Mrs. Jones as if she cannot feed herself. Mrs. Jones no longer wants to be in the hospital. Mrs. Jones does not want to eat the hospital food and does not want to take any more medications. Mrs. Jones is set to be discharged home and would not need to go to a facility for rehabilitation. However, it is believed that the daughter is trying to "handicap" Mrs. Jones. The daughter pulls Mrs. Jones' doctors away from her so she cannot hear anything and is keeping secrets from her regarding her own health. There are concerns the daughter will have Mrs. Jones medicated and force her to eat food, which will stress her out and affect her blood pressure. The daughter has allowed Mrs. Jones' cell phone battery to die and every time someone attempts to contact Mrs. Jones by hospital phone, it is "not around". Mrs. Jones has an ██████████ that is being delayed as a result of still being in the hospital.

The grandson has lived with Mrs. Jones for over five years and takes care of her and her finances. The grandson and his cousin tag-team to help Mrs. Jones and clean her home, cook her food, and provide other assistance. When the grandson goes to his part-time job

---

A person who knowingly or willfully makes public or discloses to any unauthorized person any confidential information contained in the Florida Safe Families Network is subject to the penalty provisions of s. 415.111

36

June 6, 2016

To whom it may concern,

I Dorothy B. Jones was hospitalized at Northwest Medical Center 2801 FL-7, Margate, FL. 33063 and was only there to have my heart monitored as the only medical procedure. MY grandson Michael C. Adderley, who has been taking care of me for over 5 years, called me and responded to my needs by coming back at my job and called the paramedics and met me at the hospital. It has come to my attention that my daughter has assume power of attorney over my personal banking accounts, including John Butts who I care for with his finances with the assistance of Michael C. Adderley and has also taken $2,500.00 from my CD's account without my permission and has removed Michael C. Adderley as the ITF without my permission. I never gave my daughter Deborah Anthony no power over making any decision over me medically nor did I give her power of attorney over my finances or assets. Please response to this letter at your earliest convenience. Thank you.

Sincerely

Dorothy Jones

37

June 6, 2016

To whom it may concern,

I Dorothy B. Jones was hospitalized at Northwest Medical Center 2801 FL-7, Margate, FL. 33063 and was only there to have my heart monitored as the only medical procedure. MY grandson Michael C. Adderley, who has been taking care of me for over 5 years, called me and responded to my needs by coming back at my job and called the paramedics and met me at the hospital. During my time at the hospital, Michael C. Adderley and my daughter Deborah Anthony visited my periodically with my daughter interacting with the doctors away from my room and away from my presence. Michael Adderley was present when I spoke with the hospital case worker who had informed me that I had a choice of having my rehabilitation at home or at a facility of their choosing. She asked my grandson if he lived with me and repeated his cell phone number that they had on file. I wanted to have my rehabilitation done at my home. From some reason or another, I was brought to St. John's Rehabilitation Hospital 3075 NW 35 Ave, Lauderdale Lakes, FL. 33311.

I never gave my daughter Deborah Anthony no power over making any decision over me medically nor did I give her power of attorney over my finances or assets. I was brought here against my right and was deem incompetent at the hospital and my grandson was force to leave the hospital by administration for no reason. I am requesting that I have the remaining time with my rehabilitation at home because I don't want to be here any no and I miss my family and home. My insurance should be able to pay for everything that involves my medical concerns and house-hold needs, plus my grandson stay with me. Please response to this letter at your earliest convenience. Thank you.

Sincerely

Dorothy Jones

38

<u>4 pages</u>

# <u>EXHIBIT D</u>

39



**State of Florida**
**Department of Children and Families**

MYFLFAMILIES.COM

**Ron DeSantis**
*Governor*

**Chad Poppell**
*Secretary*

January 24, 2020

Michael Adderley
adderley_ccpbcdc@yahoo.com

Dear Mr. Adderley:

Thank you for contacting the Florida Department of Children and Families (Department) Office of Inspector General (OIG) regarding the handling of child protective investigations involving your daughter and adult protective investigations involving your grandmother.  You alleged that the investigation regarding your daughter's mouth was not investigated properly, that the Department has been keeping your daughter away from you for the past three years, and that false allegations were made against you alleging that you were abusive to your daughter, neglected her as she was not being fed properly, and there was no stove in the residence.

- FSFN Child Intake #2014-195787 was received by the Department with allegations for "Burns," "Malnutrition/Dehydration," "Medical Neglect," and "Physical Injury."  You were listed as a "caregiver in the home;" therefore, you were not a subject under investigation.  The investigation was closed with "No Findings."

- FSFN Child Intake #2016-145601 was received by the Department with allegations of Environmental Hazards and Inadequate Supervision identifying you as the alleged perpetrator.  The investigation was closed with "Not Substantiated" findings as there were concerns noted by the Department regarding the hazardous conditions of the home (the nonfunctional stove and refrigerator along with inadequate food).  "Not Substantiated" is used when there is credible evidence which does not meet the standard of being a preponderance to support that the specific harm was the result of abuse, abandonment, or neglect according to Children and Families Operating Procedure (CFOP) 170-5 Chapter 22-2(b)(2).  The Department did not remove the victim child from your care nor was a Chapter 39 injunction filed.

According to CFOP 170-5 Chapter 22-1, to determine the appropriate finding(s) upon the completion of the investigation, an investigator must be able to clearly present credible evidence in support or refutation of child maltreatment (as defined in CFOP 170-4, Child Maltreatment Index) for each alleged victim. This determination by the investigator is based upon information gathered during the investigation from interviews, personal observations, and the review of records and forensic assessments (e.g., medical exams, CPT findings, police reports, drug tests, etc.).

- FSFN Adult Intake #2016-140676 was closed with "No Indicators" of exploitation by you.

- FSFN Adult Intake #2019-160124 was an anonymous report that was closed with "No Indicators" of financial exploitation by you.

1317 Winewood Boulevard, Tallahassee, Florida 32399-0700

Mission: Work in Partnership with Local Communities to Protect the Vulnerable, Promote Strong and Economically Self-Sufficient Families, and Advance Personal and Family Recovery and Resiliency

Thank you for bringing these matters to our attention.  No further action will be taken by the OIG and the OIG considers the matter closed.

Sincerely,

Keith R. Parks
Inspector General
Office of the Inspector General

41

Office of Governor Ron DeSantis                                        02/04/2020
State of Florida
The Capitol
400 S. Monroe St.
Tallahassee, FL 32399

Dear Governor:

On August 5, 2016 my grandmother, Dorothy Jones was kidnapped from her home at 2114 NW 5 Street Pompano Beach, FL. 33069 by Ivelisse Negron, who worked for Department of Children and Family (Adult Protective Unit) with Deborah Anthony, Mother, who called the elderly abuse hotline to file the complaint.

Dorothy Jones was also falsely evaluated by a Department of Children and Family mental evaluator, Jason Osborne, weeks later for capacity after Dorothy Jones was evaluated previously in June 8, 2016 by Deyron Infante, who worked for Department of Children and Family, (Adult Protective Unit), while Dorothy Jones was placed illegally at St. John's Rehab.; but was released in my care. Dorothy Jones was able to response to the commands of home aids who worked for Medicaid and was able to return to work with the Collier City/ Pompano Beach Community Development Corporation, Inc., located at 3001 NW 8 Street Pompano Beach, FL. 33069.

Dorothy Jones was illegally placed in guardianship by the courts in Broward County concerning case number (PRC 16-4508), who have sold her home and will not allow me and other family to see her, based on the wishes of her daughter, Deborah Anthony. Deborah Anthony, has also taking over Dorothy Jones position with the help of the guardianship, Gloria Ego, and her attorney Michael Ahearn, whom I have an guardianship fraud case investigation ongoing with case numbers PRC 16-4508 and CACE 17-5181, where my mother, Deborah Anthony, who filed a civil case against Dorothy Jones, her brother, Jasper Branch, and myself, which involves a nonprofit organization she started in 1979. Her daughter, Deborah Anthony was terminated and force to resign for taking board members off the board of the Collier City/ Pompano Beach Community Development Corporation, Inc.

The family is requesting a resolution through the governor's office that Dorothy Jones have all her assets returned to her, including her home and to allow her to regain her Executive Director title for the organization she created with the other board members listed in 2017 and 2018; and to have her right restored as both cases was started with false claims of negligence; where the court would not allow Mrs. Jones to receive her own attorney and would allow Mrs. Jones to return home. Thanks you.

Sincerely,

Michael Adderley, Grandson

464 NW 2 Terrace Deerfield Beach, FL. 33069, (954) 982-5652          adderley_ccpbcdc@yahoo.com

42-A



STATE OF FLORIDA

# Office of the Governor

THE CAPITOL
TALLAHASSEE, FLORIDA 32399-0001

www.flgov.com
850-717-9418

**RON DeSANTIS**
GOVERNOR

February 28, 2020

Mr. Michael Adderley
464 Northwest Second Terrace
Deerfield Beach, Florida 33069

Dear Mr. Adderley:

Thank you for contacting Governor Ron DeSantis. We are sorry to hear of your difficulties and appreciate the opportunity to respond to your letter.

To ensure they are aware of your concerns, I forwarded a copy of your letter to the Florida Department of Children and Families for review. If you want to contact the Department directly, please use the information provided below.

The Florida Constitution limits the Governor's intervention in matters that should be resolved through the court system. The person who can best assist you with any legal concerns is an attorney. The Florida Bar offers a Lawyer Referral Service which you may contact by calling toll-free (800) 342-8011, or by writing to 651 East Jefferson Street, Tallahassee, Florida, 32399-2300. You may also visit the Florida Bar's website at www.floridabar.org.

Thank you again for contacting Governor DeSantis.

Sincerely,

Janice T. Johnson
Office of Citizen Services
Executive Office of the Governor

JTJ/cas
cc:     Florida Department of Children and Families
        Building One, Room 202
        1317 Winewood Boulevard
        Tallahassee, Florida 32399-0700
        Telephone: (850) 487-1111

42-B

<u>4 pages</u>

<u>EXHIBIT E-1</u>

<u>Missing Court Transcript 8/16/2016</u>

<u>Will send as attachment under Exhibit E-2</u>



**yahoo!**mail

order

Michael Adderley | Account Info ▾ | Go   Sign Out  Home

Inbox | Contacts | Notepad | Calendar    Switch to the newest Yahoo Mail

**Compose**

← Back to Search   🗑 Delete  ⊘ Spam  Actions ▾  Apply    ✕

Inbox          999+
Drafts          109
Sent
Archive
Spam             🖿
Trash            🖿

Folders   Edit  Hide

+ New folder

**Compose**

## Fwd: questions about the hearings

**SM**  Scheduling Management ...              Sep 11 at 10:22 AM

adderley_ccpbcdc@yahoo.com

Good morning Mr. Adderley,
can you please answer the following question the typist has about the hearings.

As these are mental health hearings, I have zero access to case information. Please verify the following information:

1. The order says "two hearings," but there are 5 hearings. The dates are 8/10/2016, 8/15/2016, 8/16/2016, 9/1/2016, 9/13/2016
Please verify which of the two, or if all are needed. They may be continuations of the same hearing, I don't know yet.

2. Judge's name

3. Any and all spellings of names. These are CourtSmart, so there are no notes. The names I have thus far are:
Edmund Haskins, Jason Osborne, Deborah Anthony, Michael Adderly

Just listening to the first hearing, there are several other people there. A DCF investigator, a family friend named Joseph (can't make out the last name), another family friend whose name I couldn't hear at all, an attorney named Rachel Poole (possibly) from Office of Regional Counsel

That's it for now, but that was just trying to do the cover pages, so may have questions later.

Thank you,
Cristina

---------- Forwarded message ---------
From: Scheduling Management <scheduling@honorablereporting.com>
Date: Wed, Sep 9, 2020 at 11:07 AM
Subject: questions about the hearings
To: <adderley_ccpbcdc@yahoo.com>

Good morning Mr. Adderley,
can you please answer the following question the typist has about the hearings.

As these are mental health hearings, I have zero access to case information. Please verify the following information:

1. The order says "two hearings," but there are 5 hearings. The dates are 8/10/2016, 8/15/2016, 8/16/2016, 9/1/2016, 9/13/2016
Please verify which of the two, or if all are needed. They may be continuations of the same hearing, I don't know yet.

2. Judge's name

3. Any and all spellings of names. These are CourtSmart, so there are no notes. The names I have thus far are:
Edmund Haskins, Jason Osborne, Deborah Anthony, Michael Adderly

Just listening to the first hearing, there are several other people there. A DCF investigator, a family friend named Joseph (can't make out the last name), another family friend whose name I couldn't hear at all, an attorney named Rachel Poole (possibly) from Office of Regional Counsel

That's it for now, but that was just trying to do the cover pages, so may have questions later.

Thank you,
Cristina

## Apple Mac mini 2.3GHz Core i5 (Mid...

**$259**
Processor 2.3GHz dual-core Intel Core i 5 processor
Memory 4.0GB (2x 2.0GB).

›

43



**yahoo!mail**    Search your mailbox    🔍    Michael Adderley    Account Info ▾    Go    Sign Out  Home

Sent          Contacts          Notepad          Calendar          Switch to the newest Yahoo Mail

**Compose**

🗑 Delete    Actions ▾    Apply

Inbox          999+
Drafts          109
**Sent**
Archive
Spam
Trash

Folders    Edit  Hide

+ New folder

**Compose**

Microsoft          Enable developers to code

**Michael Adderley**                                      Sep 19 at 4:14 PM
Orders Management

DID NOT RECEIVE THIS DATE....ONLY HAVE SEPT 1 AND SEPT 13

On Wednesday, September 2, 2020, 09:51:06 AM EDT, Michael Adderley
<adderley_ccpbcdc@yahoo.com> wrote:

----- Forwarded Message -----
**From:** adderley_ccpbcdc <adderley_ccpbcdc@yahoo.com>
**To:** Orders Management <orders@honorablereporting.com>
**Sent:** Tuesday, February 18, 2020, 12:34:48 PM EST
**Subject:** Re: Hello

Transcript Coordinates
PRC 16-4508
Rm 933 08/10/2016

1. 12:53:44-12:56:35 and 1:15:00-1:18:01
2. 3:26:07- 3:26:35 and 3:29:19- 3:37:12
3. 5:06:34 - 5:08:58 and 5:12:40 - 5:20:31
08/15/2016
4. 5:11:08 - 5:25:44

Sent from my MetroPCS 4G LTE Android Device
Transcript Coordinates PRC 16-4508Rm 933 08/10/2016 1. 12:53:44-12:56:35 and 1:15:00-1:18:01 2.
3:26:07- 3:26:35 and 3:29:19- 3:37:12 3. 5:06:34 - 5:08:58 and 5:12:40 - 5:20:31 08/15/2016 4. 5:11:08
- 5:25:44 Sent from my MetroPCS 4G LTE Android Device
-------- Original message --------
**From:** Orders Management <orders@honorablereporting.com>
**Date:** 2/18/20 12:24 PM (GMT-05:00)
**To:** adderley_ccpbcdc@yahoo.com <adderley_ccpbcdc@yahoo.com>
**Subject:** Re: Hello

Do you know how long the case went?

Thank you!
-Jennifer

On Mon, Feb 17, 2020 at 11:21 AM Orders Management <orders@honorablereporting.com> wrote:
  Hello Michael,

  Do you know about how long the case went? And do you have a case name or number available?
  Or a notice you can send?

  Thank you!
  -Jennifer

On Mon, Feb 17, 2020 at 11:10 AM adderley_ccpbcdc <adderley_ccpbcdc@yahoo.com> wrote:
  Jennifer call me when you receive CD in mail.

  (954)982-5652


  Sent from my MetroPCS 4G LTE Android Device

  -------- Original message --------
  **From:** Orders Management <orders@honorablereporting.com>
  **Date:** 2/12/20 12:25 PM (GMT-05:00)
  **To:** Michael Adderley <adderley_ccpbcdc@yahoo.com>
  **Subject:** Re: Hello

  Hello Mr. Adderley,

  I have been given a physical mailing address for you to mail the audios to so we can get this
  transcribed for you.

Score a student
loan with a
competitive rate

sallie
mae

Learn more

44

Honorable reporting
6581 Geneva Street
Lake worth, Fl 33467Thank you!-Jennifer

On Tue, Feb 11, 2020 at 9:37 PM Michael Adderley <adderley_ccpbcdc@yahoo.com> wrote:

On Tuesday, February 11, 2020, 05:33:00 PM EST, Orders Management
<orders@honorablereporting.com> wrote:

Just checkin with you again. I have not received any files yet.

Thank you!
-Jennifer

On Tue, Feb 11, 2020 at 2:08 PM Michael Adderley <adderley_ccpbcdc@yahoo.com> wrote:
Hello

On Tuesday, February 11, 2020, 02:07:17 PM EST, Orders Management
<orders@honorablereporting.com> wrote:


Hello Mr. Adderley,

Lets see if this works.

Thank you!
-Jennifer
--



--



--



--



--



-------- Original message --------From: Orders Management <orders@honorablereporting.com> Date:
2/18/20  12:24 PM  (GMT-05:00) To: adderley_ccpbcdc <adderley_ccpbcdc@yahoo.com> Subject:
Re: Hello Do you know how long the case went?Thank you!-JenniferOn Mon, Feb 17, 2020 at 11:21

45

Case 0:20-cv-61935-RS   Document 1   Entered on FLSD Docket 09/23/2020   Page 58 of 181

AM Orders Management <orders@honorablereporting.com> wrote:Hello Michael,Do you know about how long the case went? And do you have a case name or number available? Or a notice you can send?Thank you!-JenniferOn Mon, Feb 17, 2020 at 11:10 AM adderley_ccpbcdc <adderley_ccpbcdc@yahoo.com> wrote:Jennifer call me when you receive CD in mail..(954)982-5652Sent from my MetroPCS 4G LTE Android Device------- Original message --------From: Orders Management <orders@honorablereporting.com> Date: 2/12/20  12:25 PM  (GMT-05:00) To: Michael Adderley <adderley_ccpbcdc@yahoo.com> Subject: Re: Hello Hello Mr. Adderley,I have been given a physical mailing address for you to mail the audios to so we can get this transcribed for you.Honorable reporting6581 Geneva StreetLake worth, Fl 33467

Thank you!
-JenniferOn Tue, Feb 11, 2020 at 9:37 PM Michael Adderley <adderley_ccpbcdc@yahoo.com> wrote:

On Tuesday, February 11, 2020, 05:33:00 PM EST, Orders Management <orders@honorablereporting.com> wrote:

Just checkin with you again. I have not received any files yet.Thank you!-JenniferOn Tue, Feb 11, 2020 at 2:08 PM Michael Adderley <adderley_ccpbcdc@yahoo.com> wrote:
Hello

On Tuesday, February 11, 2020, 02:07:17 PM EST, Orders Management <orders@honorablereporting.com> wrote:

Hello Mr. Adderley,Lets see if this works.Thank you!-Jennifer--

--

--

--

--

🗑 Delete     Actions ☑     Apply                              ⌄

46

**88 pages**

# EXHIBIT E-3

```
            IN THE COUNTY COURT IN AND FOR
               BROWARD COUNTY, FLORIDA

            CASE NO.:  MH-C-16-1714



   IN RE:

   DOROTHY JONES,

   _____/


        Proceedings had and taken place before General

   Magistrate Claudette Vanni, at the Broward County

   Courthouse, 201 Southeast 6th Street, Fort Lauderdale,

   Florida, on Thursday, the 1st day of September 2016,

   commencing at the hour of 9:03 a.m., and being a

   Hearing.
```

47

Page 2

```
 1   APPEARANCES:

 2   Appearing on behalf of DCF:

 3        OFFICE OF GENERAL COUNSEL - DCF
          201 West Broward Boulevard
 4        Suite 502
          Fort Lauderdale, Florida 33301
 5        (954) 467-4551
          edmund.haskins@myflfamilies.com
 6        BY:  EDMUND M. HASKINS, ESQUIRE

 7   Appearing on behalf of the Respondent:

 8        THE LAW OFFICES OF RACHEL B. KUHL, P.A.
          1830 North University Drive
 9        Suite 113
          Fort Lauderdale, Florida 33322
10        (786) 258-8583
          rkuhllaw@gmail.com
11        BY:  RACHEL M. KUHL, ESQUIRE
          (Appearing Via Telephone)
12
     Appearing on behalf of Deborah Anthony:
13
          LAW OFFICE OF ROMAINE BROWN, P.A.
14        290 Northwest Peacock Boulevard
          Unit 881734
15        Port Saint Lucie, Florida 34988
          (754) 300-8393
16        rbrown@romainebrownpa.com
          BY:  ROMAINE N. BROWN, ESQUIRE
17
     ALSO PRESENT:
18
          DESTINY MURRAY
19
          DEBORAH ANTHONY
20
          JOSEPH DUDLEY
21
          MICHAEL ADDERLEY
22
          JOHN BUTTS
23

24

25
```

48

Page 3

```
 1              (Thereupon, the following proceedings were

 2      had:)

 3              THE COURT:  All right.  We are on the record

 4      In Re: Dorothy Jones, Case Number MH-C-16-1714.

 5      Please announce your name for the record and

 6      relationship to the case, starting with Mr.

 7      Haskins.

 8              MR. HASKINS:  Edmund Haskins, attorney for

 9      the Department.

10              MS. MURRAY:  Destiny Murray, Human Service

11      counsel for the Department.

12              THE COURT:  Ms. Murray, how do I spell your

13      last name?

14              MS. MURRAY:  M-U-R-R-A-Y.

15              THE COURT:  Thank you.

16              MS. ANTHONY:  Deborah Anthony.  I am the

17      daughter of Ms. Dorothy Jones.

18              THE COURT:  Next, please?  Ms. Kuhl on the

19      phone?

20              MS. KUHL:  Rachel Kuhl, Office of Regional

21      Counsel.

22              THE COURT:  Thank you.  Okay.  If you could

23      both raise your right hands?

24              Do you swear to tell the truth, the whole

25      truth, and nothing but the truth, so help you God?
```

49

Page 4

1           MS. MURRAY:  I do.

2           MS. ANTHONY:  I do.

3           THE COURT:  All right, thank you very much.

4     Nice to see both of you.

5           Let the record reflect this hearing was set

6     for 8:30 this morning.  Not only did our office

7     notice the hearing, but each person on the notice

8     got a personal phone call from my assistant,

9     personal phone call to Edmund Haskins, who is

10    present, to Romaine Brown, who is in another

11    hearing, but Ms. Anthony is here.

12          My assistant called you, also?

13          MS. ANTHONY:  Yes, ma'am.

14          THE COURT:  Thank you.  Okay.  Ms. Kuhl was

15    called.  Ms. Kuhl is on the phone.  Mr. Adderley

16    was called.

17          MR. HASKINS:  Okay, this is fine.  Your

18    Honor, Ms. Anthony's attorney is here.

19          THE COURT:  Ms. Brown?

20          MR. HASKINS:  That's right.

21          THE COURT:  Come on in, Ms. Brown.

22          MS. BROWN:  I'm sorry, I was double-booked.

23          THE COURT:  I understand, I understand,

24    totally okay.

25          So, let the record reflect Ms. Brown has

1        just entered the room.  She, as I was saying on

2        the record, didn't I start to say she was in

3        another hearing?

4            MR. HASKINS:  You did.

5            THE COURT:  Okay.  So, you were personally

6        noticed by my secretary, Ms. Brown, your secretary

7        was called?

8            MS. BROWN:  I think she called, yes.

9            THE COURT:  Yes, okay.

10            MS. BROWN:  Yeah.

11            THE COURT:  So, anyway, everybody was

12        verbally noticed and written notice was provided

13        and, because of the short notice, my office gave

14        that verbal notice.  And Mr. Adderley was spoken

15        to by my assistant.  She reached him personally;

16        she did not leave a voicemail.

17            Mr. Haskins, did you talk to him about this

18        hearing?

19            MR. HASKINS:  I did.  I spoke to him

20        yesterday.

21            THE COURT:  What did you say to him?

22            MR. HASKINS:  I advised him that his hearing

23        was set for 8:30 this morning.

24            THE COURT:  And what did he say?

25            MR. HASKINS:  He said he understood.  I

Page 6

 1          think he might out in the hallway now, I hear his

 2          voice, I think.

 3                  And he and I also had a conversation about

 4          some other issues with his visitation at the ALF,

 5          which the Department would like to address at the

 6          appropriate time.

 7                  THE COURT:  Okay.  Well, if you think you

 8          hear him, we're still on the record, let's --

 9          let's bring him in.

10                  MR. HASKINS:  Okay.  Maybe -- well, it's not

11          him.

12                  THE COURT:  Hello?

13                  MR. DUDLEY:  How are you doing?

14                  THE COURT:  Hi.  Sir?

15                  MR. DUDLEY:  Yes?

16                  THE COURT:  If you could have a seat, you

17          can sit at the table, if you would like.

18                  MR. DUDLEY:  Okay.

19                  THE COURT:  It's up to you.  Sir, for the

20          record, do you want to announce your name, please?

21                  MR. DUDLEY:  Joseph Dudley.

22                  THE COURT:  D-U-D-L-E-Y?

23                  MR. DUDLEY:  E-Y, yes.

24                  THE COURT:  And you're a friend of Ms.

25          Jones?

Page 7

1          MR. DUDLEY:  Yes.

2          THE COURT:  All right.  If I can ask

3     everybody who might testify to raise your hand

4     again?

5          Do you swear to tell the truth, the whole

6     truth, and nothing but the truth, so help you God?

7          MR. DUDLEY:  I do.

8          MS. ANTHONY:  I do.

9          MS. MURRAY:  I do.

10         THE COURT:  Okay, thank you very much.

11         Mr. Dudley, just to catch you up, this

12    hearing was set at 8:30.  Mr. Adderley was noticed

13    that his hearings were set at 8:30, and he is not

14    present.  It is approximately five-after-9:00.

15         Is he out in the hall, sir?

16         MR. DUDLEY:  He's not but he did call, told

17    me he was up on -- he was at Broward.  He text --

18         THE COURT:  How long ago did he say that?

19         MR. DUDLEY:  Text -- 8:47 a.m.

20         THE COURT:  Mr. Haskins, please, last time,

21    I would ask you to sit out in the hall.

22         Did he say he was in a car accident or

23    anything like that?

24         MR. DUDLEY:  No, he did not, so.

25         MR. HASKINS:  He's here.

53

1          THE COURT:  He's here?  Mr. Adderley, please

2     sit in that chair.  Thank you, sir.  Right there.

3     Right there. Right there.

4          Okay.  And then, we have Mr. Butts?  Mr.

5     Butts, if I could ask you to -- oh, you can sit

6     next to Ms. Brown.  You can sit up here, sir.

7          MS. ANTHONY:  I'm going to ask to switch.

8          THE COURT:  Okay.

9          MS. ANTHONY:  I have a hearing problem.

10          THE COURT:  No problem.  Okay, hold on.  Mr.

11     Butts, if you could fit -- hold on, how are we

12     doing this?

13          MR. DUDLEY:  Here, he need to sit here.

14     Here, here.

15          THE COURT:  That's okay, you can sit next to

16     Mr. Dudley.  All right.

17          Please state your name for the record, Mr.

18     Adderley.

19          MR. ADDERLEY:  Michael Christopher Adderley,

20     grandson of Dorothy Jones.

21          THE COURT:  Can you raise your right hand?

22     And also, I'm sorry, Mr. Butts, also.  Do you want

23     to announce your name?

24          MR. BUTTS:  My name is John Butts.  I'm the

25     nephew of Ms. Jones.

1            THE COURT:  Okay, thank you very much.  Can

2       you both -- do you swear to tell the truth, the

3       whole truth, and nothing but the truth, so help

4       you God?

5            MR. ADDERLEY:  Yes.

6            MR. BUTTS:  Yes.

7            THE COURT:  All right, thank you very much.

8       Mr. Adderley, this hearing was set at 8:30.  I

9       moved other hearings to accommodate you, and the

10      fact that it's about seven minutes after 9:00 and

11      you're just walking in is unacceptable.

12           So, this is going to cut into the time that

13      I had set for this hearing, and there is just no

14      way that I can avoid that.  I set a certain amount

15      of time for your hearing, and you have much less

16      time.  You have at least 37 minutes left than what

17      I was originally going to give you.

18           So, that being said, Mr. Haskins, there are

19      two motions here.  We canceled the hearing for

20      September 9th and we moved both motions to today,

21      since they were intertwined.

22           One is for an independent medical

23      examination; the other is for Ms. Jones to attend

24      a funeral, or her brother's wake, on Friday, which

25      is tomorrow.

Page 10

```
 1              So, Mr. Adderley, let me ask you a question.
 2       Did you prepare these by yourself, or did a
 3       lawyer prepare these documents?
 4              MR. ADDERLEY:  It was a paralegal that was
 5       assisting me.
 6              THE COURT:  Okay.  Who was the paralegal?
 7              MR. ADDERLEY:  Lee Smith (phonetic).
 8              THE COURT:  Pardon me?
 9              MR. ADDERLEY:  Lee Smith.
10              THE COURT:  Where did you find him?
11              MR. ADDERLEY:  It was an associate with
12       Legal Shield.
13              THE COURT:  Legal Shield?
14              MR. ADDERLEY:  Yes.
15              THE COURT:  What's their phone number?
16              MR. ADDERLEY:  954-865-7608.
17              THE COURT:  Now, is this a law firm?
18              MR. ADDERLEY:  Yes.
19              THE COURT:  Then, why did you get the
20       assistance of a paralegal versus the lawyer that
21       works at the firm?
22              MR. ADDERLEY:  Because this law firm was the
23       one that was actually registering her, but the
24       process has not gone -- wasn't going through at
25       that time, as far as her registration.  So, with
```

Page 11

 1         that being said, we needed someone legally to

 2         proof the paperwork, and it just was the paralegal

 3         that I needed assistance with Ms. Jones's

 4         particular needs as far as her wanting to come

 5         home.

 6               THE COURT:  Okay.  So, did you speak to the

 7         lawyer at that firm, at Legal Shield?

 8               MR. ADDERLEY:  To the paralegal, yes.

 9               THE COURT:  But not the lawyer?

10               MR. ADDERLEY:  No.

11               THE COURT:  Okay.  So, how did you make an

12         appointment with the paralegal?

13               MR. ADDERLEY:  Just so happened, the

14         register who I was on the phone with, their

15         paralegal was actually in the car with him, and he

16         overheard the conversation.

17               THE COURT:  And so, they set you up with the

18         paralegal to help you, versus the lawyer?

19               MR. ADDERLEY:  Well, not versus.  More or

20         less while the lawyer is being included into the

21         process, because her process of her registering

22         had not gone through in time.

23               THE COURT:  What do you mean by her

24         registering?

25               MR. ADDERLEY:  Because she was registering

57

Page 12

1      with Glass Shield, which is the law firm that is

2      tied with this particular group, the number I just

3      gave you.  It was under -- I'm sorry, not Glass

4      Shield, Legal Shield, Legal Shield.

5            THE COURT:  Legal Shield?

6            MR. ADDERLEY:  Yes.

7            THE COURT:  I'm sorry, sir, it's all right,

8      I have the phone number.  Okay.

9            MR. ADDERLEY:  And do you want Mr. Lee's

10     number, too?

11           THE COURT:  Pardon me?  No, you gave me the

12     number.  95 --

13           MR. ADDERLEY:  No, no, no, that was -- the

14     paralegal's number is different from Legal

15     Shield's number.

16           THE COURT:  Okay, sure.

17           MR. ADDERLEY:  That's why you have to have

18     both.

19           THE COURT:  Sure.

20           MR. ADDERLEY:  954-465-3837.

21           THE COURT:  Now, who told you about this

22     place?

23           MR. ADDERLEY:  More or less, it was Dudley

24     who inclined me about it, because he's actually a

25     member.

Page 13

1    THE COURT:  Of this Legal Shield?

2    MR. ADDERLEY:  Yes.

3    MR. DUDLEY:  Yes.

4    THE COURT:  And they are paralegals that

5 prepare documents for people in the community?

6    MR. ADDERLEY:  He, more or less, was not

7 associated, he was with a different law firm, the

8 paralegal.

9    THE COURT:  Lee Smith?

10    MR. ADDERLEY:  Yes.

11    THE COURT:  What law firm is he from?

12    MR. ADDERLEY:  I don't quite have it in my

13 head.  He said it one or two times.  I don't have

14 it recollected in my head.

15    THE COURT:  Did he -- did he charge you for

16 this work?

17    MR. ADDERLEY:  Yes.

18    THE COURT:  Okay.  So, he looked up the case

19 law that is in --

20    MR. ADDERLEY:  Yes.

21    THE COURT:  -- your motion?

22    MR. ADDERLEY:  Yes.

23    THE COURT:  And did he give you advice?

24    MR. ADDERLEY:  More or less, he -- we -- he

25 pretty much kind of gave me some advice on, as far

Page 14

```
 1        as --
 2              THE COURT:  What to file?
 3              MR. ADDERLEY:  Yes.  And from that point, we
 4        pretty much wanted to proceed forward, as far as
 5        how to assist Ms. Jones with her particular
 6        condition and wanting to get her out of the
 7        situation that she's currently in.
 8              THE COURT:  Okay.  I'm going to call Mr.
 9        Smith. Oh, I'm sorry.  Ms. Kuhl?
10              MS. KUHL:  Yes?
11              THE COURT:  Ms. Kuhl, give me just a moment.
12              MS. KUHL:  Sure.
13              (Thereupon, the Court placed a telephone
14        call in open court.)
15              THE COURT:  Okay, that's not -- Ms. Kuhl,
16        let me call you back, okay?
17              MS. KUHL:  Sure.
18              THE COURT:  Mr. Adderley?
19              MR. ADDERLEY:  Yes, ma'am?
20              THE COURT:  Did I have the right number,
21        954-865-7608?
22              MR. ADDERLEY:  Yes, that's what I have.  Let
23        me double-check.  Actually, I'm sorry, 954-423 --
24              THE COURT:  Hold on.
25              MR. ADDERLEY:  423-0086.
```

Page 15

```
 1                    THE COURT:  All right.

 2                    (Thereupon, the Court placed a telephone

 3           call in open court.)

 4               MR. ADDERLEY:  And there was a lawyer that

 5           was trying to contact her at the facility, but he

 6           couldn't get through.

 7                    THE COURT:  Is that right?

 8               MR. ADDERLEY:  Yes.

 9                    THE COURT:  And I'm sorry, what lawyer was

10           trying to call who?  Is Lee a female or a male?

11               MR. ADDERLEY:  Lee is male.

12                    THE COURT:  Okay.

13               MR. ADDERLEY:  He's just a paralegal that

14           was doing the paperwork.

15                    THE COURT:  Right.  So, who is the lawyer?

16               MR. ADDERLEY:  The lawyer, they -- they want

17           to present a lawyer in her case, in her case, but

18           the agency did not get --

19                    THE COURT:  Sir, just stop for a second,

20           please.

21               I'm sorry, ma'am.  This is Magistrate

22           Vanni from the Broward County Courthouse.  I'm

23           trying to reach paralegal Lee Smith.

24                    UNIDENTIFIED SPEAKER:  Lee Smith?

25                    THE COURT:  Yeah.
```

Page 16

```
 1              UNIDENTIFIED SPEAKER:  I have a Lee Berger.
 2              THE COURT:  No, that's not him.  All right.
 3         I'm going to terminate the line.  Thank you very
 4         much.
 5              UNIDENTIFIED SPEAKER:  You're welcome.
 6              THE COURT:  I'm sorry, sir.  You were
 7         saying, who is the lawyer that's associated with
 8         Legal Shield?
 9              MR. ADDERLEY:  They didn't appoint her a
10         lawyer.  How --
11              THE COURT:  Who is her?
12              MR. ADDERLEY:  Dorothy Jones, sorry.
13         Dorothy Jones.
14              THE COURT:  That's okay.
15              MR. ADDERLEY:  How the process goes is, when
16         you do the registry, they give her a membership
17         number.  And from there, if you have like a case
18         that you want to present --
19              THE COURT:  Okay, hold on.  When you say
20         she, did you register her on --
21              MR. ADDERLEY:  No, she registered herself
22         because they had to speak --
23              THE COURT:  When?
24              MR. ADDERLEY:  -- when she was in the
25         hospital --
```

Page 17

```
 1                    THE COURT:  When?

 2                    MR. ADDERLEY:  -- on Saturday.

 3                    THE COURT:  With your assistance?

 4                    MR. ADDERLEY:  No, she was pretty much --

 5          they had to call her.  Her line, her landline, her

 6          hospital line.

 7                    THE COURT:  Whoa, hold on for a second.  You

 8          contacted this paralegal association, and they

 9          called her --

10                    MR. ADDERLEY:  Right.

11                    THE COURT:  -- to get her to sign up with

12          them?

13                    MR. ADDERLEY:  No, she -- they signed up

14          with her at the hospital, because she --

15                    THE COURT:  Listen to me.

16                    MR. ADDERLEY:  Yes, ma'am.

17                    THE COURT:  She's in the hospital now,

18          correct?

19                    MR. ADDERLEY:  No.

20                    THE COURT:  Okay.  She's in the rehab

21          center?

22                    MR. ADDERLEY:  Yes.  No, not rehab.  She's

23          in assisted living home.

24                    THE COURT:  Okay.  So, when she was in the

25          hospital, after she was removed from your home --
```

63

Page 18

```
1              MR. ADDERLEY:  Yes.
2              THE COURT:  -- you had Lee Smith contact Ms.
3      Dorothy?
4              MR. ADDERLEY:  No, he didn't contact -- he
5      never contacted her.  It was Glass Shield is the
6      agency that contacted her because of -- I'm
7      sorry --
8              THE COURT:  No, no, Mr. Dudley, you can't
9      interfere with his testimony.
10             MR. ADDERLEY:  I'm sorry, the name of it,
11     actually, is Legal Shield, I keep calling it Glass
12     Shield.
13             THE COURT:  It's okay.
14             MR. ADDERLEY:  But it's the same
15     affiliation.
16             THE COURT:  Right.
17             MR. ADDERLEY:  They basically came to
18     register her because she was trying to get some
19     legal assistance, because she never talked to any
20     lawyer.
21             THE COURT:  Okay.  And she was trying to do
22     that before she was removed or after she got to
23     the hospital?
24             MR. ADDERLEY:  Before, before she was
25     removed to the assisted living.
```

Page 19

```
 1              THE COURT:  Okay.  So, how did -- how did
 2      Legal Shield know that she went to the hospital?
 3              MR. ADDERLEY:  Because she wanted to get
 4      assistance. She told me to get her some legal
 5      assistance.
 6              THE COURT:  Okay.  So, you called Legal
 7      Shield and gave them her phone number at the
 8      hospital?
 9              MR. ADDERLEY:  Right, based off what she
10      wanted.
11              THE COURT:  And then, they called her?
12              MR. ADDERLEY:  Yes.
13              THE COURT:  Okay.  And then, from there, you
14      have been working with Legal Shield on her behalf?
15              MR. ADDERLEY:  No, I never -- I never spoke
16      to them because I'm not allowed to.
17              THE COURT:  Okay.
18              MR. ADDERLEY:  They told me I'm not allowed
19      to engage in that conversation with her --
20              THE COURT:  Okay.  But Lee Smith is a
21      paralegal who is affiliated with Legal Shield?
22              MR. ADDERLEY:  Negative.
23              THE COURT:  Okay.  Then, why are you telling
24      me about Legal Shield if Lee Smith has nothing to
25      do with that?
```

```
 1              MR. ADDERLEY:  Because he was the paralegal

 2      that helped me out with the paperwork when he

 3      overheard the conversation --

 4              THE COURT:  How did he overhear the

 5      conversation?

 6              MR. ADDERLEY:  Because, when I was talking

 7      with the register --

 8              THE COURT:  At Legal Shield?

 9              MR. ADDERLEY:  Yes.

10              THE COURT:  He was just there?

11              MR. ADDERLEY:  He was just so happened there

12      in the car with --

13              THE COURT:  So, how are you telling me he is

14      not affiliated with Legal Shield if he's there at

15      their firm?

16              MR. ADDERLEY:  Because he works for a

17      different law firm, that's what I'm saying.  Just

18      so -- I don't know how they were in the car

19      together, how they happened in the car together,

20      but --

21              THE COURT:  I see.

22              MR. ADDERLEY:  -- he called me about the

23      registry, that's when I went ahead and said, okay,

24      we're going to go ahead and proceed forth and Ms.

25      Jones going get processed for the payment for the
```

Page 21

```
 1        registry?

 2             THE COURT:  Hold on.  Mr. Haskins, does this

 3        not sound like solicitation?

 4             MR. HASKINS:  I'm not going to comment on

 5        that, Your Honor, respectfully.  I would -- I

 6        would just ask that we move forward with Mr.

 7        Adderley's petitions.

 8             THE COURT:  Well, and I respect that, but

 9        let me -- I think I just lost Ms. Kuhl.  Let me

10        get Ms. Kuhl back on the line.

11             MR. ADDERLEY:  Because her only concern was

12        that she never spoke with anyone legal-wise.

13             THE COURT:  When you say she, you're talking

14        about Ms. Dorothy --

15             MR. ADDERLEY:  Ms. Dorothy, yeah, I'm sorry.

16             THE COURT:  That's all right.

17             MR. HASKINS:  But I would -- I would concede

18        that this experience has direct bearing on Mr.

19        Adderley's petitions --

20             THE COURT:  It does.

21             MR. HASKINS:  -- in relationship to this

22        mother.

23             THE COURT:  Absolutely.  I mean, as an

24        Officer of the Court --

25             MS. KUHL:  Hello?
```

67

Page 22

```
 1            THE COURT:  Hi, Ms. Kuhl, I apologize.  You
 2       were off the phone for a while and I'm not sure
 3       how long.  Let me just get you up to speed.
 4            I just asked Mr. Adderley why, or how,
 5       again, how he was able to speak with Lee Smith, or
 6       how he met with Lee Smith, and what he said was
 7       Lee Smith was in the phone -- I'm sorry, was in
 8       the car with someone from Legal Shield, and then
 9       Mr. Adderley was talking to somebody from Legal
10       Shield because Ms. Dorothy had tried to sign up or
11       register with them, prior to her going into the
12       hospital.
13            And so, when he was speaking with somebody
14       from Legal Shield, Lee Smith, the paralegal, was
15       in the car and he said that he would be able to
16       help Mr. Adderley.
17            Is that correct?
18            MR. ADDERLEY:  Yes, ma'am.
19            THE COURT:  Yeah, that is correct.  So, my
20       concern is I just asked Mr. Haskins, does this
21       sound like solicitation?  You know, solicitation
22       of business, which is, you know, basically, and
23       for a lack of a better way to put it,
24       inappropriately seeking a client.  I don't know if
25       this violates any of the rules, but I can say that
```

Page 23

1          I'm very concerned because, number one, it looks

2     to me like Lee Smith, a paralegal, may be

3     practicing law without a license, because,

4     according to what Mr. Adderley said or testified

5     to earlier, he helped Mr. Adderley write these

6     pleadings and he gave him advice, as far as what

7     to file and the case law that applied.

8               Is that correct, Mr. Adderley?

9          MR. ADDERLEY:  Yes.

10         THE COURT:  Okay.  And, you know, to me,

11    that goes -- I mean, what a paralegal does, as far

12    as I know, and I have worked with paralegals since

13    2001, is -- or even before -- is they are supposed

14    to assist in writing things up, not researching,

15    giving advice based upon that research, and

16    drafting things and recommending what pleading to

17    -- to file.  I think that crosses the line. So,

18    I'm concerned about that.

19              And if I am being given petitions that have

20    been filed by somebody who is practicing law

21    without a license, I think that has bearing on

22    whether I can forward with these proceedings.

23              So, I didn't know if you wanted to comment,

24    Ms. Kuhl, or not.  If you don't, I completely

25    understand.  I just have to get to the bottom of

Page 24

1      this and -- and just, basically, I have to do the

2      right thing.

3            MS. KUHL:  I understand.  I'll defer to

4      whatever the Court feels comfortable with.  I

5      don't have any personal knowledge of the

6      [unintelligible] or how they came to be.

7            THE COURT:  All right.  So, Mr. Adderley,

8      when Mr. Smith was in the car from the

9      representative from Legal Shield, he said he will

10     help you, so that way you could help Dorothy

11     Jones; is that correct?

12           MR. ADDERLEY:  Well, once again --

13           THE COURT:  Answer my question yes or no,

14     and then you can explain.

15           MR. ADDERLEY:  Okay.  Repeat the question

16     one more time.

17           THE COURT:  Okay.  So, when Mr. Smith was in

18     the car with a representative from Legal Shield,

19     after Ms. Dorothy went to the hospital, he offered

20     to help you, Mr. Lee Smith?

21           MR. ADDERLEY:  Not offered to help me, it

22     was actually to --

23           THE COURT:  To help Ms. Dorothy?

24           MR. ADDERLEY:  Ms. Jones, right --

25           THE COURT:  I'm sorry.

70

Page 25

1           MR. ADDERLEY:  -- because she was, once

2      again, he's not a representative affiliated with

3      Legal Shield.

4           THE COURT:  I understand.

5           MR. ADDERLEY:  He has -- he's part of a

6      different law firm.

7           THE COURT:  Right, but he offered to help

8      you --

9           MR. ADDERLEY:  Correct.

10          THE COURT:  -- file things on behalf of

11     your --

12          MR. ADDERLEY:  Correct.

13          THE COURT:  -- grandma?

14          MR. ADDERLEY:  Correct, correct, because she

15     didn't have no representation, at all.  She wasn't

16     given any visitation or any interviews from no one

17     from DCF.

18          THE COURT:  Okay.  When you say no

19     representation, you're proving my point, okay?  A

20     paralegal cannot represent --

21          MR. ADDERLEY:  That is correct.

22          THE COURT:  -- somebody, in the State of

23     Florida.

24          MR. ADDERLEY:  That is correct.

25          THE COURT:  So, he had no right, okay, from

1      what I'm hearing, it doesn't sound to me like he

2      had the authority, under the laws of Florida, to

3      step in and do what he did. I could be wrong, but

4      it doesn't sound good to me, at all.

5          So, let me ask you, Ms. Kuhl and Mr.

6      Haskins, being that this may be the product of

7      something specious, ethically, am I permitted to

8      go forward with these two petitions before me?

9          MS. KUHL:  I don't know the --

10     MR. HASKINS:  On behalf of --

11     MS. KUHL:  I don't know the answer to that,

12    Your Honor.

13     THE COURT:  Mr. Haskins?

14     MR. HASKINS:  Yeah, sure.  The safest way,

15    in my mind, and I would probably call the Ethics

16    hotline, but on my understanding of the law, and

17    I'm not speaking on behalf of the Department, I'm

18    speaking as an Officer of the Court, I would deny

19    them outright based on the seemingly nefarious

20    background of how they came to be.

21     But if you want to let Mr. Adderley state

22    what he wants, because we're here, I'm fine with

23    that, but I will be responding to the allegations

24    that he made and the request that he is making in

25    his petitions, you know, baseless and legally

Page 27

1      insufficient as they may be.

2           But I wouldn't think it would be

3      objectionable for you to dismiss them based on the

4      manner in which they came to be.

5           MS. KUHL:  And Your Honor, I don't have an

6      objection to Mr. Adderley orally expressing his

7      position, what it is that he is requesting, since

8      we are all here, but I do think that what has been

9      filed is really something more for the Department

10     to respond to that, not necessarily my client.

11          THE COURT:  All right.  I need a recess.  I

12     would just ask everybody to step outside for about

13     five minutes.

14          (Thereupon, a recess was had at 9:24 a.m.)

15          (Thereupon, the proceedings resumed at 9:35

16     a.m.)

17          THE COURT:  Back on the record In Re:

18     Dorothy Jones, Case Number MH-C-16-1714.  All

19     parties remain present, all parties remain sworn.

20     All interested people and witnesses, potential

21     witnesses, remain present, remain sworn.

22          And Ms. Kuhl, you're awaiting your client's

23     presence because she can't assist in the

24     proceedings; is that correct?

25          MS. KUHL:  Yes.

Page 28

1          THE COURT:  Okay.  All right.  Mr. Haskins

2     and Ms. Kuhl, Mr. Adderley, Mr. Dudley --

3          MR. DUDLEY:  Mr. Butts, he went to the

4     bathroom.

5          THE COURT:  He went to the restroom, okay.

6     Ms. Anthony, and I'm sorry, we don't have the

7     lawyer, Romaine Brown, because she is in another

8     courtroom.  Here comes Mr. Butts.  One moment.

9     And Ms. Murray, I'm sorry.

10          Okay.  I'm not sure whether the testimony

11     that I received today from Mr. Adderley rises to

12     the level of a violation of Florida law in regard

13     to Mr. Smith, paralegal, assisting Mr. Adderley.

14     It's concerning, the testimony, because it sounds

15     like a paralegal went beyond a paralegal's duties

16     and actually engaged in giving legal advice, which

17     is the unauthorized practice of law, but I don't

18     know for sure.  I don't know for sure.

19          What I can say is this:  That both of these

20     motions, according to Mr. Adderley, were filed by

21     Mr. Adderley, on behalf of Dorothy Jones; is that

22     correct?

23          MR. ADDERLEY:  Yes.

24          THE COURT:  Okay.  Legally, in the State of

25     Florida, you, sir, don't have the right or the

```
 1          standing to file pleadings on Dorothy Jones's

 2          behalf.  Dorothy Jones has a lawyer, Ms. Kuhl, who

 3          is on the phone.

 4               So, Ms. Kuhl can't just file things if you

 5          ask her to because you're not her client.  It's

 6          Ms. Jones who is her client.

 7               MR. ADDERLEY:  Correct.

 8               THE COURT:  So, that's who needs to be

 9          filing things.  Ms. Kuhl needs to be filing things

10          on behalf of Ms. Jones, not you, Mr. Adderley.

11          So, I'm going to strike both of these motions, due

12          to the fact that they are legally insufficient

13          because they were filed on behalf of Ms. Jones by

14          Mr. Adderley and he is not authorized by Florida

15          law to do so.

16               Now, that being said, does anybody have any

17          objection to this hearing also being converted

18          into a status hearing, so that way I can hear any

19          concerns of the department, and I can hear,

20          orally, from Mr. Adderley what he would like to do

21          as far as responding to the Department's concerns,

22          and if there is anything else that he wants to ask

23          the Court?  Does anybody have any objection to me

24          hearing what he has to say?

25               MR. HASKINS:  No, ma'am.
```

75

Page 30

1           THE COURT:  Okay.  Okay.

2           MR. HASKINS:  The Department doesn't.

3           MS. KUHL:  No objection, Your Honor, and

4      I'll just, whenever the appropriate time is, I'll

5      chime in with my responses.

6           THE COURT:  Okay.  Let me -- let me say

7      this, Mr. Adderley --

8           MR. ADDERLEY:  Yes.

9           THE COURT:  -- what I just did, I struck

10     these, okay?  But I'm going to allow you to tell

11     me what you want, today, but I'm going to let the

12     Department speak first.  So, that way, you can

13     respond to what they are saying, you can do

14     everything in one shot, because we're running out

15     of time.

16          MR. ADDERLEY:  I understand, the time.

17          THE COURT:  Yes.

18          MR. ADDERLEY:  I understand.

19          THE COURT:  Go ahead, Mr. Haskins.

20          MR. HASKINS:  All right.  Given the fact

21     that the motions are stricken, I will not be

22     responding to those.

23          I would just proffer on behalf of the

24     Department that the -- Mr. Adderley's attempting

25     to exercise his visitation at the ALF where Ms.

76

1       Jones is placed has resulted in the ALF, Lamercie,

2       indicating to Ms. Murray that they no longer want

3       her placed there.

4           His behavior, according to what I have been

5       told, is disrupting her placement.  I have spoken

6       to Mr. Adderley about this.

7           THE COURT:  Hold on.  Is this an ALF?

8           MR. HASKINS:  This is an ALF.  This is where

9       she is currently placed.

10          THE COURT:  Okay, hold on.  And that's where

11       the hospital placed her?

12          MR. HASKINS:  Correct.

13          THE COURT:  Wasn't she supposed to go to

14       rehab, first?

15          MR. DUDLEY:  Mm-hmm.  Mm-hmm.

16          MR. HASKINS:  [Unintelligible] safe and

17       appropriate discharge from the hospital, so she

18       may have gone directly to Lamercie, she may have

19       gone to rehab, I don't know, and I would suggest

20       that's not really relevant at this point.

21          THE COURT:  Okay.  The reason that I'm

22       asking is I just want to make sure that, whatever

23       the hospital recommended --

24          MR. HASKINS:  Right.

25          THE COURT:  -- be her level of care --

Page 32

1          MR. HASKINS:  Yes, ma'am.

2          THE COURT:  -- when she was discharged, did

3      that happen?

4          MR. HASKINS:  Yes, ma'am.

5          THE COURT:  So, you know what, let me ask

6      your client, and then I'll let you finish.

7          MR. HASKINS:  Sure.

8          THE COURT:  Ms. Murray, when Ms. Jones was

9      discharged from the hospital, first of all, before

10     you answer that question, what hospital was she in

11     when she was removed from her home and put in the

12     hospital --

13         MS. MURRAY:  Northwest --

14         THE COURT:  -- prior to this case coming

15     before me?

16         MS. MURRAY:  Northwest Medical Center.

17         THE COURT:  Northwest?

18         MS. MURRAY:  Yeah.

19         THE COURT:  Okay.  So, Northwest, that's

20     where Mr. Adderley filed an appeal and the appeal

21     was denied, and Ms. Jones was found to be

22     incompetent to consent to services, and she was

23     found to require hospitalization and then to be

24     placed in a facility; is that correct?

25         MS. MURRAY:  Yes.

78

1          THE COURT:  Okay.  And the facility that

2     they chose was an ALF, versus a skilled nursing

3     home or a rehab or some other type of placement?

4          MS. MURRAY:  Yes.

5          THE COURT:  Okay.  Do you know why?  Why did

6     they place her in an ALF, versus some higher level

7     of care?

8          MS. MURRAY:  Well, when we place, before we

9     place the clients, we ask the doctors to fill out

10     a 3008 and an 1823, describing the level of care

11     and, from those forms, it was to be an ALF, is

12     what the doctor said that she needed.

13          THE COURT:  Okay.

14          MS. MURRAY:  So, she was discharged to an

15     ALF.

16          THE COURT:  Okay.  Did they say that she

17     could not go back home?

18          MS. MURRAY:  They said that she would be

19     best in an ALF.  They did not recommend her to be

20     back home.

21          THE COURT:  Okay, okay.  All right.  So, who

22     was the doctor, do you know?

23          MS. MURRAY:  No, I don't know.

24          THE COURT:  Okay.  But --

25          MS. MURRAY:  I just know the social worker,

Page 34

```
 1          her name is Melissa.

 2               THE COURT:  Okay.  And she told you that Ms.

 3          Jones had a competency evaluation at Northwest and

 4          they recommended that she cannot consent to

 5          services and she needs to be placed in an ALF as

 6          the proper level of care for her --

 7               MS. MURRAY:  Yes.

 8               THE COURT:  -- is that correct?

 9               MS. MURRAY:  Yes.

10               THE COURT:  All right.  Mr. Haskins, please

11          continue, I apologize.

12               MR. HASKINS:  No, ma'am, it's very

13          straightforward.  This is -- she -- Ms. Jones is

14          currently placed at Lamercie.  Her -- up until the

15          last couple days, it's my understanding her

16          placement was safe and stable.

17               And based on the visitation that, allegedly,

18          Mr. Adderley is exercising and the manner in which

19          he is doing it, Lamercie itself is now saying we

20          no longer want this patient here.

21               I'm hoping we can salvage that by

22          terminating Mr. Adderley's contact there.  I don't

23          know that that's the case, but we have no other --

24          we have no other options, at this point.

25               MR. ADDERLEY:  And I'm going to tell you
```

Page 35

```
 1      why --
 2              MR. HASKINS:  Because the --
 3              MR. DUDLEY:  Mm-hmm.
 4              MR. HASKINS:  What the view is, she is
 5      placed where she is supposed to be placed.
 6      According to the hospital, the Department was to
 7      verify a safe and appropriate discharge.  This is
 8      what her placement is required to be.
 9              If this placement breaks down, I guess the
10      Department may have to make efforts to find
11      another ALF for her.  We're hoping we can salvage
12      it if we can tell Lamercie that Mr. Adderley will
13      not be coming there anymore, but I don't see any
14      other option at this point.
15              I have discussed his behavior with him, and
16      apparently it's still going on, so.
17              THE COURT:  Okay.  Mr. Adderley, I want to
18      hear from you.
19              MR. ADDERLEY:  Yes, ma'am.  The staff member
20      who I had, I guess, engaged contact with, as well
21      as a DCF case worker, who was also at the
22      facility, them, more or less, was trying to engage
23      me into negative contact, to where I would sit
24      there and cuss and yell or do that -- they were
25      trying to provoke me into that, and I wasn't
```

1          feeding into the --

2               THE COURT:  Okay, hold on.  Let me ask you a

3          question.

4               MR. ADDERLEY:  Yes, ma'am.

5               THE COURT:  Do you see these, these motions

6          that I had to deny?

7               MR. ADDERLEY:  Yes, ma'am.

8               THE COURT:  Did you tell Ms. Jones that you

9          were filing them on her behalf?

10              MR. ADDERLEY:  No, she told me what she

11         wanted to instruct the paralegal, based off what

12         --

13              THE COURT:  So, you told her, since she has

14         been in an ALF, that you have had contact with Lee

15         Smith, and Lee Smith was the --

16              MR. ADDERLEY:  That was prior to ALF.

17              THE COURT:  Prior to the ALF?

18              MR. ADDERLEY:  Yes, when she was in the

19         hospital, because the people came to register her,

20         that was in the hospital.

21              THE COURT:  Okay.  Since she has been in the

22         ALF, did you tell her that you filed these on her

23         behalf?

24              MR. ADDERLEY:  Yes.

25              THE COURT:  When did you tell her that?

82

Page 37

1        MR. ADDERLEY:  I told her that on -- when

2    was that? Yesterday.

3        THE COURT:  Okay.  Sir --

4        MR. ADDERLEY:  Yesterday.  And the fact that

5    she wasn't getting no representation at the -- to

6    see about her.  In addition to that, when I viewed

7    her, when she first came out, she told me she fell

8    prior to, and DCF didn't know about it, and the

9    family didn't know about it, so we didn't know

10   what her condition was, as far as her falling down

11   at that particular facility that she's currently

12   at.

13        They didn't bother to tell us at all about

14   how she fell, why she fell, or her condition.  So,

15   they kind of kept that a secret.  That's the

16   reason why they're saying what they're saying now.

17        In addition to that, my grandmother, the way

18   she came out, the way she was appearing, it was

19   not appropriate.

20        THE COURT:  All right.  Let me tell you

21   something --

22        MR. ADDERLEY:  They had hairs and everything

23   on her face and everything.  And when she was at

24   the hospital, I made sure my grandmother was

25   shaven, I made sure I was there visiting her every

1    day.  There was no problem with the hospital, but

2    there's a problem here, because I was asking

3    questions, and I'm asking how come you don't have

4    any camera to view what happened to her falling.

5         I just wanted that, you know, to see what

6    happened to her.  He got upset with me.

7         THE COURT:  Who is he?

8         MR. ADDERLEY:  The -- I don't know who this

9    guy --

10        THE COURT:  The person at the ALF?

11        MR. ADDERLEY:  Yes.

12        THE COURT:  The staff?

13        MR. ADDERLEY:  It's the head staff member

14   who called DCF.

15        THE COURT:  Okay.  All right.  Mr. Adderley,

16   let me tell you something.

17        MR. ADDERLEY:  Yes, ma'am.

18        THE COURT:  First of all, when we were in

19   court on August 16th, I made very clear to

20   everybody, and everybody agreed, okay, that no one

21   shall speak to Respondent, that's Ms. Jones, about

22   the current case.

23        MR. ADDERLEY:  Yes.

24        THE COURT:  You had no right.  You, against

25   the court order, told her that you were filing

84

Page 39

1        these pleadings.

2              MR. ADDERLEY:  She told me to.

3              THE COURT:  Listen to me.

4              MR. ADDERLEY:  That's the problem.

5              THE COURT:  I told you don't speak to her

6        about the case.

7              MR. ADDERLEY:  Yes.

8              THE COURT:  And I also said that, if she

9        wants to talk about the case, you redirect her,

10       remember?

11             MR. ADDERLEY:  Right, but the --

12             THE COURT:  You even nodded your head, Mr.

13       Dudley.

14             MR. ADDERLEY:  The only reason --

15             THE COURT:  You sat there nodding your head

16       yes, because I said you redirect her --

17             MR. DUDLEY:  Yes, I understand that.

18             THE COURT:  -- you talk about the weather,

19       you don't --

20             MR. ADDERLEY:  Yes.

21             THE COURT:  -- if she wants to speak about

22       it, you don't talk about it with her.

23             MR. ADDERLEY:  Yes, yes.

24             THE COURT:  You had no business violating --

25             MR. ADDERLEY:  The only --

85

Page 40

1              THE COURT:  Listen.

2              MR. ADDERLEY:  Yes.

3              THE COURT:  You had no business violating

4       this court order, okay?

5              MR. ADDERLEY:  Yes.

6              THE COURT:  You're making your own problem,

7       all right?  Because I'm going to tell you right

8       now, if she's not ready to go home, she's not

9       going home.  Once she is ready to go home, I would

10      absolutely be willing to consider placing her back

11      with you if it's safe.

12             But what you're doing, you're showing me

13      that it's not safe for her to be there, because

14      you're violating court orders, okay, you're

15      causing problems where they don't even want to

16      keep her at the placement, okay, and you're filing

17      things on her behalf and you don't have the

18      authority to do that.

19             That's the least of -- I have to say I don't

20      find that you did that intentionally, that you

21      meant to do something wrong, okay, but I'm telling

22      you, from here on out, you're not her lawyer,

23      you're not a lawyer --

24             MR. ADDERLEY:  Yes.

25             THE COURT:  -- you cannot be filing

Page 41

1    pleadings on her behalf like a lawyer, even with

2    the assistance of a paralegal, okay?

3         MR. ADDERLEY:  Yes.

4         THE COURT:  Whether the paralegal is right

5    or wrong, you cannot file pleadings on her behalf.

6         MR. ADDERLEY:  Right.

7         THE COURT:  Does that make sense?

8         MR. ADDERLEY:  Yes, that makes sense, but I

9    just want to add --

10        THE COURT:  Okay.  And you can't be saying

11   that they provoked you, because you know what?

12        MR. ADDERLEY:  No, I --

13        THE COURT:  People provoke all people, all

14   the time, and it's what you do with the

15   provocation that matters.

16        MR. ADDERLEY:  That is correct.

17        THE COURT:  You need to sit there and you

18   need to just --

19        MR. ADDERLEY:  Be quiet.

20        THE COURT:  -- let it be --

21        MR. ADDERLEY:  Exactly.

22        THE COURT:  -- let it roll of your back.

23        MR. ADDERLEY:  Exactly.  That's what I did.

24        THE COURT:  You didn't.  You just told me

25   that you were cursing --

87

Page 42

```
 1              MR. ADDERLEY:  No, that's -- no, ma'am --

 2              THE COURT:  -- because they provoked you.

 3              MR. ADDERLEY:  No, ma'am, I said they wanted

 4       to do that --

 5              MR. DUDLEY:  They tried.

 6              MR. ADDERLEY:  -- they were --

 7              MR. DUDLEY:  They tried.

 8              MR. ADDERLEY:  -- they were provoking me to

 9       do that, and I would not give in to that.  That's

10       the problem.  I would not give in to that

11       negativity --

12              THE COURT:  All right, hold on.  Let me

13       hear --

14              MR. ADDERLEY:  -- that's the problem.

15              THE COURT:  Let me hear from Ms. Murray.

16       What was he doing at the ALF that made them feel

17       that they don't want to have Ms. Jones there

18       anymore?

19              MS. MURRAY:  It was a phone call.  I don't

20       necessarily think he was cursing at me, maybe he

21       was cursing at someone in the background, and then

22       that's when I got on the phone.  He wanted myself

23       and the owner there to introduce ourselves.

24              He was just saying, you know, when are you

25              going to
```

Page 43

```
 1        do this, when are you going to do that.  The

 2        owner --

 3             MR. ADDERLEY:  When are they going to do

 4        what?

 5             THE COURT:  Did he use foul language?

 6             MS. MURRAY:  Yes, he did, but I don't know

 7        who it was directed towards, who --

 8             THE COURT:  How do you know Mr. Adderley

 9        used foul language?

10             MS. MURRAY:  I heard him say it.

11             THE COURT:  And were you on the phone?

12             MS. MURRAY:  Yes, we were on the phone.

13             THE COURT:  And you recognized his voice?

14             MS. MURRAY:  Yes.

15             THE COURT:  Okay.  So, you don't know if he

16        was cursing at you or cursing at somebody else?

17             MS. MURRAY:  Yeah, that's why I said I don't

18        know if he was cursing at me or cursing at someone

19        else, I'm not sure.

20             THE COURT:  Okay.  But you heard him use

21        foul language?

22             MS. MURRAY:  Yes.

23             THE COURT:  All right.  Go on.

24             MS. MURRAY:  Oh, and then, he began to ask

25        me about the funeral, and I was like, you know,
```

89

Page 44

1     maybe I can set something up, let me ask my

2     supervisor, let me go to Legal and discuss it.

3     That's when I asked him for his phone number, so I

4     can have my supervisor call me -- call him. He

5     said he's not going to give it to me.  So, I

6     said, okay, Mr. Adderley, have a good day.

7          MR. ADDERLEY:  That is not how the

8     conversation went and you know that.

9          THE COURT:  Okay.

10          MR. ADDERLEY:  You know that.  I asked you,

11     how come my grandma didn't get a visitation

12     evaluation of her home --

13          MR. HASKINS:  Your Honor, I would rather

14     that Mr. Adderley address the Court.

15          THE COURT:  Okay.

16          MR. HASKINS:  [Unintelligible] to you, it's

17     fine.  That's not what we're here to do.

18          THE COURT:  Okay.  Talk to me, sir, don't

19     talk to Ms. Murray.

20          MR. ADDERLEY:  Okay.  All I asked her was --

21          THE COURT:  Sustained.

22          MR. ADDERLEY:  -- a few questions.  One of

23     them was when is my grandma going to get her home

24     evaluated, based on what you recommended.

25          THE COURT:  Right.  Well, let me explain to

Page 45

1     you --

2           MR. ADDERLEY:  And --

3           THE COURT:  -- let me clarify, okay?

4           MR. ADDERLEY:  Okay.

5           THE COURT:  I don't mean that the Department

6     needs to have a home ready when she's not ready to

7     come home.

8           MR. ADDERLEY:  I understand.

9           THE COURT:  What I said was the Department

10    should have -- they shouldn't drag their feet.

11    They shouldn't create an unnecessary delay.

12          MR. ADDERLEY:  And that's what happened.

13          THE COURT:  Start checking things out, so

14    that way, when she's ready to come home, we can

15    see if she can go home.

16          MR. ADDERLEY:  Right.

17          THE COURT:  I never promised that she could

18    go home.

19          MR. ADDERLEY:  No, I never stated that.

20          THE COURT:  Okay.

21          MR. ADDERLEY:  What I was stating, based on

22    when we spoke to Negron --

23          THE COURT:  Yes.

24          MR. ADDERLEY:  -- last time we was here, she

25    was supposed to come that Friday.

Page 46

1           THE COURT:  Right.  And then, she didn't do

2      it.

3           MR. ADDERLEY:  She made an appointment, she

4      did not come.  She was supposed to interview him.

5           THE COURT:  Okay.

6           MR. ADDERLEY:  We waited for her like four

7      hours.

8           THE COURT:  All right.  And I --

9           MR. ADDERLEY:  And I'm calling her, calling,

10     calling, calling --

11          THE COURT:  I am sorry for that.

12          MR. ADDERLEY:  -- and I never got anything

13     from her at all --

14          THE COURT:  Okay.  And I am --

15          MR. ADDERLEY:  -- and her voicemail is full.

16          THE COURT:  All right.  And I do -- I mean,

17     it's -- I don't work for the Department.  I'm an

18     impartial hearing officer --

19          MR. ADDERLEY:  I know, but I'm just going

20     based off the chronology --

21          THE COURT:  -- but I'm sorry that you went

22     through that.

23          MR. ADDERLEY:  I'm sorry just basing

24     everything off the chronology --

25          THE COURT:  I understand.

Page 47

1          MR. ADDERLEY:  -- of out how the events

2     went, because we went to -- we came to the

3     hearing, we spoke to her after the hearing, she

4     said she had an appointment Friday, she never

5     showed up.  Only thing she told me about was, she

6     gave me a number to a Destiny, and I called that

7     number.  It just came up busy, busy, busy.  I --

8     at that point, I didn't know who to contact.

9          So, I contact the supervisor, which was Ms.

10    Hasting.  I still have her number.  She was the

11    old supervisor that was on the case.  So, she wind

12    up said she was going to look into it.  That's

13    when I got a call from the current supervisor,

14    which is Ms. Hiller, and she said she was going to

15    look into it, but I told her we're waiting on you

16    guys to come to evaluate the situation, and she

17    said no, you guys are supposed to put adequate

18    supervision in the home, not us.  I'm like --

19          THE COURT:  Who said this?

20          MR. ADDERLEY:  This is the DCF.  And you

21    ordered them to put that in the home.

22          THE COURT:  Well, actually, no.  The court

23    order -- no.  What I stated, just so you know,

24    it's not in the court order.  I was stating the --

25    how the law is written, okay?

93

Page 48

```
 1              MR. ADDERLEY:  Right, I understand.
 2              THE COURT:  And the way the law is written
 3         is that your mom -- I mean your grandma should
 4         have the least restrictive placement, meaning
 5         that, if she can go home and remain there safely,
 6         that that's what should happen.
 7              MR. ADDERLEY:  Right.
 8              THE COURT:  And I wanted the Department to
 9         look into it, but that doesn't mean they have to
10         look into it today, if your grandma is not ready
11         to come home.
12              MR. ADDERLEY:  Right.
13              THE COURT:  What I just cautioned them was
14         don't wait until the last minute because what I
15         don't want to see is Ms. Dorothy is ready to
16         leave --
17              MR. ADDERLEY:  That's the problem.
18              THE COURT:  -- and then nobody checked out
19         her house.
20              MR. ADDERLEY:  That's the problem and
21         that's --
22              THE COURT:  Okay.  But the thing is, I mean,
23         if she's not ready to leave for some time, the
24         Department is not wrong by not checking it out
25         now, because, truthfully, if they check it out too
```

Page 49

1    soon, okay, they're just going to have to check it

2    out again, if she is not ready to go home in a

3    month, or two months, or three months, because

4    however it is now doesn't mean that's how it's

5    going to be in the future when she's ready to go

6    home.  So, I don't find the Department at fault.

7         Mr. Haskins, tell me, what is it -- I'm

8    sorry.  Do you have any response?

9         MR. HASKINS:  Sure.  The Department doesn't

10   have the authority and, statutorily, is not

11   responsible for placing services back into a home,

12   anyone's home, to place someone back into their

13   home.

14        Now, if Mr. Adderley, how we would do it, I

15   don't know, or Ms. Jones, if she has funds to

16   place the level of care that she needs in the

17   home, and can illustrate to the Department that

18   they have that, then we will look at it and verify

19   the same and take a position.

20        THE COURT:  Okay.

21        MR. HASKINS:  But at this point, it's going

22   to be absolutely not.

23        THE COURT:  Right, okay.  But --

24        MR. HASKINS:  For all sorts of reasons.

25        THE COURT:  But let me ask you a question.

Page 50

1        Pardon me.

2              MR. HASKINS:  Sure.

3              THE COURT:  I apologize.  But if Mr.

4    Adderley cooperates with the Department, the

5    Department can make referrals for in-home services

6    that are available to community-based people,

7    correct?

8              MR. HASKINS:  I don't believe that that's

9    the case, Your Honor, no.  We don't -- we don't

10   refer to service providers.  We don't do that --

11             THE COURT:  You don't make a referral to

12   Broward County Elderly Services, for example?

13             MR. HASKINS:  For individuals that are in

14   their home, sure, but she is not.

15             THE COURT:  Right.  Okay.  So, a referral to

16   Broward County Elderly Services wouldn't be able

17   to be made in case she will be able to go back

18   home?

19             MR. HASKINS:  I don't --

20             THE COURT:  To put it in the works to see

21   if, by the time that they're done with the

22   referral process, that the services would be ready

23   upon her discharge?

24             MR. HASKINS:  No.  The Department, under the

25   statute, I would suggest the Department doesn't

Page 51

1    have the requirement to do that.  What the

2    Department, according to the statute, 415.1051,

3    Subsection 3, has the obligation to remedy, upon

4    court order, to remedy the issues at the time of

5    the abuse, neglect, exploitation, what have you.

6    We have done that.

7         So, I would suggest the Department has done

8    everything that the law requires at this point.

9         Now, if Mr. Adderley wants his mother placed

10   back in the home with him, then he can, you know,

11   line up service providers on behalf of his mother

12   and illustrate that there is no risk of harm for

13   her in the home, which I will concede, in the

14   Department's estimation, is a huge, huge burden,

15   given how things have gone on in this case.

16        Then, they can come to the Court and do that

17   and the Department will take a position.  But

18   we're not going to facilitate placement back into

19   a home where we feel that it's not safe for her.

20        THE COURT:  I -- no, that, I understand.

21   So, let me --

22        MR. HASKINS:  And the law doesn't require us

23   to do that.

24        THE COURT:  Let me make sure I understand

25   what you're saying.

1          MR. HASKINS:  Sure.

2          THE COURT:  What you're saying is, if Mr.

3     Adderley didn't act out at Ms. Jones's current

4     placement, if this were just a family that was

5     just working with the Department, cooperating, to

6     try to get her back home, the Department would see

7     fit to make referrals and to work with the family

8     to try to get the home placement assessed, and

9     make referrals for services, if there are any, so

10    that way the home could be considered.

11         But what the Department is saying now is

12    they are not considering this placement because,

13    even with all the services in the world, because

14    the placement would be with Mr. Adderley, because

15    of the way he has acted and because of his

16    judgment, the Department feels it's unsafe,

17    regardless of services.

18         MR. HASKINS:  Correct.  And based on the

19    fact that we have remedied the initial issues that

20    this case came into care.  That's where we are.

21         THE COURT:  All right.

22         MR. HASKINS:  The Department has done its

23    requirements under the statute.  That's where we

24    are.

25         THE COURT:  Well, if Mr. Adderley comes to

98

1       the Department and asks for help in getting those

2       services in place, would the Department be willing

3       to give him some direction at this time?

4              MR. HASKINS:  The Department -- no, no.

5       Your Honor, given the fact, what's going on, how

6       this case came into care and what's going on, that

7       puts the Department in a serious position of

8       liability issues, as well as given the fact that,

9       statutorily, we have done what the -- what the

10      Department has asked to do and what is required to

11      do under the statute, which is remove her from the

12      situation that she was in regarding the

13      exploitation, abuse, neglect, and all that.

14             We're past that.  The Department has placed

15      or verified appropriate placement from the safe

16      and appropriate discharge, and, as of yesterday,

17      she was safe and stable.  All that has changed now

18      because of, allegedly, Mr. Adderley's behavior.

19      So, that's going to have to be remedied.

20             But as far as making efforts to place her

21      back in the home, no, Your Honor, I would disagree

22      the Department has any statutory obligation there.

23             MR. ADDERLEY:  Sir, when I spoke with the

24      DCF, with Ms. Hiller, after she spoke with the

25      gentleman --

1          THE COURT:  No, no, don't -- hold on.  I'm

2     going to tell you right now, if you don't follow

3     the rules, this is not an open chat, you can't be

4     whispering to each other. When one person is

5     talking, that's testimony and that testimony has

6     to be free of influence.

7          Do not, Mr. Dudley, tell Mr. Adderley what

8     to say or try to have a discussion.

9          MR. DUDLEY:  I didn't tell him what to say,

10     ma'am.

11          THE COURT:  I just heard you whisper to him.

12      I just heard that.  You can't do that.  I don't

13     care if you just said have a nice day, take it

14     easy, it doesn't matter, you can't do that, sir.

15          Mr. Adderley, what did Mr. Dudley just tell

16     you?

17          MR. ADDERLEY:  He just said don't talk

18     yourself into a hole, that was it.

19          THE COURT:  Okay.  And that's exactly what

20     is inappropriate.  You can't be saying that.

21          MR. ADDERLEY:  All right.  The situation at

22     the facility is just being made up, because the

23     simple fact, when I went to ask questions, that --

24     that's when he wanted to get an attitude with me,

25     because I had concerns about my grandmother

1   falling in this facility and no one reported it.

2        THE COURT:  All right, hold on.  What about

3   the fall, Ms. Murray?  Did Ms. Dorothy Jones fall

4   at the facility?

5        MS. MURRAY:  I wasn't notified.  I called

6   and asked them and left a voicemail but I didn't

7   get a return back. And usually, when there's

8   incidents that occur, just like when there's

9   incidents that happened with Mr. Adderley, they

10  would notify me.

11       THE COURT:  Okay.

12       MS. MURRAY:  It could have happened and I

13  wasn't notified, but I'm not -- I don't have any

14  knowledge of it.

15       THE COURT:  Okay.  Well, that needs to be

16  looked into by the Department, obviously.  Mr.

17  Haskins --

18       MS. MURRAY:  Okay.

19       THE COURT:  -- okay, make sure that she is

20  getting the appropriate medical treatment.

21       MR. HASKINS:  Sure.  We'll verify the

22  report.

23       THE COURT:  Yeah.

24       MR. ADDERLEY:  Right.  And when I was

25  speaking with, in my grandmother's presence the

Page 56

1     whole time, including the conversation on the

2     phone, because she was asking -- I told Destiny,

3     she tried to put me on one-on-one call, I said no,

4     put me on speaker phone, that way we got multiple

5     witnesses, because I don't like dealing with one-

6     on-one, anyone can make something up in the

7     courtroom.

8          So, the questions were, when I was on the

9     phone with her, was the supervision, the

10    evaluation, and also the fact that, how come she

11    was placed there, opposed to what would -- you had

12    instructed, which was her being placed in a rehab

13    home.

14         THE COURT:  I didn't instruct, that was just

15    what the Department, I thought --

16         MR. ADDERLEY:  As far as in her best

17    interests, as far as her best interests, but I'll

18    say it that way, I'll word it that way.

19         THE COURT:  Well, that's not -- the

20    Department was supposed to place her where the

21    level of care was appropriate for her.  So, if the

22    doctor said that she could go to an ALF or

23    assisted nursing home --

24         MR. ADDERLEY:  Well, the only reason why --

25         THE COURT:  -- that's where she should be,

Page 57

1    because, truthfully, an ALF is less restrictive

2    than a nursing home.

3         MR. ADDERLEY:  I understand.  Only reason

4    why I'm stating that because, at that time, the

5    right to refusal --

6         THE COURT:  Yeah.

7         MR. ADDERLEY:  -- was at that point, and she

8    did get validated for her refusal by Medicare, at

9    that time.  So, that's when you went ahead and

10   instruct me to advise her to try to lift it off,

11   so if she would be placed in a rehab --

12        THE COURT:  No, I didn't advise you to do

13   that.  I asked you if you were going to -- to

14   speak to them about undoing the appeal.  I asked

15   if you were going to; I didn't tell you to do

16   that.

17        MR. ADDERLEY:  I couldn't do that because

18   she have to do that --

19        THE COURT:  Well, it went forward and it was

20   denied.

21        MR. ADDERLEY:  Right, I understand.

22        THE COURT:  That's what -- that was the

23   testimony --

24        MR. ADDERLEY:  I understand.

25        THE COURT:  -- in a subsequent hearing, and

1    that's fine.

2         MR. ADDERLEY:  I understand.  I understand

3    for the second part, that's no problem.

4         THE COURT:  Yeah.

5         MR. ADDERLEY:  My point was, with the

6    conversation that took place at the facility --

7         THE COURT:  Yeah.

8         MR. ADDERLEY:  -- I was not yelling, I was

9    not cussing there, because there are old people

10   there.  I worked in a rehab home for over four

11   years, from Boca to Deerfield to Pompano and never

12   got fired in any of those facilities.

13        So, with that being said, the conversation

14   was basically about how come there was no cameras

15   in here and why did my grandmother fall and how

16   come there's no documentation of that.  And her

17   appearance, as far as her not being shaven and the

18   way her hair was, I'm like just treat the woman as

19   if she's your mother.

20        THE COURT:  Yes.

21        MR. ADDERLEY:  I don't understand why you

22   all can't do that.  So, from there, he started to

23   get an attitude with me.  I'm like, sir, I see

24   what you're trying to do, I see that you're mad

25   that I'm asking questions that you don't want me

Page 59

1    to know, you feel I'm not qualified to ask, but

2    this is my grandmother, I care for my grandmother,

3    and I'm just concerned about what she just told

4    me.  This came out of her mouth, I didn't hear it

5    from you, and this is your facility.

6         THE COURT:  All right, give me a second.

7         Mr. Haskins, let me ask you this.  What

8    about -- I mean, I understand the Department wants

9    to salvage her placement and they don't have any

10   other placement to put Ms. Jones at this time.

11   So, what about changing the visitation to

12   supervised, supervised by the staff?

13        Would the staff be willing to allow Mr.

14   Adderley those visits under those circumstances?

15        MR. HASKINS:  I don't believe so, Your

16   Honor.

17        MS. KUHL:  I believe it already is

18   supervised.

19        MR. HASKINS:  Yeah, it's already supervised

20   and I believe -- let me check.

21        THE COURT:  Oh, that's right, we went from

22   unsupervised to supervised, that is correct.

23        MR. ADDERLEY:  Yeah, because everyone who --

24   everyone who was there, every time, every time I

25   was there, and she was supervised, I didn't have

Page 60

1    no issue with them.  He was the only one that came

2    at me with an attitude, and he was the only one

3    that made a call to Ms. Hiller.  That's what the

4    issue was.

5        Other than that, anyone who was there did

6    not hear me cuss, did not hear me yell.

7        MR. HASKINS:  The other reason -- sorry.

8        THE COURT:  Yeah.

9        MS. BROWN:  I'm sorry, I apologize.  My

10   client has advised me that this kind of similar

11   fact pattern has happened before with a different

12   facility and Mr. Adderley.  She has personal

13   knowledge about, you know, his actions and how he

14   interacts with staff in the past in regards to Ms.

15   Jones.

16        She just wanted to briefly, just very

17   briefly, advise the Court of her concern and that

18   she thinks that, you know, she wants her to stay

19   at the facility and she doesn't want him to have

20   any visitation.

21        THE COURT:  Okay.  Well, you're speaking on

22   her behalf --

23        MS. BROWN:  Okay.

24        THE COURT:  -- and I understand your

25   position.

Page 61

1          MS. BROWN:  All right.

2          THE COURT:  Is there anything else you

3     wanted to add, Ms. Anthony?

4          MS. ANTHONY:  I just wanted to say this is a

5     repeat of what happened when she was in Saint

6     Johns.  Mr. Adderley, from Mr. Johnson, the

7     director over there, said he was calling, I don't

8     want to use the word "harassment," but calling

9     repeatedly, seven, eight times a day, demanding

10    she comes home.

11         Even Mr. Infante (phonetic) that was the

12    case manager for the first case said the same

13    thing, his aggressive demeanor.  Ms. Vanni, my

14    mother has two tumors in her brain.

15         THE COURT:  Oh no.

16         MS. ANTHONY:  She does.  The -- her medical

17    records, which I didn't bring them this morning,

18    came from Dr. Guerrero at Northwest Regional.  She

19    has two tumors in her brain.  She had eight

20    doctors.  They wanted to try to shrink the tumors,

21    but the first thing they were concerned about was

22    her going to rehab.  They were going to bring her

23    back to deal with the tumors.  Her sister died

24    with tumors on the brain.

25         THE COURT:  Oh my God.

Page 62

```
 1              MS. ANTHONY:  So, my mother's care is
 2      paramount. She needs to be with professional
 3      people.  I mean, my God, please.  I mean, you
 4      know, this is -- this is, I mean --
 5              THE COURT:  Have you been to this facility?
 6              MS. ANTHONY:  Ma'am, I have stayed away out
 7      of fear.
 8              THE COURT:  I understand.  I understand.
 9              MS. ANTHONY:  No, ma'am, I have not.  I have
10      not because --
11              THE COURT:  Okay.  But you don't have any
12      objection to her leaving the -- I mean you don't
13      have any objection to her staying at this
14      facility?
15              MS. ANTHONY:  No.  No, ma'am, I do not.
16              MR. ADDERLEY:  Ma'am --
17              THE COURT:  Last thing, sir, because I have
18      to move --
19              MR. ADDERLEY:  I'm going to make this clean
20      and correct and quick.
21              MS. KUHL:  And I would like to be heard,
22      too, Your Honor.
23              THE COURT:  Okay.  Go on.
24              MR. ADDERLEY:  My grandmother is Mr. John
25      Butts's payee with Social Security.
```

Page 63

1          THE COURT:  That's right, I know, you said

2     that last time.

3          MR. ADDERLEY:  He was -- she was tooken

4     [sic.] off by Ms. Anthony.

5          THE COURT:  Right.

6          MR. ADDERLEY:  Because she went up there and

7     said she don't want to do it anymore.  How we

8     found this out, we went to the Social Security

9     place --

10          THE COURT:  Right.

11          MR. ADDERLEY:  -- and his check was just

12     sitting there because of what she did.

13          THE COURT:  Right.  Respectfully, sir, I

14     can't really get into the issues of Mr. Butts, but

15     let me say this.  Mr. Haskins, you're the

16     Department, if the Department can look into

17     whether Mr. Butts needs some help, if he comes to

18     you after the hearing and requests some help, if

19     you're permitted to do so pursuant to Florida law,

20     I would suggest that your client make the

21     appropriate referrals for him.

22          And obviously, if the Department is aware of

23     any sort of allegations regarding exploitation,

24     that needs to be called into the hotline.

25          But what I'm hearing right now, I don't

Page 64

1    necessarily hear anything rising to the level of

2    exploitation.  What I'm hearing is that grandma,

3    Ms. Jones, used to be the payee, and that grandma

4    can't be the payee because she's sick and in ALF

5    right now --

6            MR. ADDERLEY:  Right, I understand that.

7            THE COURT:  -- so Ms. Anthony is now the

8    payee.

9            MR. ADDERLEY:  Right.

10           THE COURT:  And that's it, I'm not hearing

11   any more about that.  I can't.

12           MR. ADDERLEY:  No, I actually --

13           THE COURT:  Do you want to say anything else

14   about your grandma?

15           MR. ADDERLEY:  I actually have a court

16   document -- I mean, not a court, I mean --

17           THE COURT:  Sir, no more about Mr. Butts.

18   Talk to me about Ms. Jones, because I need to

19   leave and I have to give Ms. Kuhl an opportunity

20   to speak.  She has not spoken this whole time.

21           MR. ADDERLEY:  Okay.  In regardless [sic.]

22   to Ms. Jones, the only thing that the petition was

23   stating that we wanted, and that she wanted too,

24   also, she want to just be around her family again.

25           THE COURT:  I understand.

Page 65

1          MR. ADDERLEY:  And with that being said,

2     that includes her brothers, her cousins --

3          THE COURT:  I understand, which is why I

4     said do not discuss this placement or this case

5     with her --

6          MR. ADDERLEY:  Yes.

7          THE COURT:  -- because she needs to be where

8     she's at and get better.

9          MR. ADDERLEY:  Yes.

10          THE COURT:  So, that way, I could consider

11     the possibility of her going home, but,

12     unfortunately, because of the things that you have

13     done, you are jeopardizing her current placement

14     and the Department feels that it's not appropriate

15     to even look into placing her at home with you

16     because they feel that, no matter what services

17     are in the home, if you're in the home, you're

18     putting her at risk.

19          Is that correct, Mr. Haskins?

20          MR. HASKINS:  That is correct, Your Honor.

21          THE COURT:  Yeah, and I can't --

22          MR. DUDLEY:  Your Honor --

23          THE COURT:  -- you know, I mean, there is --

24          MR. DUDLEY:  Your Honor --

25          THE COURT:  -- really nothing --

Page 66

1          MR. DUDLEY:  Your Honor --

2          THE COURT:  Yes?

3          MR. DUDLEY:  Can I say something, please?

4          THE COURT:  Very briefly.

5          MR. DUDLEY:  It's going to be brief.  He did

6     not start it.  They started it.  DCF the one

7     started everything in the hospital.  When they

8     came, she had already won her case to stay at the

9     hospital.  That appeal, she won that appeal, and

10    they said, okay, when she won that appeal in the

11    hospital to stay in the hospital --

12         THE COURT:  She lost the appeal.

13         MR. ADDERLEY:  The second one.

14         MR. DUDLEY:  No, she won the appeal.  She

15    won the first appeal.  Ms. Jones won that appeal.

16         THE COURT:  She lost the appeal that said

17    she could go back home.

18         MR. DUDLEY:  No.

19         THE COURT:  She was not allowed to go back

20    home.

21         MR. DUDLEY:  No, no, not to go home, not to

22    go home, to not be transferred.

23         THE COURT:  Oh, that is correct.

24         MR. DUDLEY:  She won that appeal not to be

25    transferred.

```
 1              THE COURT:  Right.  And instead of putting
 2         her --
 3              MR. DUDLEY:  And they started the -- all of
 4         her physical therapy.
 5              THE COURT:  Right.
 6              MR. DUDLEY:  She had the eight sessions of
 7         physical therapy, already.
 8              THE COURT:  At the hospital.
 9              MR. DUDLEY:  Yes, she had already started.
10              THE COURT:  Right, but then, they
11         transferred her to an ALF.
12              MR. DUDLEY:  No, she had first -- she had
13         started her physical therapy in the hospital.  She
14         started walking up and down the hallways and
15         everything, speech got better, she got strong.
16         So, she thought she was ready to go home.
17              DCF started talking to her, telling her, we
18         wasn't saying anything.  DCF workers, they had
19         case workers and everything come started talking
20         to Ms. Jones.  We wasn't talking to her, and we
21         was wondering where she was getting this
22         information from.  They was talking to her.
23              THE COURT:  Okay.  Respectfully, sir --
24              MR. DUDLEY:  Yes.
25              THE COURT:  -- DCF has a certain job to do.
```

Page 68

1                 The court order was about the family and Mr. --

2                       MR. DUDLEY:  That's what we --

3                       THE COURT:  Listen to me, Mr. Dudley.

4                       MR. DUDLEY:  I understand.

5                       THE COURT:  Mr. Adderley testified today --

6                       MR. DUDLEY:  I know.

7                       THE COURT:  -- that he spoke to Ms. Jones

8         about this case.

9                       MR. DUDLEY:  I know.

10                      THE COURT:  He told her that he was filing

11        those pleadings and I'm, again --

12                      MR. DUDLEY:  I understand.

13                      THE COURT:  -- no one shall speak -- and I'm

14        sorry, it does say no one shall speak to the

15        Respondent about current case, but that's the

16        family.  That's not D --

17                      MR. DUDLEY:  It says no one.

18                      THE COURT:  Listen.  That's not DCF.

19                      MR. ADDERLEY:  Right, but --

20                      THE COURT:  DCF has a job to do.

21                      MR. DUDLEY:  Okay.

22                      THE COURT:  They have to talk to her about

23        the case.

24                      MR. DUDLEY:  But you said no one.

25                      MR. ADDERLEY:  The only reason why my

114

Page 69

```
 1        grandmother told me to do what I -- told me what
 2        she wanted me to do for her, because she said
 3        people kept coming up there saying that she's
 4        going to come home with me and she didn't know who
 5        these people was because --
 6             MR. ADDERLEY:  They started it.
 7             THE COURT:  Excuse me.  You're not going to
 8        speak anymore, sir.  If I hear one more word out
 9        of you, these deputies will escort you outside.
10             MR. DUDLEY:  No problem, ma'am.
11             THE COURT:  You're not even a party to this
12        case. It's a courtesy that I'm letting you speak.
13             MR. DUDLEY:  Okay.
14             THE COURT:  Go on, Mr. Adderley.
15             MR. ADDERLEY:  Okay.  She kept on telling me
16        that there were different people in different
17        clothes coming to see her, saying that she was
18        going to come stay with me, and she couldn't
19        identify these people and let them know, and they
20        didn't identify themselves to her.
21             THE COURT:  Okay.  Excuse me just a moment.
22             MR. ADDERLEY:  And that's what caused that
23        reaction.
24             THE COURT:  Mr. Haskins, I want -- the court
25        order is going to be clarified.  When it said no
```

Page 70

 1        one, it's no family or friend, okay?  It's not the

 2        Department.  Or should I say no one except for the

 3        Department and the Department service providers.

 4             MR. ADDERLEY:  Because when we was making

 5        visitations, when I was going to the hospital,

 6        rather, when I was --

 7             MS. KUHL:  And her attorney, correct, Your

 8        Honor?

 9             THE COURT:  Of course.

10             MR. DUDLEY:  When it was explained to me --

11             THE COURT:  You know what?  I'm just going

12        to clarify, no one means family or friends.

13             MR. DUDLEY:  What was explained to me by

14        the --

15             THE COURT:  Or anybody who is coming on

16        behalf of the family or friends.  You can't get a

17        stranger to go in and do --

18             MR. ADDERLEY:  No, no.

19             THE COURT:  -- what you're not allowed to

20        do.

21             MR. ADDERLEY:  No, no, of course not.  But

22        like I said, she only told me to do that based off

23        the people who she couldn't identify telling her

24        that you're coming home with me.  That would just

25        alert any elderly person to sit here and say I

116

1      need to defend myself because I don't know what's

2      going on.

3             THE COURT:  I'm sorry, you told her she was

4      coming home with you?

5             MR. ADDERLEY:  No.  She said that other

6      people were coming to the hospital, ma'am --

7             THE COURT:  Saying that, you're coming home

8      with me.

9             MR. ADDERLEY:  You're coming home with me

10     and she --

11            THE COURT:  And you don't know who they

12     were?

13            MR. ADDERLEY:  She couldn't -- they didn't

14     leave no information upon that.  So, obviously,

15     based off of what's told at the security desk,

16     that she couldn't have any visitors, there was

17     only a certain amount of people name that was on

18     that last, from what DCF left there, that only

19     puts the blame on other participants that's either

20     involved with that facility where she's currently

21     at or someone on DCF's side, because no one

22     couldn't go see her except for me and Dudley.  Her

23     own brother couldn't go see her.

24            So, we were trying to figure out who was

25     coming to her room and, you know, telling her

117

1          you're coming to stay with me, and all this and

2          that.  And then, Sunday, she up and transferred

3          her to Lamercie.

4               THE COURT:  All right.  Well, let me -- let

5          me also say, Mr. Dudley, you're obviously making a

6          big deal, and it should be a big deal, where the

7          court order says no one, okay?  So, how do -- so,

8          obviously, Mr. Adderley's conduct, when he spoke

9          with Ms. Jones about this case and told her that

10         he was filing pleadings on her behalf, was

11         unacceptable and a violation of the court order.

12              And you, Mr. Adderley, are lucky that I am

13         not going to find you in contempt of court today.

14         You are lucky.

15              MR. DUDLEY:  Can I --

16              THE COURT:  No, you cannot.

17              MR. DUDLEY:  No, no --

18              THE COURT:  No, you cannot.  We're going to

19         hear from Ms. Kuhl, and the hearing is going to be

20         over.  Ms. Kuhl?

21              MR. DUDLEY:  It's about visitation.

22              MS. KUHL:  Thank you, Your Honor.

23              THE COURT:  Ms. Kuhl?

24              MS. KUHL:  Yes, thank you.  Can you hear me?

25              THE COURT:  I can.

Page 73

```
 1              MS. KUHL:  Okay.

 2              MR. DUDLEY:  Visitation --

 3              MS. KUHL:  Just briefly, first of all --

 4              MR. DUDLEY:  Jesus.

 5              MS. KUHL:  -- I don't know why Mr. Adderley

 6         is saying --

 7              THE COURT:  Hold on.  If you can excuse him,

 8         please?

 9              MS. KUHL:  -- visitation --

10              THE COURT:  Stop.  Ms. Kuhl, Ms. Kuhl, Ms.

11         Kuhl, hold on.  Mr. Dudley is being excused.

12              MR. DUDLEY:  They took my visitation.  They

13         took my visitation away.

14              THE COURT:  It's supervised, sir.

15              MR. DUDLEY:  No.

16              THE COURT:  It's supervised.

17              MR. DUDLEY:  It's not.  They took it.

18              MR. ADDERLEY:  They took it away.

19              THE COURT:  How did --

20              MR. DUDLEY:  That's what I was trying to

21         say.

22              MR. ADDERLEY:  The downstairs security

23         place, they took his name off.  I don't know who

24         did it.

25              MR. HASKINS:  I don't know what they're
```

119

Page 74

1    talking about and I'm trying [unintelligible].

2         THE COURT:  Okay.

3         MR. ADDERLEY:  [Unintelligible.]

4         MR. DUDLEY:  They took it.

5         MR. HASKINS:  As far as the current

6    placement, they want her out because of however he

7    has been behaving. That's what --

8         MR. DUDLEY:  I never went.

9         THE COURT:  Mr. Dudley, also?

10        MR. DUDLEY:  Yeah, I never went.

11        MR. ADDERLEY:  He never went there.

12        THE COURT:  No, just Mr. Adderley, okay.

13        MR. HASKINS:  Whatever happened in the

14   hospital is irrelevant now, so.

15        THE COURT:  Okay.  All right, thank you,

16   sir.  Go on, Ms. Kuhl, I apologize.

17        MS. KUHL:  No problem.  As the Court is

18   aware, my office was appointed to represent Ms.

19   Jones at the inception of the case, and I, on

20   behalf of my office, have been representing her.

21        We have had multiple, extensive hearings on

22   this case.  There were a number of concerns, which

23   I did bring to the attention of the Department,

24   specifically Ms. Negron, which I believe are still

25   under investigation.

Page 75

1          I did provide my phone number to Mr.

2     Adderley, at his request, previously.  He asked me

3     to write it down for him in his binder of

4     documents relating to this case.  And I just want

5     to say, I have not received a single phone call or

6     voicemail from Mr. Adderley, Mr. Dudley, from Ms.

7     Jones.

8          Certainly, if there are any issues happening

9     with the placement, you know, I am keeping aware

10    of that.  And as the Court is aware, on other

11    cases, when I'm made aware of issues happening

12    with my clients at their placement, I bring it to

13    the attention of the Court and the Department.

14         So, I just wanted to say that, you know,

15    when Mr. Adderley said, well, I didn't know who to

16    call, I didn't know what to do, that's not

17    correct, because he does have my number, and I was

18    not contacted once for any request on behalf of my

19    client.  And if anything is ever brought to my

20    attention, I certainly then bring it to the

21    Court's and the Department's attention.

22         Aside from all of that, there were some

23    concerns that I did bring to Ms. Negron's

24    attention regarding numerous allegations of

25    exploitation, among other things, which is why the

Page 76

1    Court did suspend both powers of attorney and

2    ordered supervised visits for all the family and

3    friends.

4         So, the fact that the POAs are suspended and

5    there's supervised live visits, it does concern me

6    that Mr. Adderley is having this level of

7    involvement with my client.

8         THE COURT:  I'm sorry, I'm sorry.  Can you

9    repeat, please, about the POA?

10        MS. KUHL:  Yes, the fact that the Court

11   suspended the POAs at the last hearing and ordered

12   supervised visits, the fact that those things

13   happened based on the allegations in this case, it

14   is concerning to me that Mr. Adderley is having

15   this level of involvement with my client, that he

16   -- that the level of involvement that he has in

17   the case, and I know that's why the Court issued

18   the prior orders, is concerning.

19        He should not be speaking to her about the

20   case, because I believe the allegations are still

21   under investigation.

22        So, I would like to know from the Department

23   what the status is of the investigation.  There

24   were numerous financial records that Ms. Negron

25   was in the process of reviewing, but I would like

1          to know what the status is of that investigation,

2          because that certainly relevant --

3               THE COURT:  All right.

4               MS. KUHL:  -- as to if and when my client

5          can even go home.

6               THE COURT:  Okay.  Well, that, you're not

7          going to be able to find out today.  You can

8          contact DCF later on and they can tell you, and

9          you can file a motion if you see fit.

10              I must leave because my Baker Acts are

11         supposed to be heard in three minutes, and I'm

12         never getting there in three minutes.  I'm already

13         going to be late.  I gave this hearing way more

14         time than I said I would, and I have heard enough

15         in order to make findings and recommendations.

16              Number one, Deputy, if I can ask you to --

17         Number one, I am going to suspend -- no, over

18         here, Deputy.

19              I am going to suspend the visitation of Mr.

20         Dudley and Mr. Adderley temporarily, okay?  I need

21         the placement to stabilize again, where the

22         facility can revisit the issue at a later time,

23         but, for now, know that they are not going to have

24         these disruptions.  So, that way, they can get

25         things back on track.

1        So, Mr. Adderley and Mr. Dudley are not

2   going to have any contact with Ms. Jones until

3   further order of the Court.

4        Mr. Dudley was excused, but I'm going to

5   tell you right now I'm not going to tolerate that

6   type of disrespect --

7        MR. ADDERLEY:  I'll talk to him.

8        THE COURT:  -- in this hearing room again.

9        MR. ADDERLEY:  I'll talk to him.

10        THE COURT:  Mr. Dudley is not entitled to be

11   here. He was allowed to be here because there were

12   no objections, as a courtesy, because I do believe

13   that he cares about Ms. Jones --

14        MR. ADDERLEY:  He's a friend of the family.

15        THE COURT:  -- and he cares about the

16   family.

17        MR. ADDERLEY:  Yes.

18        THE COURT:  But if he thinks that he is

19   going to come in here and disrupt these

20   proceedings, and basically disrespect your

21   grandmother by doing so, even though he might

22   think that he's doing something for her, these are

23   her proceedings, they are supposed to be conducted

24   with order and decorum and respect, and that

25   behavior is not that.  It does not conform with

Page 79

1        order, decorum and respect.

2              So, if he thinks he's going to do that

3        again --

4              MR. ADDERLEY:  I'll deal with him.

5              THE COURT:  -- he's mistaken, okay?

6              MR. ADDERLEY:  I'll deal with him.  I'll

7        deal with him.

8              THE COURT:  That's not going to happen,

9        again, I'm going to tell you right now.

10             So, we have another hearing scheduled on the

11       13th, correct, Mr. Haskins?

12             MR. HASKINS:  Yes, ma'am.

13             THE COURT:  So, we will have a hearing on

14       the 13th and we will revisit whatever issues are

15       scheduled to be revisited on that day, and hear

16       whatever issues are to be heard on that day.

17             I'm going to clarify the court order about

18       no family, friends, directly or indirectly, are to

19       speak, so that way it covers any sort of stranger

20       that could be employed by the family or friend in

21       order to do the bidding of the person who wants to

22       contact Ms. Dorothy Jones about the case in

23       violation of the court order, okay?  It can't be

24       somebody directly, it can't be somebody

25       indirectly.

```
 1              The Department must talk about the case to

 2        the extent that they are obligated to talk about

 3        the case pursuant to Florida law.  Ms. Kuhl has to

 4        be able to speak with her client.  So, that was

 5        understood when that order was written.  However,

 6        because the issue was raised, we're going to

 7        clarify and make sure that that order is correct.

 8              I'm also going to have that order, the

 9        clarification, I'm going to ask the Judge to nunc

10        pro tunc it, meaning to the date of the hearing,

11        because it was a Scrivener's error.  Any

12        objection?

13              MR. HASKINS:  No, ma'am.

14              MS. KUHL:  No, Your Honor.

15              THE COURT:  Okay.  All right.

16              MS. KUHL:  Your Honor, with regard to the

17        funeral, is the Court taking a position --

18              THE COURT:  I had to deny those two -- well,

19        here's the thing, let me just ask.  I will ask

20        this because we are converting this to a status,

21        so I am going to ask very quickly, from Ms.

22        Murray.

23              Ms. Murray, does the nursing home -- I'm

24        sorry. Does the ALF say that Ms. Jones can go to

25        the -- her brother' wake or her -- or his funeral
```

Page 81

```
 1      on Saturday.

 2              MS. MURRAY:  They were willing to let her

 3      go, yes, they were willing to.

 4              THE COURT:  They --

 5              MR. HASKINS:  How is she going to get there

 6      and who is going to take her?  I mean, the

 7      Department is not going to assume responsibility

 8      for that, considering the situation that we have

 9      had with her.

10              MS. ANTHONY:  And --

11              MR. ADDERLEY:  I'm not [unintelligible] to

12      my mother.

13              MS. ANTHONY:  -- my concern is her being

14      alone, if they were going to do that, we need

15      somebody to be with her.

16              THE COURT:  And we don't have anybody?

17              MS. ANTHONY:  There's no --

18              MR. HASKINS:  No --

19              MS. ANTHONY:  We discussed that.  We don't

20      want her to be by herself.

21              THE COURT:  Well, of course she can't be by

22      herself.

23              So, if there was somebody responsible,

24      the nursing home would have let her go to the

25      funeral?
```

Page 82

1          MS. MURRAY:  Yes.

2          THE COURT:  But the Department doesn't know

3     of anybody responsible who can take her, at this

4     time?

5          MS. MURRAY:  No.  No.

6          MR. ADDERLEY:  Say another family member?

7          MS. ANTHONY:  We don't -- we're going to

8     have to talk to --

9          MR. HASKINS:  We don't -- I hate to say it.

10    We don't trust -- yeah.  No disrespect to Mr. --

11    to you, Mr. Adderley.

12          MR. ADDERLEY:  No, no, no --

13          MR. HASKINS:  The family has got issues, we

14    don't --

15          MR. ADDERLEY:  It doesn't have to be me.

16    All I'm simply saying is she would feel more

17    comfortable on that day to be --

18          THE COURT:  Well, I can't.  I can't do -- I

19    can't do some family member I don't know.

20          MR. ADDERLEY:  No, I understand.  It could

21    be her brother, I don't really mind, just --

22          THE COURT:  I don't know.  He never

23    presented --

24          MR. ADDERLEY:  All I'm simply saying, on

25    that day, I just want something comfortable for

128

1    her, because, you know, she did lose her brother,

2    you know what I'm saying?

3         THE COURT:  I understand that, but I don't

4    have any option to send her.  If the placement was

5    going to let her but they want somebody

6    responsible, the Department, by law, is not

7    obligated to transport her or to take her there or

8    to watch her.  It's not permitted by -- I mean

9    they're not obligated by law and I can't force

10   them.

11        If I even recommended to the Judge that he

12   enter an order for that, that wouldn't hold water.

13   They could appeal that and, I mean, it's just not

14   in conformity with the law.  The Department does

15   not have to take, unfortunately, because I

16   understand it's a serious issue, but does not have

17   to -- does not have the obligation to take an

18   elderly person to a funeral, even if it's a

19   brother.

20        So, at this time, no, I am not going to

21   allow her to go to the wake or the funeral.  She

22   needs to stay where she's at.

23        And as far as the independent medical

24   examination, she already had one.  She had one at

25   Northwest.

Page 84

1           MR. HASKINS:  Right.

2           THE COURT:  Because Northwest evaluated her.

3     There was an appeal.  Even Mr. Dudley said, you

4     know, there were two appeals.  She won the one to

5     stay at the hospital and not go to the rehab and

6     she lost the one to go back home.

7           So, arguably, there were two independent

8     evaluations there.  At the very least, one, okay,

9     because whatever Northwest recommended is not the

10    Department.  Northwest and the Department are two

11    different things.

12          MR. ADDERLEY:  I understand, I understand.

13          THE COURT:  Okay.  So, that -- I'll allow

14    both of those motions to be considered ore tenus

15    and they are denied.

16          MR. ADDERLEY:  And when I try to speak with

17    her representative attorney in the hallway, I

18    think it was the second to last time we was here,

19    that's why nobody has ever sat at the table --

20          THE COURT:  Right.

21          MR. ADDERLEY:  -- because she didn't give us

22    any good vibe that she wanted to share any

23    information with us or tell a thing that was going

24    on with my grandmother.

25          THE COURT:  Sir --

Page 85

1          MR. ADDERLEY:  That's why my grandmother

2     wanted her own attorney.

3          THE COURT:  Okay.  Well, you know what?  She

4     doesn't have the ability to have you do what you

5     did for her. That's not permitted.  You cannot be

6     filing motions on her behalf.

7          MR. ADDERLEY:  What do you mean by the

8     ability? What do you mean?

9          THE COURT:  You don't have the right.

10          MR. ADDERLEY:  No, not me, I'm saying what

11     do you mean by she don't have the ability?

12          THE COURT:  No, no, you don't have the right

13     to file motions on her behalf, and she doesn't

14     have the ability to tell you to do that.

15          MR. ADDERLEY:  Yes, she does.

16          THE COURT:  Okay?

17          MR. ADDERLEY:  But she --

18          THE COURT:  Listen to me.  She doesn't have

19     the right, under the laws of Florida, to tell you

20     to file a motion on her behalf.  She can't do

21     that, okay?

22          So, you can't do it on your own, and you

23     can't do it because she told you to, okay?  That's

24     what my point --

25          MR. ADDERLEY:  Okay.

Page 86

1          THE COURT:  So, Ms. Kuhl is her lawyer, Ms.
2     Kuhl is who needs to file the motions.  So, if she
3     wants legal assistance, put her in -- I'm sorry.
4     She knows to be in touch with Ms. Kuhl.
5          You are not allowed to have contact with her
6     until further order of the Court.
7          MR. ADDERLEY:  But she --
8          THE COURT:  So, we're at least not going to
9     have contact --
10          MR. ADDERLEY:  But she doesn't have her
11     contact.
12          THE COURT:  -- until September 13th when I
13     have a hearing and we can readdress the issue.
14          MR. ADDERLEY:  Right, but my grandmother
15     don't have her contact.  That's what --
16          THE COURT:  Okay.  You're going to -- we're
17     going to make sure that she gets that.
18          MR. ADDERLEY:  Okay.
19          THE COURT:  Mr. Haskins and Ms. Murray, Ms.
20     Murray, if -- by close of business today, are you
21     able to go and visit?
22          MS. MURRAY:  Yes, yes.
23          THE COURT:  Okay.  And speak to the
24     placement and try and salvage the placement?
25          MS. MURRAY:  Yes.

Page 87

1           THE COURT:  If you could also give Ms. Jones

2      Ms. Kuhl's phone number?

3           MS. MURRAY:  Okay.

4           MR. ADDERLEY:  Yes.

5           THE COURT:  So, that way, she can call Ms.

6      Kuhl if she wants to, okay?

7           MR. ADDERLEY:  That's all she asked for,

8      ma'am. That's all she asked for.

9           THE COURT:  All right.  Thank you so much.

10     Ten days waived?

11          MR. HASKINS:  Still waived.

12          (Thereupon, the proceedings were concluded

13     at 10:21 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

133

Page 88

1                    TRANSCRIBER'S CERTIFICATE

2     STATE OF FLORIDA:

3     COUNTY OF BROWARD:

4

5          I, Sharon Hodge, Court Reporter, certify that I

6     was authorized to and did transcribe the foregoing

7     audio-recorded proceedings taken on September 1st, 2016,

8     and the transcript is a true and accurate transcription

9     of said recording.

10          I further certify that I am not a relative,

11    employee, attorney, or counsel of any of the parties'

12    attorney or counsel connected with the action, nor am I

13    financially interested in the action.

14

15

16

17

18

19

20                              *Sharon Hodge*
                                _____
21                              Sharon Hodge, FPR

22

23

24

25

134

32 pages

EXHIBIT E-4

IN THE COUNTY COURT IN AND FOR
BROWARD COUNTY, FLORIDA

CASE NO.:  MH-C-16-1714


IN RE:

DOROTHY JONES,

_____/


    Proceedings had and taken place before General
Magistrate Claudette Vanni, at the Broward County
Courthouse, 201 Southeast 6th Street, Fort Lauderdale,
Florida, on Tuesday, the 13th day of September 2016,
commencing at the hour of 4:27 p.m., and being a
Hearing.

Page 2

1    APPEARANCES:

2    Appearing on behalf of DCF:

3         OFFICE OF GENERAL COUNSEL - DCF
          201 West Broward Boulevard
4         Suite 502
          Fort Lauderdale, Florida 33301
5         (954) 467-4551
          edmund.haskins@myflfamilies.com
6         BY:  EDMUND M. HASKINS, ESQUIRE

7    Appearing on behalf of the Respondent:

8         THE LAW OFFICES OF RACHEL B. KUHL, P.A.
          1830 North University Drive
9         Suite 113
          Fort Lauderdale, Florida 33322
10        (786) 258-8583
          rkuhllaw@gmail.com
11        BY:  RACHEL M. KUHL, ESQUIRE

12   Appearing on behalf of Deborah Anthony:

13        LAW OFFICE OF ROMAINE BROWN, P.A.
          290 Northwest Peacock Boulevard
14        Unit 881734
          Port Saint Lucie, Florida 34988
15        (754) 300-8393
          rbrown@romainebrownpa.com
16        BY:  ROMAINE N. BROWN, ESQUIRE

17   ALSO PRESENT:

18        DESTINY MURRAY

19        DEBORAH ANTHONY

20        JOSEPH DUDLEY

21        MICHAEL ADDERLEY

22        JOSEPH BRANCH

23

24

25

*136*

Page 3

1              (Thereupon, the following proceedings were

2      had:)

3              THE COURT:  We are on the record In Re:

4      Dorothy Jones.

5              Ms. Kuhl, could you read that case number

6      into the record, please?

7              MS. KUHL:  MH-C-16-1714.

8              THE COURT:  Thank you so much.  Please

9      announce your name and relationship to the case for

10     the record, starting with Mr. Haskins.

11             MR. HASKINS:  Edmund Haskins, attorney for

12     the Department.

13             MS. MURRAY:  Destiny Murray, Human Service

14     Counsel for the Department.

15             MS. BROWN:  Romaine Brown, attorney for the

16     daughter of Dorothy Jones.

17             THE COURT:  One second, we skipped Mr.

18     Adderley.

19             MS. BROWN:  I'm sorry.

20             THE COURT:  Mr. Adderley?

21             MR. ADDERLEY:  Michael Christopher Adderley,

22     Dorothy Jones's grandson.

23             THE COURT:  Thank you, sir.

24             MS. BROWN:  Attorney Romaine Brown appearing

25     on behalf of Deborah Anthony, daughter of Dorothy

Page 4

1       Jones.

2               MS. ANTHONY:  Deborah Anthony, daughter of

3       Dorothy Jones.

4               THE COURT:  Thank you, ma'am.

5               MS. KUHL:  Rachel Kuhl, Office of Regional

6       Counsel.

7               MR. DUDLEY:  Joseph Dudley, friend of Dorothy

8       Jones.

9               THE COURT:  Thank you.  Mr. Branch?

10              MR. BRANCH:  Jasper Branch.  I'm her brother.

11              THE COURT:  Dorothy Jones's brother?

12              MR. BRANCH:  Yes.

13              THE COURT:  Thank you, sir.  All right, thank

14      you very much.

15              If I could have everybody raise their right

16      hands?

17              Do you swear to tell the truth, the whole

18      truth, and nothing but the truth, so help you God?

19              MS. MURRAY:  I do.

20              MS. ANTHONY:  I do.

21              MR. DUDLEY:  I do.

22              MR. ADDERLEY:  I do.

23              MR. BRANCH:  I do.

24              THE COURT:  All right.  Thank you very much.

25              Ms. Murray, can you tell me, how is

Page 5

1       Dorothy's -- pardon me, that's the Clerk's Office.

2       Oh, remain seated, I'm sorry.

3              Thank you, Mr. Haskins.

4       This is not it.  Adrianna, that's not it.  Jones.

5              MR. HASKINS:  Case Number 1714.

6              THE COURT:  I'll give you this one.

7              MR. HASKINS:  Does she need the case number?

8              THE COURT:  Thank you.  Okay.  So, you'll

9       answer the door next time?

10             UNIDENTIFIED SPEAKER:  Yes, ma'am.

11             THE COURT:  Okay.  Thank you so much.

12             All right.  So, if you could answer my

13      question.  How is she doing at her current

14      placement?

15             MS. MURRAY:  She is doing fine, but I did

16      receive a phone call from the facility.

17             THE COURT:  Oh no.

18             MS. MURRAY:  Yeah.  One of the workers,

19      Jordan, said that a friend of the family, Joseph

20      Dudley, came to the facility, asking questions

21      about the client.

22             Jordan said that Joseph Dudley called the

23      police at around 8:30 a.m.  Jordan showed the

24      police the court order and the police had the

25      friend removed from the premises.

1   Jordan also told me that there was a phone

2 call made from, I guess, a friend, you know, asking

3 questions about the client, and that was it that he

4 told me that happened.

5   THE COURT:  Now, is that placement still

6 willing to keep Ms. Jones, even though they were

7 talking about -- or I shouldn't say talking about.

8 They said, based upon your testimony last time,

9 that they wanted Ms. Jones removed from their

10 facility because of the behavior of Mr. Adderley

11 and others.

12   And then, I issued the no contact order for

13 Mr. Adderley and Mr. Dudley until further order of

14 the Court. Has that changed their mind to where

15 they are willing to keep her?

16   MS. MURRAY:  No.  They said, after all that

17 has happened, they just can't.

18   THE COURT:  So, what is the Department's

19 plan, at this point?

20   MS. MURRAY:  I'm going to have to look for

21 ALF placement, but they said, because the client is

22 pleasant, they can keep her until I do find a

23 placement.  They just said for the future, because

24 of everything, that they are sorry, they just have

25 to let her go because they are scared of anything

1      else that might happen.

2          THE COURT:  There was an issue that took

3      place the last hearing.  I just want to address it

4      very quickly. There was some testimony last time

5      about Mr. Butts and that Mr. Butts had a Social

6      Security check, and Ms. Anthony, Deborah Anthony,

7      who is present today, was the recipient of that

8      Social Security check.

9          And I found at the time, when we were in

10     hearing, that it wasn't a matter that the Court was

11     scheduled to address.  And also, the testimony was

12     that, if I'm not mistaken, that he chose to have

13     Ms. Deborah Anthony be his payee.

14         However, since that hearing, I reanalyzed and

15     I remember, also, that there was an open

16     investigation regarding Ms. Anthony, that doesn't

17     mean that the allegations are true, that there's an

18     open investigation regarding exploitation.

19         And so, I just wanted to inquire from Ms.

20     Brown, if you may, I mean if you can.  If it's

21     attorney/client and you can't say anything, then

22     don't.  But I would like to know if Ms. Anthony is

23     the payee of Mr. Butts's Social Security.

24         And before you answer that, let me just find

25     out something from Mr. Haskins.

1         Mr. Haskins, has Ms. Anthony's case regarding

2    exploitation and other issues been closed?

3         MR. HASKINS:  Yes, ma'am.

4         THE COURT:  Okay.  Are you at liberty to say

5    whether it was closed with some indicators, no

6    indicators?

7         MR. HASKINS:  If the Court is requesting that

8    I answer that.  I'll note for the record both Ms.

9    Kuhl and both Ms. Anthony, as she is the AP, and

10   Ms. Kuhl, as she represents the victim, are both

11   entitled to the information, so.

12        THE COURT:  Well, I can tell you that we have

13   people here that aren't entitled to that

14   information, so I'm not asking you at this time.

15        MR. HASKINS:  Okay.

16        THE COURT:  So, let me just ask you, Ms.

17   Brown, in light of the fact that there was or is an

18   open -- well, actually, was an open investigation,

19   at least I know it's closed, I do need to ask, as

20   an Officer of the Court, and I do believe that it

21   is part of the obligations that I have as a General

22   Magistrate, when I hear something like that, to ask

23   the following.

24        Is your client actually the payee of Mr.

25   Butts's Social Security, or is she not?

142

Page 9

1          MS. BROWN:  That is a gray area and there is

2     a catch to it, because I think what happened was,

3     my understanding is that, at some point, he

4     requested that she be the payee and her name was

5     added.  And then, when she got the check, she sent

6     the check back to them and said I don't want to be

7     the payee, and that was coming from Mr. Butts.

8          THE COURT:  Okay.  May I ask your client if

9     that's correct?

10         MS. BROWN:  Yes, of course.

11         MS. ANTHONY:  Yes, ma'am, that is correct.

12    And actually, when I took the check back to the

13    Social Security office, they gave me a receipt.

14         THE COURT:  Okay.  How many -- how many

15    checks did you receive for -- on behalf of Mr.

16    Butts?

17         MS. ANTHONY:  One.

18         THE COURT:  Okay.  May I see the receipt?

19         MS. BROWN:  Yes, let me show it to Opposing

20    Counsel before --

21         THE COURT:  Yes, absolutely, and if you could

22    show Mr. Haskins, as well?

23         MR. HASKINS:  I have seen it.

24         MS. BROWN:  Yeah.  I'm sorry, it's on the

25    last page.

Page 10

1              MS. KUHL:  Is it something different?

2              MS. BROWN:  Yes.

3              MS. ANTHONY:  Because they told me that,

4       until someone comes back, they are going to suspend

5       his checks because -- so they can be the payee,

6       because I told them there was just too much

7       confusion going on and I would just rather not be

8       involved.

9              THE COURT:  Okay.  For the record, I was just

10      handed a document that says, "Social Security

11      Administration, Social Security, 5195 Coconut Creek

12      Parkway, Margate, Florida 33063-9907," dated July

13      22nd, 2016.

14             This is a receipt for the check that you

15      returned.  Keep this receipt as proof that you

16      returned this check.  The receipt number is

17      16204722003, and says, "Person making the payment,

18      Deborah Anthony, you returned this check for John

19      E. Butts," B-U-T-T-S, same spelling, same name as

20      the person that was in court last time, Claim

21      Number -- some of it is X-ed out.

22             Pardon me just one moment.

23             Amount of check returned, $981.  Reason for

24      payment, to return a benefit check.  Type of

25      payment, check or money order.  Date of check/money

144

Page 11

1    order, July 1st, 2016.  Check/money order number

2    403343204445.  Thank you for returning the check.

3         Okay.  So, that clears up that issue.  Thank

4    you very much.  I would ask you to return that back

5    to Ms. Anthony.

6         MS. ANTHONY:  However, because I had asked

7    one of the -- another relative, a cousin, and she

8    gave me a statement at the time, if she would be

9    payee and care for him, because she lives like five

10   minutes from him, and she did give a statement

11   saying that she would, you know, be willing to be

12   his payee and be able to look after him.

13        THE COURT:  Okay.  And that's what you

14   forwarded to Social Security?

15        MS. BROWN:  We're in the --

16        MS. ANTHONY:  No, no, I'm just bringing to

17   the Court --

18        MS. BROWN:  We're in the process of doing

19   that.  I think that the issue is that he wanted her

20   to do it and that that's how her name got

21   associated with it, but she has declined.

22        THE COURT:  Right.  And I see that she has

23   declined and she returned the check.

24        MS. BROWN:  Right.

25        THE COURT:  And that's all I need to know.

145

1          MS. BROWN:  Okay.

2          THE COURT:  Okay?  I mean, as far as anything

3     else, I mean, let's put it this way.  Everybody is

4     a mandatory reporter in this room, generally

5     speaking, and if there is some sort of exploitation

6     or neglect that rises to the level of that you're

7     obligated to call the hotline, that's what needs to

8     be done.

9          So, if Mr. Butts cannot care for himself, and

10    I'm not asking because I really don't have the

11    jurisdiction to get into that, but I can only get

12    into what was raised before me, which you have

13    sufficiently, let me say for the record, cleared up

14    for me.

15         But if Mr. Butts cannot care for himself to

16    the point that he's at imminent risk, for example,

17    of substantial self-neglect, then people here are

18    required to call the hotline if they have

19    information to that effect. So, that way, if that

20    happens to be -- at the very least, the Department

21    can go out and do an investigation, but the

22    Department does not do an investigation unless the

23    hotline is called.

24         Is that correct?

25         MR. HASKINS:  That is correct, Your Honor.

Page 13

```
 1            THE COURT:  All right.  And that being said,
 2       so that issue, I find, is -- has been sufficiently
 3       resolved.
 4            So, Mr. Haskins, tell me, since last hearing,
 5       what is it that the Department wants me to address
 6       today, other than the breakdown of the placement?
 7            MR. HASKINS:  The Department filed a Motion
 8       for Modification of your initial order and
 9       placement, as we weren't given the authority to
10       place --
11            THE COURT:  Correct.
12            MR. HASKINS:  [unintelligible] monitor safe
13       and appropriate discharge.  We filed that.
14            THE COURT:  Can I see your motion, please?
15            MR. HASKINS:  Sure.
16            THE COURT:  And when did you file that?
17            MR. HASKINS:  I believe I filed it September
18       7th.
19            THE COURT:  Okay.  May I have this for the
20       file?
21            MR. HASKINS:  Sure.  This should be in there.
22        I know we --
23            THE COURT:  I don't see it.
24            MR. HASKINS:  I know we print out and file
25       copy of it, but I don't know why -- but at any
```

Page 14

1   rate, you know, if it's not sufficient, we'll make

2   the ore tenus motion now.

3        THE COURT:  No, no, it's sufficient.

4        MR. HASKINS:  Thank you.  She is safe and

5   stable, but given the situation with actors outside

6   of Ms. Jones, herself, she needs to be moved and

7   there is no one else to do it but the Department.

8   So, where we are -- well, I have made the

9   Department's position.

10        THE COURT:  Mm-hmm.

11        MR. HASKINS:  So, the Department is asking

12   for the authority to place Ms. Jones in a placement

13   commensurate with her level of care.  I believe Ms.

14   Murray has already made efforts to facilitate that,

15   given the fact that Lamercie is unwilling to keep

16   her long-term and there are no other options in the

17   eyes of the Department for where else she could be

18   placed.

19        THE COURT:  All right.  I'm going to give

20   this hearing about two more minutes, and then we're

21   concluding.

22        Mr. Haskins, let me say this to you.  You

23   have information, obviously, that people are

24   violating court orders?

25        MR. HASKINS:  Yes, ma'am.

Page 15

```
 1              THE COURT:  The Department can absolutely
 2       look into filing contempt proceedings, which can --
 3       can include jail time.
 4              MR. HASKINS:  Yes, ma'am.
 5              THE COURT:  For a period of up to six months,
 6       under some circumstances, and up to one year for
 7       others.
 8              MR. HASKINS:  Yes, ma'am.
 9              THE COURT:  And that's just in regard to the
10       contempt.
11              MR. HASKINS:  I understand.
12              THE COURT:  That's not in regard to any sort
13       of criminal penalties, other than -- or that may
14       generate from the same set of facts.
15              MR. HASKINS:  Yes, ma'am.
16              MS. KUHL:  Your Honor, if I may, briefly?
17              THE COURT:  Yes.
18              MS. KUHL:  I had initially requested that my
19       client be present today.  However, in speaking with
20       Ms. Murray, she informed me the reason why she
21       was --
22              THE COURT:  One moment.  Are you recording
23       this proceeding, Mr. Adderley?
24              MR. ADDERLEY:  No, ma'am.  Why would I do
25       that?
```

1          THE COURT:  Sir, you don't ask me the

2     questions.  I ask you the questions.  Are you

3     recording this proceeding on your laptop?

4          MR. ADDERLEY:  Negative.

5          THE COURT:  I'm asking you a question.

6          MR. ADDERLEY:  Negative.

7          THE COURT:  Negative, okay.  I want you to

8     put away your laptop.  It's not allowed in this

9     courtroom.

10          MR. ADDERLEY:  I'm putting away everything

11     because I already see where the case going.

12          THE COURT:  Pardon me?

13          MR. ADDERLEY:  I'm putting away everything.

14          THE COURT:  Because what?

15          MR. ADDERLEY:  I see where the case is going.

16          THE COURT:  Sir, let me tell you something.

17          MR. ADDERLEY:  Yes, ma'am.

18          THE COURT:  Don't you ever speak to this

19     Court with that disrespect, do you understand me?

20          MR. ADDERLEY:  Okay.

21          THE COURT:  Ms. Kuhl?

22          MS. KUHL:  Yes, Your Honor.  I just wanted

23     to, briefly, if we could have Ms. Murray just state

24     on the record her efforts to have my client present

25     today and why she was not brought, so that I can

1     waive her presence.  I just wanted her to state

2     what the efforts were.

3             THE COURT:  Please.

4             MS. MURRAY:  Oh, I called the facility and I

5     asked them, you know, I would be willing to drive

6     them there, as long as someone comes with me.  They

7     said if Mr. Adderley is going to be there, they are

8     not coming to the hearing and they cannot bring

9     her.

10            THE COURT:  And why is that?

11            MS. MURRAY:  They said they were afraid, they

12     don't know his intentions, and they don't want to

13     be around him.

14            MS. KUHL:  So, Your Honor, I did discuss this

15     with Mr. Haskins and with Ms. Murray the other day,

16     because they knew that I had requested my client's

17     presence, but based on the testimony, I don't feel

18     that, legally, I can require them to bring her

19     under those circumstances.  And therefore, I would

20     waive her presence for purposes of today.

21            THE COURT:  So waived.  So waived for good

22     cause. So, Mr. Haskins, I am going to grant the

23     Department's Motion for Authority to change the

24     placement to a facility, a facility that is

25     appropriate for the Respondent that is commensurate

Page 18

1       with her level of care.

2              MR. HASKINS:  Yes, ma'am.

3              MS. BROWN:  Your Honor, if I may interrupt, I

4       would just like to say --

5              THE COURT:  You may.  You're not

6       interrupting.

7              MS. BROWN:  I'm sorry.  I did file a motion

8       for a clergy member to visit Ms. Jones.  Ms.

9       Anthony contacted me and told me, yesterday, that

10      she said that she wanted her to visit her, and

11      then, also, this clergy member. It's a long-time

12      family friend.  It's Reverend Lester. And I have,

13      you know, just advised the Department as to, you

14      know, giving them the information.

15             I did file a motion.  Her number is on this.

16      I was -- we were hoping that if it was okay with

17      them, and they, after they spoke to her, that we

18      could have her reverend go see her.

19             THE COURT:  Okay.  Let me just ask.  Mr.

20      Haskins, no objection to the motion, correct?

21             MR. HASKINS:  I don't have a basis to object,

22      at this point, Your Honor.

23             THE COURT:  How about you, Ms. Kuhl?

24             MS. KUHL:  I take no position on the motion,

25      Your Honor, other than to say, obviously, no one

Page 19

1        should discuss the case --

2                THE COURT:  That's still -- that is still --

3                MS. KUHL:  -- with my client.

4                THE COURT:  You got that that lengthy --

5                MS. ANTHONY:  Yes, of course.

6                THE COURT:  Okay.

7                MS. KUHL:  But I don't take a position as to

8        the motion.

9                THE COURT:  Ms. Brown, did you get that

10       lengthy report that I wrote based upon that hearing

11       that we had on --

12               MS. BROWN:  I think got it yesterday, yes.

13               THE COURT:  You got it yesterday?

14               MS. BROWN:  Yes.

15               THE COURT:  Okay.  So, basically, the August

16       16th order was modified, clarified in part, to

17       reflect that no family member or friend, directly

18       or indirectly, shall communicate with the

19       Respondent about the above-captioned case.  The

20       mandate does not include restrictions on the

21       Department of Children and Families' communication

22       with the Respondent, nor does it restrict the

23       communication of any of the Department of Children

24       and Families service providers with the Respondent.

25               Regional Counsel's communication with the

153

Page 20

1    Respondent is also not restricted by said

2    provision, because I didn't want -- I mean,

3    obviously, I think that it's an unreasonable

4    interpretation to think that the order meant to

5    restrict the communication of the Department and

6    the lawyer. However, it was raised, and I did fix,

7    or I did clarify/modify that order, so that way

8    there is no confusion.

9         And even with that, there still, allegedly,

10   are violations of the court order, which I don't

11   understand or appreciate, if it's true.

12        So, I'm going to grant your motion.  Just

13   make sure that that clergy member knows.  Remember,

14   family member or friend.  So, if the Respondent

15   somehow brings up the case, the clergy person

16   should just redirect the Respondent, so that way --

17   so that way she is -- the clergy person is not in

18   violation of a court order.  More importantly, Ms.

19   Dorothy Jones is not going to get riled up and

20   Baker Acted again, or worse.

21        I mean, you know, to have -- to upset her

22   like that is not good for her, which is the whole

23   purpose of the restriction on the contact about the

24   communication.  So, thank you, yes, it's granted.

25        MS. BROWN:  Okay.

Page 21

1    THE COURT:  You're okay with that motion,

2    correct?

3    MS. MURRAY:  Yes.

4    THE COURT:  All right.  Anything else from

5    you, Mr. Haskins?  I know we said that we would

6    revisit the issue of the no contact order with Mr.

7    Dudley, and also Mr. Adderley, but based upon what

8    you're telling me, that the placement has broke

9    down -- and when I say you, ma'am, I apologize, the

10    Department representative, Ms. Murphy --

11    MS. MURRAY:  Murray.

12    THE COURT:  I'm sorry, Murray.

13    MS. MURRAY:  It's okay.

14    THE COURT:  Sorry, sorry.  I'm going to leave

15    those no contact orders in place until we review

16    this again at the next hearing.

17    MR. DUDLEY:  May I say something?

18    THE COURT:  Sir, no, you cannot.  You are not

19    a party to this case.  As a courtesy, I have let

20    you speak at other hearings, but based upon your

21    behavior last time --

22    MR. DUDLEY:  [Unintelligible.]

23    THE COURT:  -- and the fact that we have run

24    out of time -- I'm speaking -- you are not going to

25    be allowed to speak today.

155

Page 22

1           So, we are going to come back and we will

2       address -- we will readdress those no contact

3       orders at that time.

4               MR. BRANCH:  Ma'am, could I -- could I say

5       something?

6               THE COURT:  Yes, Mr. Branch.  Briefly.

7               MR. BRANCH:  Ma'am, I'm her brother.

8               THE COURT:  Yes.

9               MR. BRANCH:  Now, they got her in the

10      facility with no visitors.

11              THE COURT:  That's not true, she can have

12      visitors.

13              MR. BRANCH:  When she was in Saint John, no

14      visitors, because I went there three or four times.

15              THE COURT:  I wasn't the magistrate on the

16      case when she was at Saint John's.

17              MR. BRANCH:  Well, now, it just not right,

18      now, that's my niece and I love her --

19              THE COURT:  Yes.

20              MR. BRANCH: -- but I think she gone wrong --

21      wrong.

22              THE COURT:  She -- she is not even speaking,

23      sir.  She is not even speaking in this hearing,

24      other than to address the issue with Mr. Butts,

25      okay?

1          So, that being said, I appreciate what you're

2     saying.  She is allowed visitors per the court

3     order.  You will have to speak to Mr. Haskins as

4     far as what contact she can have, and no matter

5     what contact that she has, she cannot be -- you

6     cannot speak about the case with her.

7          MR. BRANCH:  Okay.

8          THE COURT:  Not you or not a friend on your

9     behalf, nobody can talk about this case with her.

10          As you can see, since people keep violating,

11     or allegedly violating, the court orders, that

12     placement is now wanting her to leave.  And I

13     shouldn't even say wanting her to leave; they have

14     put in their notice to the Department that she is

15     out of there, she is leaving.  And now, the

16     Department needs to find another placement.

17          And from what I understand, this is a lovely

18     placement, and they love Ms. Jones.  It's not Ms.

19     Jones that's the problem.  It's the family members

20     going there and causing problems and not following

21     court orders, allegedly.

22          Again, I'm not making any findings today

23     whether this court order was violated, but that

24     doesn't mean I won't make those findings at another

25     time.  If the Department begins, for example,

Page 24

1      contempt proceedings, and it is referred to me, as

2      it likely will be, I will make findings whether the

3      alleged perpetrators are in contempt of court, and

4      they will go to jail if the Judge signs off on what

5      I find and recommend.

6            And let me say, for the record, I have done

7      many contempt proceedings and there have been many

8      people who have gone to jail based upon what I have

9      found and recommended.  Is that not correct, Ms.

10     Kuhl and Mr. Haskins?  Not in an APS case, but in a

11     Marchman case.

12           MS. KUHL:  Yes, Your Honor.

13           THE COURT:  Thank you.  This is the first APS

14     that I have ever had anybody so defiant that

15     contempt was an issue.

16           Put your hand down.

17           MR. DUDLEY:  It's not right.

18           THE COURT:  Put your hand down.

19           MR. DUDLEY:  It's not right.  I didn't

20     violate no court order.

21           THE COURT:  I'm sorry, sir?

22           MR. DUDLEY:  I didn't --

23           THE COURT:  You're excused.  You're excused.

24     That's it.  No interruptions.  Excused.  Out.

25           MR. DUDLEY:  [Unintelligible] court order.  I

Page 25

```
 1        don't know what court order I violated.  I don't

 2        know what court order --

 3             THE COURT:  Mr. Dudley is not allowed back in

 4        these proceedings.  That's that.  I want that in

 5        the court order.  He is too disruptive to the

 6        proceedings, every time.  That's it.

 7             MR. HASKINS:  Did you want to pick a date,

 8        ma'am?

 9             THE COURT:  Yeah, I'm picking a date.  When

10        do you want to come back?

11             MR. HASKINS:  I would say 38, 45 days.

12             THE COURT:  How about three weeks?

13             MR. HASKINS:  How about three weeks?  Twenty-

14        one days.

15             THE COURT:  When did we decide that we were

16        coming back on that other case?

17             MR. HASKINS:  We decided we were coming back

18        on October 11th.

19             THE COURT:  All right.  Let's do that.

20        Should we do the same day?

21             MS. KUHL:  That's fine.

22             THE COURT:  Yeah?  How about 4:00.

23             MS. KUHL:  That's fine.

24             THE COURT:  4:00 o'clock, Tuesday, October

25        11th.  Is that all right with you?  Is that all
```

Page 26

```
1         right with you?
2              MR. ADDERLEY:  Am I allowed to speak?
3              THE COURT:  I want an answer to my question.
4         Yes, you can speak.  I asked you a question; you
5         can answer it.
6              MR. ADDERLEY:  All right.
7              THE COURT:  Is October 11th good, at 4:00
8         o'clock, for the next hearing?
9              MR. ADDERLEY:  Yes, that's no problem.
10             THE COURT:  Thank you, that's the answer,
11        that's it.
12             MR. ADDERLEY:  Okay.
13             MS. KUHL:  And Your Honor, just for
14        completeness of the court order, my client's
15        brother, Mr. Branch, is permitted contact with my
16        client, supervised by the staff facility?
17             THE COURT:  Let me just take a look.
18             MS. KUHL:  I don't believe we had ever
19        addressed his contact, prior.
20             THE COURT:  I think that we addressed, in
21        general, family members having contact.  Give me
22        just a moment.
23             MS. KUHL:  Correct.  I know that the no
24        contact was as to Mr. Adderley --
25             THE COURT:  Correct.
```

Page 27

1            MS. KUHL:  -- and Mr. Dudley.

2            THE COURT:  Correct.  That's not as to Mr.

3       Branch.

4            MS. KUHL:  Not as to Mr. Branch.  I just want

5       to --

6            THE COURT:  Not yet, anyway.

7            MS. KUHL:  Okay.  I just want to clarify he

8       may have contact with his sister.

9            THE COURT:  Give me just a moment.  Let me --

10           MS. KUHL:  Sure.  I think she had supervised.

11      And Your Honor, while you're looking, I believe

12      Ms. Anthony had supervised contact --

13           THE COURT:  Correct.

14           MS. KUHL:  -- as of the last order?

15           THE COURT:  That's what she wanted and I did

16      that.  No, actually, she wanted no contact because

17      she didn't want any problem, and I gave her

18      supervised just in case she changed her mind.

19           MS. KUHL:  So, it would still be supervised,

20      barring a change in the court order as to Ms.

21      Anthony.

22           THE COURT:  Correct.

23           MS. KUHL:  Right.

24           THE COURT:  Let me just look.

25           MS. KUHL:  We're just double-checking.  Yeah,

Page 28

```
 1        it was no contact as to Mr. Adderley and Mr.
 2        Dudley, supervised as --
 3              THE COURT:  All visitation shall be
 4        supervised by facility, and then, by all people,
 5        which includes all family and friends.
 6              MS. KUHL:  Okay.  So, then, we would just --
 7        Mr. Branch can have supervised contact.
 8              THE COURT:  Yeah, and that -- there's no need
 9        to enter another court order.  This court order --
10              MS. KUHL:  No, it's covered under that.
11              THE COURT:  Exactly.  And that's pursuant to
12        the August 26th, 2015 report and recommendation
13        which is now an order.
14              MS. KUHL:  And the only thing that was
15        modified was that it was -- it changed to two
16        individuals to no contact on the --
17              THE COURT:  Correct, and that was based on
18        last --
19              MS. KUHL:  Right.
20              THE COURT:  Yes, that was the issue --
21              MS. KUHL:  Okay.  Supervised contact.
22              THE COURT:  So, you can have contact.  You
23        have always been allowed to have contact with your
24        sister, supervised by the facility.  So, that's
25        still fine.
```

162

Page 29

```
 1            But remember, you can't speak about the case
 2       with her.  If, if, you start speaking about the
 3       case with her, they have a right to stop your
 4       visitation and escort you out of the facility.  And
 5       then, I'll hear the issue before me, and then I
 6       have the obligation to determine whether I'm going
 7       to continue to let you have supervised or whether
 8       I'm going to change your contact to no contact with
 9       Mr. Dudley and Mr. Adderley.
10            MR. BRANCH:  Okay.  Can I ask one question?
11            THE COURT:  Sure.
12            MR. BRANCH:  When is she going to be well
13       enough before she can go home?
14            THE COURT:  I don't know, sir.  I don't know,
15       but that's why I'm setting another hearing, so I
16       can review the placement, so I can see how she's
17       doing.  This case is not closing.
18            All right.  That's it.  Do we have anything
19       else from your, Mr. Haskins or Ms. Kuhl?
20            MS. KUHL:  No, Your Honor.
21            MR. HASKINS:  No, Your Honor.
22            THE COURT:  Ms. Romaine?
23            MR. HASKINS:  Oh, I have a question.
24            MS. BROWN:  Just --
25            MR. HASKINS:  Brown.
```

Page 30

1          THE COURT:  Brown, I'm sorry.

2          MS. BROWN:  Just that Ms. Anthony wanted to

3     bring her mom like maybe a robe and some --

4          THE COURT:  Sure.

5          MS. BROWN:  -- clothing, nail clippers and --

6          THE COURT:  Of course, just make sure you're

7     -- just make sure you contact a supervisor, that's

8     per the court order, just have a facility person

9     escort you there.

10         MS. ANTHONY:  There, yes, ma'am.  Yes, ma'am.

11         MR. HASKINS:  Thank you, I apologize, Your

12    Honor. Lamercie has an outstanding balance for Ms.

13    Jones.  It's $2,258.  We're asking that the report

14    [unintelligible] that the bank shall make a payment

15    out --

16         THE COURT:  Yes.

17         MR. HASKINS:  -- to Lamercie Home for that

18    amount --

19         THE COURT:  Yes.

20         MR. HASKINS:  -- so that get compensated.

21         THE COURT:  Yes, yes.  Yes, Mr. Adderley,

22    briefly.

23         MR. ADDERLEY:  Ma'am, I wanted to know why

24    did we set it up this way to where we couldn't have

25    everything on a fair, universal plane, opposed to

164

Page 31

1     being selective and biased?

2          THE COURT:  You'll have to talk to somebody

3     else to answer your question.  I'm not here to

4     answer those types of questions, sir.  This is a

5     fair and impartial hearing, sir, respectfully,

6     okay?  And I am not getting into whether you are in

7     contempt of court today, because that matter --

8          MR. ADDERLEY:  No, no, no --

9          THE COURT:  Listen to me.  That matter is not

10    set for today.

11         MR. ADDERLEY:  Correct.

12         THE COURT:  But if you wanted me to hear that

13    issue today, and I heard it, and I found you were

14    in contempt, and the Judge ratified my report and

15    made it a court order, then these deputies,

16    arguably, could take you into custody.

17         MR. ADDERLEY:  I understand.

18         THE COURT:  So, I think, as a courtesy, you

19    should be happy that I'm not addressing that issue

20    today.

21         MR. ADDERLEY:  But I --

22         THE COURT:  So, if you think that I'm being

23    unfair by not addressing --

24         (Thereupon, the proceedings were concluded at

25    4:55 p.m.)

Page 32

1                    TRANSCRIBER'S CERTIFICATE

2    STATE OF FLORIDA:

3    COUNTY OF BROWARD:

4

5         I, Sharon Hodge, Court Reporter, certify that I

6    was authorized to and did transcribe the foregoing

7    audio-recorded proceedings taken on September 13th,

8    2016, and the transcript is a true and accurate

9    transcription of said recording.

10         I further certify that I am not a relative,

11    employee, attorney, or counsel of any of the parties'

12    attorney or counsel connected with the action, nor am I

13    financially interested in the action.

14

15

16

17

18

19                              *Sharon Hodge*
                           _____
20                         Sharon Hodge, FPR

21

22

23

24

25

166

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments.
Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; June 2019; All rights reserved.

# UNITED STATES POSTAL SERVICE®

**PRIORITY MAIL**

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

EP14F Oct 2018
OD: 12 1/2 x 9 1/2



PRIORITY MAIL
FLAT RATE
POSTAGE REQUIRED

US POSTAGE
09/21/2020
From 33441

Zone 2

Pitney Bowes
ComPlePrice
Flat Rate Envelope

02EW0004897490

30006510377

# PRIORITY MAIL 1-DAY

Estimated Delivery Date: 09/22/2020

C019

0006

Michael Christopher Adderley
Michael Christopher Adderley
464 NW 2 Terrace
Deerfield Beach FL 33441-1936

**COURT CLERK**
**US DISTRICT COURT**
**299 E BROWARD BLVD**
**FORT LAUDERDALE FL 33301-1944**

USPS TRACKING #

9405 5098 9864 2473 5494 96



To schedule free
Package Pickup,
scan the QR code.

USPS.COM/PICKUP

